# 24-2950-cv

## United States Court of Appeals

*for the*

## Second Circuit

EUCLIDES BARTOLOME BUGLIOTTI, MARIA CRISTINA DE BIASI, ROXANA INES ROJAS, DENISE LAURET, MARIA CARLA GONANO,

*Plaintiffs-Appellants,*

– v. –

THE REPUBLIC OF ARGENTINA,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFFS-APPELLANTS

MICHAEL C. SPENCER
MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN, PLLC
*Attorneys for Plaintiffs-Appellants*
100 Garden City Plaza, Suite 500
Garden City, New York 11530
(212) 594-5300

CP COUNSEL PRESS    (800) 4-APPEAL • (336450)

# TABLE OF CONTENTS

Jurisdictional Statement ...................................................................1

Statement of the Issues Presented for Review ...........................................2

Statement of the Case......................................................................4

    A.   Summary..................................................................4

    B.   Facts ...................................................................6

        1.   Plaintiffs purchased Argentina sovereign "global" bonds in mid-2001 and then deposited them in trust with Caja de Valores for participation in the government's Tax Credit Program. The bonds went into default starting at the end of 2001. Under the Tax Credit Program, Plaintiffs received "CC" custody certificates showing the face amounts of bonds on deposit; and "CCF" tax credit certificates for each interest amount accruing semi-annually on the bonds, until the two issuances of Plaintiffs' bonds matured in 2012 and 2017. ...................................................................6

        2.   Upon the bond maturities, all CCFs had been used up, and Plaintiffs sought to extricate their bonds from the program trusts. The government blocked withdrawal of Plaintiffs' bonds from trust and refused to repay principal. ...............................10

        3.   Plaintiffs asked Caja in 2017 to sue Argentina to recover principal on the bonds. Caja noted the Trust Agreement provision stating it was not obligated to bring such a suit. Caja and Plaintiffs executed a "Certification" stating that Caja understood (or looked to) Plaintiffs to bring the bond enforcement lawsuit. ........................................11

4.  Plaintiffs filed their first action in 2017 to recover principal plus interest accruing after bond maturity (*i.e.,* not covered by the CCFs). The district court dismissed on the ground that Plaintiffs had given up "ownership" of the bonds by placing them in trust for the Tax Credit Program. On appeal, this Court vacated and remanded, holding that dismissal would be appropriate "only if Plaintiffs are not among those entitled to seek a judgment" under Argentine trust law....................13

5.  On remand, the parties' Argentine law experts disputed whether a trustee could delegate the right to sue to trust settlor-beneficiaries. In March 2021, the district court again dismissed the action, holding that Argentine law provides a trustee with the exclusive right to sue; that Caja had not in fact delegated such a right to Plaintiffs; and that Plaintiffs would have had to "reassemble" their bonds by returning the CCs and CCFs "or their economic value" to the government before bringing suit. .........................................................15

6.  On appeal, in May 2023, this Court affirmed the district court's dismissal of the prior action on the ground that "there is no evidence that Caja ever made ... a delegation" to Plaintiffs under Argentine law to bring suit to recover on the bonds. This Court held that Plaintiffs' remedy under Law 24,441 was to obtain judicial authorization to sue, instead of Caja. This Court's decision explicitly assumed *arguendo* that Plaintiffs were not required to reassemble the bonds in order to sue. ......................................................................16

7.  Plaintiffs, with the participation of Caja, then applied to a competent court in Buenos Aires and obtained judicial authorization orders in June and July 2023 for Plaintiffs to bring a follow-on action in New York to enforce the bonds. Plaintiffs filed the present action, 23 Civ. 6588, on July 28, 2023, and it was again assigned to Judge Preska.............................17

8. Argentina moved to dismiss Plaintiffs' follow-on action. In September 2024, the district court granted the motion. (a) On limitations, it held that the six-month extension provided by New York's "savings" statute was unavailable to Plaintiffs because they had failed to obtain personal jurisdiction over Argentina in the prior action; and that the New York COVID-era Executive Orders were not full tolling provisions. (b) On collateral estoppel, the district court held *sua sponte* that Plaintiffs were precluded from relitigating issues of jurisdiction, apparently referring to bond "reassembly." ............................................................19

Summary of Argument............................................................21

Argument .............................................................................26

    A. Standard of Review .............................................................26

    B. Plaintiffs' claims in the present action on their 2012 and 2017 bonds are timely. The district court erred in finding that the six-month limitation extension provided by NY CPLR § 205(a) was unavailable to Plaintiffs: the prior action was not terminated due to a failure by Plaintiffs to obtain personal jurisdiction over Argentina on the bonds............................................................27

        1. For claims on the bonds, there is no factual dispute about Argentina's waiver of sovereign immunity and submission to New York jurisdiction in the bonds' Fiscal Agency Agreement, or about Plaintiffs' service of process on Argentina in accordance with the FAA in both the prior action and the present action ............................................................27

        2. CPLR § 205(a) extends the limitation period here. The dismissal of Plaintiffs' prior action due to a curable standing defect was not within § 205(a)'s exception for "failure to obtain personal jurisdiction over the defendant," as a matter of New York limitations law........................................30

            a. Procedural background on "personal jurisdiction" in Plaintiffs' 2017 action ............................................................32

b.  Background of § 205(a) ............................................................32

c.  New York caselaw is clear that a plaintiff's curable lack of standing does not constitute a failure to obtain personal jurisdiction over the defendant under § 205(a) ...........34

d.  Argentina's sovereign status does not affect the conclusion that Plaintiffs may invoke § 205(a) to extend the limitation period applicable to their claims.............38

e.  Under New York law, § 205(a) is to be liberally construed in favor of extending limitation periods, based on a judicial preference for deciding cases on their merits................................................................................42

C.  Plaintiffs' claims in the present action on their 2017 bonds are also timely because the claims were filed within six years post-maturity plus 228 days (the COVID-related extension promulgated by Executive Orders in 2020) ..............................................43

D.  The district court erred in applying collateral estoppel, based on part of its 2021 dismissal decision, to find that "reassembly" of the bonds is a condition for Plaintiffs' bond enforcement claims............46

1.  Collateral estoppel cannot be based on a prior lower court decision that is appealed and the issue for which estoppel is claimed is not reached or ruled on by the appellate court ..........47

2.  The district court's 2021 dismissal decision itself held that judicial authorization is an "alternative remedy" to "reassembly." Because Plaintiffs have obtained judicial authorization, the prior decision on "reassembly" could not give rise to an estoppel in the present action...................................48

3.  If this Court reaches this substantive issue on this appeal: Argentina's defense that Tax Credit Program participants must "reassemble" their bonds as a condition to filing an enforcement action in New York is untenable as a matter of fact and law ..............................................................................48

iv

E.   The district court erred in applying collateral estoppel based on the prior action to preclude Plaintiffs from opposing Argentina's argument of lack of personal jurisdiction in the present action ...............53

Conclusion ................................................................................................56

Certificate of Compliance ........................................................................57

Certificate of Service ...............................................................................57

# TABLE OF AUTHORITIES

## U.S. Authorities

<u>Cases</u>

*Brash v. Richards,*
  195 A.D.3d 582, 149 N.Y.S.3d 560 (2d Dep't 2021) ...................................44

*Brown v. Lutheran Medical Ctr.,*
  939 N.Y.S.2d 817 (Sup. Ct. Kings Co. 2012),
  *aff'd,* 107 A.D.3d 837, 968 N.Y.S.2d 526 (2d Dep't 2013).................... 35-37

*Bugliotti v. Republic of Argentina,*
  17 Civ. 9934 (LAP), 2019 U.S. Dist. LEXIS 7942 (S.D.N.Y.
  Jan. 15, 2019), *vacated,* 952 F.3d 410 (2d Cir. 2020),
  *dismissed,* slip op. (S.D.N.Y. Mar. 31, 2021),
  *aff'd,* 67 F.4th 102 (2d Cir. 2023)..........................................................*passim*

*Cannellas v. Lentz,*
  396 F. Supp. 2d 435 (S.D.N.Y. 2005) ..........................................................36

*Deutsche Bank Nat'l Trust Co. v. Quicken Loans Inc.,*
  810 F.3d 861 (2d Cir. 2015) .........................................................................26

*Diffley v, Allied-Signal, Inc.,*
  921 F.2d 421 (2d Cir. 1990) ..................................................................36, 42

*Dyer v. Cahan,*
  150 A.D.2d 172, 150 N.Y.S.2d 785 (1st Dep't 1989)...................................43

*Garcia v. City of New York,*
  No. 15 Civ. 470 (ER), 2017 WL 1169640
  (S.D.N.Y. Mar. 29, 2017)........................................................................ 41-42

*Gelb v. Royal Globe Insurance Co.,*
  798 F.2d 38 (2d Cir. 1986) ...........................................................................47

*George v. Mt. Sinai Hospital*,
  47 N.Y.2d 170, 390 N.E.2d 1156, 417 N.Y.S.2d 231 (1979) ...........................30, 33

*Hakala v. Deutsche Bank AG,*
    343 F.3d 111 (2d Cir. 2003) ....................................................14, 17, 30, 39, 42

*Hambric v. McHugh,*
289 A.D.2d 290, 734 N.Y.S.2d 596 (2d Dep't 2001)................................................34

*Harden v. Weinraub,*
    221 A.D.3d 1460 (4th Dep't 2023) ................................................................44

*JDM Import Co. v. Shree Ramkrishna Exports Pvt. Ltd.,*
    No. 22 Civ. 4042 (VEC) (S.D.N.Y. Mar. 24, 2023) .....................................35

*Loeb v. County of Suffolk,*
    No. 22 Civ. 6410 (HG), 2023 WL 4163117
    (E.D.N.Y. Jun. 23, 2023) ...........................................................................45-46

*Matter of Goldstein v. New York State Urban Dev. Corp.,*
    13 N.Y.3d 511, 893 N.E.2d 635, 893 N.Y.S.2d 753 (2008) ........................33

*Murphy v. Harris,*
    210 A.D.3d 410, 177 N.Y.S.3d 559 (1st Dep't 2022)...................................44

*Parker v. Mack,*
    61 N.Y.2d 114, 460 N.E.2d 1316, 472 N.Y.S.2d 882 (1984) ......................34

*Reliance Ins. Co. v. PolyVision Corp.,*
    9 N.Y.3d 52, 876 N.E.2d 898, 845 N.Y.S.2d 212 (2006) ............................33

*Matter of Roach v. Cornell Univ.,*
    207 A.D.3d 931, 172 N.Y.S.3d 215 (3d Dep't 2022) ...................................44

*Romandette v. Weetabix Co.,*
    807 F.2d 309 (2d Cir. 1986) ........................................................................42

*Tenenbaum v. Setton,*
    49 Misc. 3d 39 (App. Term 2d Dep't 2015)..................................................34

*Tydings v. Greenfield, Stein & Senior, LLP,*
    11 N.Y.3d 195, 897 N.E.2d 1004, 868 N.Y.S.2d 563 (2008) ................23, 47

*Verne v. N.Y.C. Dep't of Education,*
 No. 21 Civ. 5427 (JPC), 2022 WL 4626533
 (S.D.N.Y. Sep. 30, 2022)................................................................45

*In re Vitamin C Antitrust Litig.,*
 837 F.3d 175 (2d Cir. 2016) .........................................................27

*Yonkers Contracting Co. v. Port Auth. Trans-Hudson Corp.,*
 93 N.Y.2d 375, 712 N.E.2d 678, 690 N.Y.S.2d 512 (1999) .................. 38-40

Statutes, Rules, Treatises

28 U.S.C. § 1291 ...........................................................................2

28 U.S.C. § 1330(a) ...............................................................1, 14, 39

28 U.S.C. § 1603(a) ................................................................1, 4, 14

28 U.S.C. § 1605 ...................................................................14, 39

28 U.S.C. § 1608 ...................................................................14, 39

28 U.S.C. § 2107 ...........................................................................2

Federal Rule of Civil Procedure 12(b)...........................................*passim*

N.Y. Civil Practice Law and Rules § 205(a) ..................................*passim*

N.Y. Executive Law § 29-A ...........................................................43

9 NYCRR 8.202.8 (March 20, 2020)................................................43

9 NYCRR 8.202.72 (November 3, 2020) .........................................43

*Restatement (Second) of Judgments § 27*
 *& comment o (Am. Law Inst. 1982)* ......................................23, 47

**Argentina Authorities**

Decree 1005/2001 .............................................................*passim*

Resolution 415/2001 ..........................................................*passim*

Law 27,249...........................................................................11

Law 24,441.....................................................................16, 17

*Buigliotti v. Republic of Argentina,*
   134/2012 (Arg. Sup. Ct. Jul. 14, 2015) .........................51

*Domec Compania de Artegactos Domesticos S.A.I.C. y F.*
   *v. Republic of Argentina*, 265/2011, 47-D
   (Arg. Sup. Ct. Nov. 27, 2014) ........................................51

# JURISDICTIONAL STATEMENT

In their complaint, Plaintiffs-Appellants invoke 28 U.S.C. § 1330(a), which provides that the district courts shall have original jurisdiction over *in personam* claims against a foreign state, as defined by 28 U.S.C. § 1603(a), when the foreign state is not entitled to immunity. Complaint ¶¶ 3, 4, Joint Appendix ("A")-19. Plaintiffs sued in July 2023 to recover principal and unpaid post-maturity interest on bonds issued by Argentina pursuant to a fiscal agency agreement providing for New York jurisdiction and waiver of sovereign immunity.

Plaintiffs had placed their bonds in trust in Argentina in 2001, in the year prior to default, to qualify them for participation in an Argentine government "Tax Credit Program."

The present action is a follow-on to a prior civil action started by Plaintiffs in 2017 seeking the same relief as the present action. The prior action was before this Court twice, resulting in decisions in March 2020 (A-273, 952 F.3d 410, holding that the in-trust status of the bonds did not mean Plaintiffs had given up "ownership" of the bonds; vacating the district court's dismissal on that ground) and May 2023 (A-385, 67 F.4th 102, holding that Plaintiffs were required under Argentine law to obtain judicial authorization to sue as settlor-beneficiaries, in place of the trustee). Plaintiffs then promptly obtained that authorization from a competent Argentine court and filed the present action in July 2023 to continue their bond recovery efforts.

1

Argentina moved to dismiss in October 2023, contending that Plaintiffs' claims had become time-barred under New York's six-year statute of limitations for contract claims (the bonds had matured in 2012 and 2017) and that Plaintiffs could not sue without satisfying two ostensible conditions arising under Argentine law.

The district court (Preska, J.) granted Argentina's dismissal motion on limitation and one of the other grounds ("reassembly") on September 30, 2024, SPA-1. A final judgment dismissing the action was entered on the same day, SPA-21. Plaintiffs' notice of appeal was filed on October 29, 2024, A-778, so this Court has jurisdiction under 28 U.S.C. §§ 1291 & 2107 and Federal Rule of Appellate Procedure 4. This appeal is from a final order and judgment that disposed of all parties' claims.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

In light of Plaintiffs' prior action to enforce their bonds, as described in the Jurisdictional Statement above:

<u>Limitations</u>

1.     Did this Court's holding on the second appeal in Plaintiffs' prior action that Plaintiffs were required to obtain judicial authorization in Argentina in order to sue in place of the trustee constitute a dismissal for "failure to obtain personal jurisdiction over the defendant," rendering unavailable to Plaintiffs the limitation "savings" provision of NY CPLR § 205(a) (extending for six months the limitation

period applicable to Plaintiffs' present action, which Plaintiffs filed after obtaining such judicial authorization)? (No.)

2.     Does application of the New York governor's COVID-era Executive Orders tolling the running of statutes of limitation in New York for 228 days in 2020 require plaintiffs to show "how the COVID-19 pandemic affected their ability to file [their] claims" as a matter of equitable tolling? (No.)

Collateral estoppel and "reassembly" of the bonds

3.     Can collateral estoppel be based on one of several alternative holdings of the district court (requiring bond "reassembly") in dismissing the prior action, when Plaintiffs appealed the dismissal on all such grounds and this Court decided the appeal without reaching the issue now assertedly estopped? (No.)

4.     Can Plaintiffs be collaterally estopped based on the district court's prior decision requiring bond "reassembly," when that decision held that obtaining authorization from an Argentine court was "an alternative remedy" to the bond reassembly requirement, and Plaintiffs did obtain such authorization? (No.)

5.     If the Court reaches this issue: Is "reassembly" of Plaintiffs' bonds, by which Argentina means that bondholders must refund all amounts of tax credits they received through the program over 10-15 years, a condition for Plaintiffs' filing and pursuing the present action to recover principal and post-maturity interest on their bonds? (No.)

<u>Collateral estoppel regarding personal jurisdiction over Argentina in the present action</u>

6.    Can a standing defect in the prior action give rise to collateral estoppel in the present action with respect to personal jurisdiction, even though the defect was cured when Plaintiffs obtained judicial authorization before the present action was filed? (No.)

<strong>STATEMENT OF THE CASE</strong>

**A.    Summary**

This is a breach of contract action by holders of sovereign "global" bonds of the type issued by Argentina in the period 1993-2001, on which Argentina defaulted starting at the end of 2001. Plaintiffs' bonds have total face amounts of some $35 million. This is one of the very few remaining of the hundreds of such cases that have been heard in the Southern District. Jurisdiction for the action is based on the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1603 *et seq.* (FSIA), and on Argentina's agreements in its bond documents to waive sovereign immunity and submit to New York jurisdiction, law, and service-of-process rules.

Plaintiffs first filed suit in December 2017 (17 Civ. 9934). In that prior action, Argentina sought dismissal under Rule 12(b) by contending that Plaintiffs had relinquished "ownership" of their bonds by placing them in trust in order to participate in an Argentine government Tax Credit Program. The district court dismissed on that ground. In March 2020, this Court vacated the dismissal and

4

remanded for determination under Argentine law of whether Plaintiffs had standing to sue to enforce the bonds, in place of the trustee. 2020 Appeal Op., A-273.

After another Rule 12(b) motion by Argentina, the district court again dismissed, in March 2021, holding that authorization from an Argentine court was required for a settlor-beneficiary to have standing to sue in place of the trustee; and alternatively accepting Argentina's argument that Plaintiffs' bonds had been "disassembled" upon entry into the Tax Credit Program and had to be "reassembled" before suit could be brought unless judicial authorization had been obtained.[1] On appeal, in May 2023, this Court affirmed dismissal on the ground that judicial authorization was required under Argentine law. This Court explicitly did not reach other appealed issues, including bond "reassembly." 2024 Appeal Op., A-385.

Plaintiffs, with the participation of the trustee, promptly obtained judicial authorization from a competent Argentine court and filed the present action in July 2023 (23 Civ. 6588). Argentina moved to dismiss, asserting that Plaintiffs' claims were now barred by limitations (six years after bond maturity); and again that Plaintiffs were required to "reassemble" their bonds before suing. On September 30,

---

[1] Argentina had also argued that Plaintiffs were required to obtain the judicial authorization through an arbitration proceeding in Argentina, rather than from a court. The district court did not mention arbitration in its decision. That omission was warranted, because Caja had appeared and told the court in Buenos Aires it did not oppose Plaintiffs' request for judicial authorization, *see* Complaint, Ex. A, A-37, so there was no dispute for the parties to the Trust Agreement to arbitrate. Plaintiffs accordingly do not further address arbitration in this brief.

2024, the district court (Preska, J., who has heard these cases from inception) dismissed on limitation grounds and on the ground that collateral estoppel precluded Plaintiffs from asserting they were not required to "reassemble" their bonds and from contesting Argentina's defense of lack of personal jurisdiction. 2024 Dismissal Op., SPA-1. Plaintiffs then filed the present appeal.

The district court's Rule 12(b) dismissal is subject to *de novo* review for errors of law, including any foreign law that may be applicable. To the extent any relevant factual matters are in dispute, the well-pled allegations of the complaint control. *Bugliotti v. Republic of Argentina,* 67 F.4th 102, 104-05 (2d Cir. 2023).

**B.    Facts**

> **1.    Plaintiffs purchased Argentina sovereign "global" bonds in mid-2001 and then deposited them in trust with Caja de Valores for participation in the government's Tax Credit Program. The bonds went into default starting at the end of 2001. Under the Tax Credit Program, Plaintiffs received "CC" custody certificates showing the face amounts of bonds on deposit; and "CCF" tax credit certificates for each interest amount accruing semi-annually on the bonds, until the two issuances of Plaintiffs' bonds matured in 2012 and 2017.**

Plaintiff Bugliotti is a businessman in Cordoba, Argentina. Plaintiff de Biasi is his wife. Hugo Lauret was his long-time business partner.

Bugliotti and Lauret sold a large company and decided in early 2001 to invest part of the proceeds in Argentine government bonds. Declaration of Horacio T. Liendo (Plaintiffs' Argentine counsel) ¶ 4, A-199. They purchased so-called

"global" FAA bonds[2] maturing in 2017, which had been in the market since they were issued in 1997; and also FAA bonds maturing in 2012, which had been brought to market by the Argentine government in February 2001. Bugliotti and his wife bought over $27 million (face amount) of 2012 bonds and over $5 million of 2017 bonds; Lauret bought over $3 million of 2012 bonds and a small amount of 2017 bonds. Complaint ¶¶ 6-7, A-19-20; Liendo Dec. ¶ 4, A-199.

At about the same time in mid-2001, Argentina introduced its Tax Credit Program in an effort to provide a special incentive for its citizens to buy government bonds, since the country was under heavy pressure in international financial markets (though no bond defaults had yet occurred). Liendo Dec. ¶ 6, A-199. The program was established in August 2001 by actions of the executive branch: Presidential Decree 1005/2001 (SPA-43) and Resolution 415/2001 (SPA-54).[3] Plaintiffs put their 2012 and 2017 bonds into the program in November 2001. Complaint ¶ 12, A-21.

The government retained Caja de Valores S.A. ("Caja"), a prominent depository and clearing institution in Argentina that has often worked with the

---

[2] These bonds were issued pursuant to Argentina's 1994 Fiscal Agency Agreement ("1994 FAA"), which is similar in function to an indenture. 1994 FAA, A-62 (excerpts). The bonds are negotiable "unconditional" obligations of Argentina. 1994 FAA § 1(c), A-66. Bonds are usually referred to by their maturity year, *e.g.,* "2012 bonds."

[3] An enactment by the Argentine Congress (national legislature) and signed by the President is titled a Law; an executive action by the President or Executive Branch is titled a Decree; an action by a Ministry or similar regulatory act is titled a Resolution.

government, to administer the program. Bondholders subscribing to the program entered into Trust Agreements with Caja (Bugliotti's Trust Agreement ("Trust Agmt.") is at A-99; Lauret's Trust Agreement has materially identical terms). All program participants' bonds, including Plaintiffs', were "deposited" at Caja, in the sense that the bond clearing system electronic records evidencing bondholders' interests in the bonds were adjusted, to show that the bonds were held in Caja Trust Account No. 2 by Caja as trustee and under the participants' names. Liendo Dec. ¶ 6, A-199-200.

At the same time, participants received into their personal Caja accounts two types of certificates: Tax Credit Certificates (CCFs,[4] an abbreviation from the Spanish) reflecting the amounts of coupon interest that would accrue twice yearly on the bonds until their maturities, which participants could use to pay corresponding amounts of their national taxes; and Custody Certificates (CCs[5]), which were actually just printed-out Caja ledger entries showing the face amounts of the program bonds held under the participants' names in trust at Caja. Complaint ¶ 12, A-21; Liendo Dec. ¶¶ 6, 7(d), A-199, 201.

---

[4] There do not appear to be any CCFs, themselves, in the record. Plaintiffs submitted all their CCFs to obtain tax credits over the years the program was in operation.

[5] Plaintiffs provided copies of their CCs as Liendo Dec. Ex. B, A-207-209, which Argentina has not disputed.

The bond defaults started at the very end of 2001, after the then-current President of Argentina resigned and a new administration took over. Complaint ¶ 13, A-22.

The Tax Credit Program provided that, if the government missed making the periodic payments of interest on bonds in the program (*i.e.,* after default), program participants could use their CCFs, notionally equivalent in value to each missed coupon interest payment,[6] to pay their national tax obligations. Decree 1005/2001 Art. 4, SPA-45; Trust Agmt. Art. 3.2, A-101-102.

For Plaintiffs, after the default, the program worked as planned with respect to accruing bond interest: as the twice-yearly bond interest payments were defaulted, the Plaintiffs were able use their CCFs to pay their national tax obligations. This continued throughout the remaining terms of the defaulted bonds, until their respective maturities in 2012 and 2017. Complaint ¶ 15, A-22.

---

[6] The bonds paid interest in U.S. dollars, but the corresponding CCF tax credits were denominated in Argentine pesos, calculated with an exchange rate very favorable to the government. *See* Liendo Dec. ¶ 9, A-202 (CCFs reflected a "sharp discount due to the compulsory *pesification* implemented by the government through Decree 471/2002 on foreign currency obligations").

**2. Upon the bond maturities, all CCFs had been used up, and Plaintiffs sought to extricate their bonds from the program trusts. The government blocked withdrawal of Plaintiffs' bonds from trust and refused to repay principal.**

The 2012 bonds matured in February 2012. As in all years post-default, the Argentine government had enacted "lock laws" and payment "moratorium" laws prohibiting enforcement or payment of government obligations arising under pre-default instruments – including the obligation to pay back the principal on the 2012 bonds. *See* Liendo Dec. ¶ 11 & n.2, A-203. At that point, Plaintiffs' 2012 bonds were still held in trust at Caja; Plaintiffs still held the corresponding CCs; the CCF interest credits had been used up and the trust was supposed to terminate (see next paragraph). Liendo Dec. ¶ 9, A-202. The program continued for the 2017-maturing bonds.

In 2014 and 2015, Plaintiffs told Caja that they wished to exercise their "one-time-only" right, expressed in Decree 1005/2001 Art. 5, SPA-45, and Trust Agmt. Art. 11(b), A-104, to withdraw their bonds from trust (which would also entail handing in their CCs, and their remaining CCFs on their 2017 bonds). Liendo Dec. ¶ 15, A-204-205. Plaintiffs also requested Caja to determine that the trusts had terminated for their matured 2012 bonds "due to the termination of the credit balances of CCFs or CCs in the respective sub-account" – in this case, depletion of the CCFs – as provided by Trust Agmt. Art. 11(c), A-104. Liendo Dec. ¶ 15, A-204-205. On October 5, 2015, the government sent a written objection to Caja blocking

10

the requested termination and release of the 2012 bonds from trust ("it is not appropriate to grant what petitioners [Bugliotti] have proposed"). Complaint ¶ 15, A-22; Liendo Dec. ¶ 15, A-205; Letter from Ministry of Economy, Oct. 5, 2015, A-341-343.

In 2015, a new national administration headed by Mauricio Macri was elected. President Macri took office in late 2015. Although the moratorium and lock laws remained in force and Argentina was still not paying money judgments, the Macri administration passed special laws and opened its *Propuesta* settlement offers in February 2016, available to all holders of global bonds, including 2012 and 2017 bonds. Law 27,249, SPA-70. Most global bonds, including Plaintiffs', were eligible for "Standard" settlements in the amount of face value plus 50% (*i.e.,* "150% settlements"). These was no provision in the *Propuesta* offer for CCs and CCFs. *Id.*

Plaintiffs' 2017 bonds matured in January 2017. The government treated the 2017 bonds as it had the 2012 bonds upon maturity, refusing to honor the bond obligation for repayment of principal. Complaint ¶¶ 15, A-22.

**3. Plaintiffs asked Caja in 2017 to sue Argentina to recover principal on the bonds. Caja noted the Trust Agreement provision stating it was not obligated to bring such a suit. Caja and Plaintiffs executed a "Certification" stating that Caja understood (or looked to) Plaintiffs to bring the bond enforcement lawsuit.**

In view of the upcoming expiration of the New York six-year limitation period to recover principal on the 2012 bonds, Plaintiffs concluded that a lawsuit was their

11

only remaining option. In October 2017, Plaintiffs asked Caja as trustee to bring such a suit in New York.

However, one of the clauses in the Trust Agreements provided that "in no case shall the Trustee be in charge of pursuing the rights that are granted by the CCFs or CCs, or the Trust Assets [the bonds], and the Trustee is not obliged to initiate any court proceedings of any kind in this regard." Trust Agmt. Art. 6, A-103.[7]

Discussions ensued, and Caja and Plaintiffs reached written agreements, titled "Certifications," noting that the Trustee was not responsible for pursuing such a legal action and stating: "and the Trustee accordingly looks to Bugliotti to take such action" or "understands that such actions are the plaintiffs' responsibility" (depending on the translation). Complaint ¶ 16, A-23; *see* 2023 Appeal Op. at 3-4, A-388-389.

---

[7] Caja had inserted that clause because it viewed its role as limited to keeping accounts and arranging transfers and it did not want to have to sue the government; Caja was the leading central depository in Argentina, which made the government its client and regulator. Declaration of Alejandro Santiago Berney, executive director of Caja, ¶¶ 2-3, 10-11, A-226-29.

**4. Plaintiffs filed their first action in 2017 to recover principal plus interest accruing after bond maturity (*i.e.,* not covered by the CCFs). The district court dismissed on the ground that Plaintiffs had given up "ownership" of the bonds by placing them in trust for the Tax Credit Program. On appeal, this Court vacated and remanded, holding that dismissal would be appropriate "only if Plaintiffs are not among those entitled to seek a judgment" under Argentine trust law.**

Plaintiffs filed their (prior) action in the Southern District on December 20, 2017. (Lauret had died, so his executor was the Plaintiff on his bonds.) The complaint alleged that Caja as trustee had certified that it "looks to Plaintiffs" to enforce their beneficial ownership rights in their bonds. The complaint demanded a money judgment for repayment of principal and for payment of interest accruing since the bonds' maturities. Complaint ¶ 17 & Wherefore clause (a), A-23, 26.

Argentina moved to dismiss under Federal Rule of Civil Procedure 12(b)(1), (2), (5) and (6) in March 2018. Argentina's main argument was that Plaintiffs "no longer own beneficial interests in the bonds on which they purportedly bring suit" because Plaintiffs assertedly relinquished ownership by placing the bonds in trust and "exchanging" them for CCs and CCFs when enrolling in the Tax Credit Program. Argentina briefed its motion on the premise that Plaintiffs were just "acting as if they are in fact suing on the 1994 FAA bonds," *see* A-183, when they were really suing on the CCs and CCFs, which do not have provisions for jurisdiction, waiver of sovereign immunity, or service of process as required by the FSIA for suits

in the U.S. against foreign states. *Id.; see* 28 U.S.C. §§ 1330(a)&(b), 1605, 1608, SPA-30, 33, 40.

Plaintiffs opposed by reiterating that their complaint sought recovery on the bonds, not on the CCs or CCFs, and by arguing that many provisions in the Tax Credit Program rules and the Trust Agreements themselves showed that Plaintiffs retained significant interests in the bonds, as reflected by the facts that the bonds had remained in trust at Caja throughout the entire period; that the bonds not been "exchanged" (in the sense of relinquished) for CCs and CCFs; and that the legislation for the program assured that bond principal would be repaid "in the usual manner." *See, e.g.,* Liendo Dec. ¶ 7 (a)-(g), A-200-202; Decree 1005/2001, SPA-44 (ninth paragraph on this page).

The district court dismissed the action in January 2019, holding that Plaintiffs did not own the bonds and lacked any jurisdictional basis for suing Argentina under the FSIA. 2019 Dismissal Op. at 6-8, A-261, 266-269, 17 Civ. 9934, 2019 WL 586091.

On appeal, this Court vacated and remanded. 2020 Appeal Op., A-273 (Mar. 17, 2020, per curiam, Katzman, C.J., Hall and Lynch, JJ., reported at 952 F.3d 410). This Court held that the district court's focus on bond "ownership" was "misplaced" and that "dismissal was appropriate *only* if Plaintiffs are not among those entitled to

seek a judgment of unpaid principal and post-maturity interest" based upon analysis of Argentine trust law. *Id.* at 3 (emphasis added), A-275.

> **5.** **On remand, the parties' Argentine law experts disputed whether a trustee could delegate the right to sue to trust settlor-beneficiaries. In March 2021, the district court again dismissed the action, holding that Argentine law provides a trustee with the exclusive right to sue; that Caja had not in fact delegated such a right to Plaintiffs; and that Plaintiffs would have had to "reassemble" their bonds by returning the CCs and CCFs "or their economic value" to the government before bringing suit.**

On remand, Argentina's expert declared that under Argentine law a trustee has the "exclusive" right to sue to enforce rights under trust property and that Plaintiffs could sue only if they "reassembled" the bonds. Bottini Dec. ¶¶ 16, 24, A-77, 82. Plaintiffs' experts asserted that a trustee may delegate that right to trust settlor-beneficiaries. Carregal-Silva Joint Dec. ¶¶ 28-36, A-312-315. On reply, Argentina's expert introduced arguments that the Certification by its terms was not a delegation by Caja to Plaintiffs. Bottini Reply Dec. ¶¶ 29-33, A-153-155.

In March 2021, the district court again dismissed the action. 2021 Dismissal Op., A-361 (17 Civ. 9934, reported at 2021 WL 1225971). The district court ruled that Caja held an exclusive right to enforce the bonds and had not effectively delegated that right to Plaintiffs. *Id.* at 19-22, A-379-382. The district court also accepted Argentina's argument on "reassembly," holding that Argentine law requires Plaintiffs to return the CCFs and CCs or their economic value in order "to

15

reassemble the bonds to bring suit on the bonds." *Id.* at 22-23, A-382-383. The

district court then noted:

> The Court acknowledges that it may be cumbersome for
> Plaintiffs to return their CCs and the economic value of the tax-credit
> certificates and terminate the trust. But Plaintiffs are not left without
> additional recourse. As discussed above, Article 18 also provides as an
> *alternative* remedy–obtaining authorization from the judge to exercise
> an action instead of the trustee. (See Law No. 24, 441, Art. 18.)

*Id.* at 23 (emphasis added), A-383.

> **6. On appeal, in May 2023, this Court affirmed the district court's
> dismissal of the prior action on the ground that "there is no
> evidence that Caja ever made ... a delegation" to Plaintiffs
> under Argentine law to bring suit to recover on the bonds. This
> Court held that Plaintiffs' remedy under Law 24,441 was to
> obtain judicial authorization to sue, instead of Caja. The
> Court's decision explicitly assumed *arguendo* that Plaintiffs
> were <u>not</u> required to reassemble the bonds in order to sue.**

On May 2, 2023, this Court affirmed the district court's dismissal on the

ground that: "even if we assume arguendo that Caja had the authority to delegate its

enforcement right to Plaintiffs, and that Plaintiffs were not required to first

reassemble the bonds before bringing this action, we still cannot find that Plaintiffs

are entitled to bring suit to recover the bonds under Argentine law, since there is no

evidence that Caja ever made such a delegation." 2023 Appeal Op. at 3-4, A-388-

389 (per Sullivan, C.J., with Calabresi and Lynch, JJ., reported at 67 F.4th 102). The

Court held: "To the extent that Plaintiffs disagree with Caja's decision not to bring

suit to recover on the bonds, their remedy is limited by section 16 of the Trust

Agreement, which directs Plaintiffs and Caja to 'resolve their disputes through an arbitration [before] the Permanent Arbitration Tribunal of the Buenos Aires Stock Exchange . . . , waiving any other jurisdiction that may correspond to them, ... and by Law 24,441, which requires judicial authorization before 'the beneficiary [may] exercise actions instead of [Caja]'....” *Id.* at 4, A-389.

**7. Plaintiffs, with the participation of Caja, then applied to a competent court in Buenos Aires and obtained judicial authorization orders in June and July 2023 for Plaintiffs to bring a follow-on suit in New York to enforce the bonds. Plaintiffs filed the present action, 23 Civ. 6588, on July 28, 2023, and it was again assigned to Judge Preska.**

Plaintiffs and Caja both then agreed that judicial authorization should be sought. The parties to the Trust Agreements did not have a dispute to resolve and thus arbitration was not pursued. Plaintiffs applied to a competent court in Buenos Aires. Caja participated in the hearing and did not oppose the request for judicial authorization.[8]

The Argentine court issued its judicial authorization order on June 21, 2023,

---

[8] The Authorization Order issued on June 21, 2023, stated: “Caja de Valores S.A. states that it does not modify its position regarding the fact that it will not pursue enforcement of any rights related to the instruments under the Trust, and does not oppose the judicial authorization requested by the trustors and/or beneficiaries in these proceedings, further ratifying the terms of the 2017 and 2022 Certifications, which were mutually agreed upon between the parties within the framework of the Trust Agreements.” Authorization Order, first page, A-37. The July 12 order added specific provisions for plaintiff Gonano, the legal representative of the minor son of Hugo Lauret. A-52-56.

resolving (last two pages) to "Authorize [Plaintiffs] ... to exercise and/or continue the relevant actions and all necessary acts for that purpose, in any jurisdiction and at all levels ... in substitution of the Trustee of the Trust Agreements ... in order to sue the issuer for the collection of the bonds or public securities that constitute underlying assets of the mentioned trusts .... in their capacity as trustors and beneficiaries." A-43-44. The court noted: "In this context there is no obstacle to granting the present request for judicial authorization, as denying it would deprive the plaintiffs of the possibility of exercising their legitimate rights, especially considering that the case falls within" the judicial authorization provision of Argentine trust law. *Id.,* sixth page, A-42.

Plaintiffs then filed the present (follow-on) action, 23 Civ. 6588, in the Southern District on July 28, 2023, to continue their efforts to recover principal on their bonds, plus accruing non-coupon interest. Complaint, A-18.[9] Because the Tax Credit Program benefits that had been received by Plaintiffs corresponded to the bond interest coupon amounts covering the period between default and maturity, Plaintiffs' complaint did not include any claim for that interest.

---

[9] In the meantime, Hugo Lauret's bonds had been inherited by Plaintiffs (in the present action) Rojas, Denise Lauret, and Gonano as representative of his minor son. Complaint ¶ 7, A-20. References to "Plaintiffs" in this latter period are to the Bugliottis and to Hugo Lauret's heirs.

**8. Argentina moved to dismiss Plaintiffs' follow-on action. In September 2024, the district court granted the motion. (a) On limitations, it held that the six-month extension provided by New York's "savings" statute was unavailable to Plaintiffs because they had failed to obtain personal jurisdiction over Argentina in the prior action; and that the New York COVID-era Executive Orders were not full tolling provisions. (b) On collateral estoppel, the district court held *sua sponte* that Plaintiffs were precluded from relitigating issues of jurisdiction, apparently referring to bond "reassembly."**

Argentina made a Rule 12(b) motion to dismiss the present action. It argued that Plaintiffs' claims were now barred by limitations (six years after bond maturity) and that New York CPLR § 205(a) – the "savings" statute extending for six months the limitation period for a follow-on action after dismissal of a prior similar action – was inapplicable because the prior action assertedly had been dismissed for "failure to obtain personal jurisdiction over the defendant," which is an exception in § 205(a). SPA-22.

Plaintiffs argued that their prior action had been dismissed for lack of standing and authorization to sue under Argentine trust law, based on this Court's May 2023 decision, and not for failure to obtain personal jurisdiction within the meaning of § 205(a). Plaintiffs argued additionally that their claims on the 2017-maturing bonds were timely, even without § 205(a)'s six-month extension, based on the COVID-era New York governor's Executive Orders tolling limitation periods for 228 days in 2020. SPA-24, 26, 28.

Argentina also renewed its argument that bond "reassembly" was a condition

for an action to enforce the bonds, based on the same expert declarations it submitted in support of "reassembly" as an alternative ground for its second (2020-2021) motion to dismiss in the prior action. Plaintiffs opposed.

The district court dismissed the action on September 30, 2024. 2024 Dismissal Op., SPA-1.

First, the district court held that a limitation extension under § 205(a) was not available to Plaintiffs, finding that its dismissal orders in the prior action had recited Rule 12(b) subparts including (2) personal jurisdiction and (5) service of process (as well as (6), failure to state a claim), *id.* at 11-13, SPA-11-13 – and that this Court's 2023 affirmance of dismissal, on the ground of lack of judicial authorization, amounted to or included a dismissal for failure to obtain personal jurisdiction. *Id.* at 13, SPA-13.

Second, the district court interpreted the New York governor's Executive Orders as "equitable tolling" provisions and held that Plaintiffs "provide no reason for how the COVID-19 pandemic affected their ability to file these claims," so the Executive Order tolling provisions did not apply. *Id*. at 14-15, SPA-14-15.

Third, the district court held that Plaintiffs were "collaterally estopped from relitigating issues of jurisdiction" (the court raised the issue *sua sponte* even though Argentina had not made a collateral estoppel argument). Most of the district court's collateral estoppel discussion was couched in terms of "jurisdiction" generally; the

only specific issue mentioned for estoppel treatment is "reassembly" of the bonds.[10] The district court found, among other things, that resolution of the estopped issue was "necessary to support a valid and final judgment on the merits" – presumably referring to the role of the "reassembly" argument in dismissal of the prior action. *Id*. at 17-19, SPA-17-19.

The district court's dismissal of the present action was entered for "the following reasons" and "the foregoing reasons" as expressed in its order. *Id.* at 1, 20, SPA-1, 20. It appears to Plaintiffs that the "reasons" were limitations, and "reassembly" as an application of collateral estoppel from the prior action.

## SUMMARY OF ARGUMENT

1. On limitations, this is a classic case for Plaintiffs to utilize the six-month "savings" extension provided in CPLR § 205(a). As a matter of law, § 205(a)'s exception for when a plaintiff failed to obtain personal jurisdiction in the prior action arises when the defendant did not have minimum contacts with the

---

[10] The district court also made one mention of the "judicial authorization" issue, in discussing the "identicalness" element of collateral estoppel. Near the end of its order, the district court compared its proceedings in the prior action to the present action and observed that in the present action, "The only additional fact is that, since the Court of Appeals affirmed dismissal and terminated the Earlier Action, Plaintiffs have sought and obtained a judicial authorization order from an Argentine court. Still, absent reassembly of the bonds, this fact is insufficient to change the legal result or to establish a different basis for jurisdiction." 2024 Dismissal Op. at 17-18, SPA-17-18. Because judicial authorization clearly was *not* an identical issue as between the prior action and the present action, the district court could not logically have been applying collateral estoppel to that issue, even as a matter of jurisdiction.

jurisdiction or was not served with a summons and complaint (and thus did not have notice of the plaintiff's claims) – clearly not the case here. Argentina's and the district court's position that a finding later in the litigation that Plaintiffs lacked standing for a curable reason (the Argentine law requirement of judicial authorization) fits neither the letter nor the purpose of the New York personal jurisdiction exception. Clear New York caselaw establishes that a curable lack of standing does not mean that the plaintiff failed to obtain personal jurisdiction in the context of § 205(a).

2.     The governor's COVID-era Executive Orders, authorized under state statutory law, have been held by all four Appellate Division departments to toll the running of limitation periods for 228 days in 2020 as a matter of law. The district court's characterization of the Executive Orders as "equitable tolling" provisions lacks any legal support. Plaintiffs' claims on their 2017 bonds are timely for this legal tolling reason as well.

3.     On "reassembly":

(a)  The district court's *sua sponte* invocation of collateral estoppel to apply its earlier (2021) alternative decision on bond "reassembly" to preclude Plaintiffs' bond enforcement claims below was in error. Plaintiffs' appeal to this Court of the 2021 dismissal of their claims included the

"reassembly" issue and this Court did not reach that issue on the appeal (indeed, this Court's holding on judicial authorization assumed *arguendo* that reassembly was <u>not</u> required). Under New York law, "collateral estoppel does not prevent relitigation of a ruling that was an alternative basis for a trial-level decision, where an appellate court affirmed the decision without addressing that ruling." *Tydings v. Greenfield, Stein & Senior, LLP,* 11 N.Y.3d 195, 197, 897 N.E.2d 1004, 868 N.Y.S.2d 563 (2008). Federal law and Restatement (Second) of Judgments § 27 are in accord.

(b)  Moreover, the district court's 2021 dismissal decision explicitly held that obtaining judicial authorization was "an alternative remedy" to reassembly. 2021 Dismissal Op. at 23, A-383. Plaintiffs obtained judicial authorization, in response to this Court's decision on appeal, in 2023. Therefore, according to that term of the district court's 2021 decision, once judicial authorization was obtained, "reassembly" was *removed* as a possible defense (based on preclusion or substantively).

(c)   If this Court reaches the substance of the "reassembly" argument, Argentina did not overcome the following:

(1)  There is no provision in the Trust Agreements, the 1994 FAA, or bond or Tax Credit Program documents requiring a program

23

participant to refund the tax credit amounts they had received over the years, which is what the district court and Argentina say is ultimately meant by "reassembly" of Plaintiffs' bonds, as a condition for filing a New York enforcement action.

(2) The *Domec* decision of the Argentina Supreme Court dealt with the terms of the 2005 and 2010 "exchange offer" bond *settlements*, and did not, under any stretch of legal imagination, establish a "reassembly" condition for program bondholders to file an *action* to obtain repayment of their bond principal in a New York court under New York law.

(3) The Argentina law authorizing and setting up the Tax Credit Program, Decree 1005/2001, itself stipulated in its preamble that the government's "commitments will be fully complied with upon maturity in the usual manner" (whereas clause, ninth paragraph on p. 2, SPA-44). That can only be read as assurance to bondholders entering the program that, at the very least, they would receive repayment of their principal at the end of the program after the bonds matured; and "in the usual manner" cannot reasonably be interpreted

to include a condition that the bondholders must refund all tax credits they received through the program.

4.     The district court's *sue sponte* invocation of collateral estoppel to (perhaps) apply its prior (2021) decision to preclude a finding that Plaintiffs had obtained personal jurisdiction over Argentina in the present action was in error. Plaintiffs properly invoked Argentina's agreement to New York jurisdiction and satisfied the FAA service of process requirements for this action (as in the prior action). The fact that Plaintiffs obtained judicial authorization before filing this (second) action means the district court's basis for (perhaps) denying personal jurisdiction in the prior action no longer involved an "identical" issue and was mooted for purposes of any collateral estoppel.

5.     From a broader perspective: Plaintiffs are not looking for any special advantage or treatment via this action. Plaintiffs are entitled to sue and obtain a money judgment for unpaid amounts on their bonds, just as hundreds of other Argentine bondholders already have in the Southern District. Economically, the Tax Credit Program is out of the picture: the bonds have matured, and the program is now over. Plaintiffs' complaint explicitly does not seek any recovery for bond interest "coupon" amounts as to which

Plaintiffs received value from their corresponding CCFs, so there is no issue of possible over-recovery. Neither Argentina nor the district court articulated any valid legal basis for importing an unstated condition that Plaintiffs must refund their CCF tax credit benefit values as a condition for enforcing their right to recover bond principal under governing New York law.

This Court should reverse the district court's decision dismissing Plaintiffs' claims for entry of an appropriate judgment enforcing their bonds.

## ARGUMENT

### A.    Standard of review

Dismissals under Federal Rule of Civil Procedure 12(b) are subject to *de novo* review on appeal for errors of law, including dismissals for lack of jurisdiction and for failure to state a claim, accepting the complaint's well-pled allegations as true. *Bugliotti v. Republic of Argentina,* 952 F.3d 410, 412-13 (2d Cir. 2020). This includes interpretation of unambiguous laws and agreements, which is also reviewable *de novo* on appeal. *Deutsche Bank Nat'l Trust Co. v. Quicken Loans Inc.,* 810 F.3d 861, 865 (2d Cir. 2015).

There do not appear to be any true factual disputes here. On limitations, the court records contain the undisputed facts concerning the basis for dismissal of Plaintiffs' prior (2017) action, as may be relevant to application of CPLR § 205(a), which is reviewable as a matter of law. Application of the COVID-era Executive

Orders on tolling is a matter of law and does not depend on any disputable facts.

On "reassembly," this Court reviews as a matter of law whether the district court's holding on "reassembly" in the prior action has any issue-preclusive effect here. If this Court reaches the substantive "reassembly" issue, its application (if any) is reviewable *de novo* either under U.S. or New York domestic law; or under foreign law based on Federal Rule of Civil Procedure 44.1, *see In re Vitamin C Antitrust Litig.,* 837 F.3d 175, 183 (2d Cir. 2016). Plaintiffs' pleading in their complaint that their bonds have remained intact in the program trusts at all relevant times must be accepted as factually true and is also supported by uncontroverted evidence.

**B.** **Plaintiffs' claims in the present action on their 2012 and 2017 bonds are timely. The district court erred in finding that the six-month limitation extension provided by NY CPLR § 205(a) was unavailable to Plaintiffs: the prior action was not terminated due to a failure by Plaintiffs to obtain personal jurisdiction over Argentina on the bonds.**

**1.** **For claims on the bonds, there is no factual dispute about Argentina's waiver of sovereign immunity and submission to New York jurisdiction in the bonds' Fiscal Agency Agreement, or about Plaintiffs' service of process on Argentina in accordance with the relevant FAA provision in both the prior action and the present action**

Plaintiffs commenced their prior action in the district court by filing their complaint on December 20, 2017. A-18. Paragraph 22 of the 1994 FAA (excerpted at A-68-69) provides that Argentina consents to personal jurisdiction in New York and appointed the New York office of Banco de la Nación Argentina (BNA) to

receive process for claims arising out of or based on the bonds and the FAA. In both cases, Plaintiffs' process server served the summons and complaint accordingly. Docket Sheet, 2017 Action, ECF 6, A-11, and Affidavit of Service, A-69; Docket Sheet, 2023 Action, ECF 16, A-4. Argentina has not disputed those facts.

Argentina first moved to dismiss the prior action in March 2018, contending that Plaintiffs did not own FAA-governed bonds but instead had given them up in exchange for the Argentine-law CCs and CCFs. Argentine asserted that Plaintiffs must be suing on the latter instruments, which did not include FSIA consents. Argentina thus began its pattern of claiming erroneously that Plaintiffs had failed to establish personal jurisdiction for claims on the bonds at issue in this litigation.

The district court accepted Argentina's arguments and dismissed the action in January 2019. 2019 Dismissal Op., A-261. Plaintiffs appealed, and in March 2020, this Court vacated the dismissal, finding that "ownership" was not the real issue and remanding for determination of the issue of who may sue to enforce the bonds under Argentine law. 2020 Appeal Op. at 3, A-275.

After that point, Argentina never returned to its fallacious argument that Plaintiffs were not really suing on the bonds. In its post-remand motion to dismiss, Argentina focused on Argentine law governing who can sue on *bonds* held in trust. Its brief mentioned New York personal jurisdiction only in its first and last sentences (which simply recited the subparts of Rule 12(b)); its dismissal motion did not

address actual service of process or minimum contacts. A-172, 211. The only reference to personal jurisdiction, as applied to Plaintiffs, in the district court's second dismissal decision, in March 2021, was its conclusory assertion that "Because Plaintiffs lack standing to bring suit to enforce the 1994 FAA Bonds ... the complaint must be dismissed. Moreover, Plaintiffs may not invoke the 1994 Bonds' service of process and jurisdictional provisions under the FSIA." 2021 Dismissal Op. at 23, A-383.

This Court's most recent decision in this case, in May 2023 (A-386), affirmed the district court's 2021 dismissal due to Plaintiffs' failure to obtain judicial authorization but did not state whether that lack of standing represented a failure to state a claim or a failure of personal jurisdiction (or other basis). Certainly, this Court had no reason to opine on the effect of such lack of standing on a possible future invocation by Plaintiffs of § 205(a) to extend the applicable limitation period, if Plaintiffs asserted their claims in a new action.

In its motion to dismiss below, Argentina did not argue that Plaintiffs still lacked standing or that Plaintiffs had not complied with the 1994 FAA provisions concerning jurisdiction and service of process. It argued limitations, arbitrability, and required "reassembly."

Accordingly, the only context in which personal jurisdiction could arise in the present appeal is through the side door of the limitation extension provision of §

205(a) and its exception if the plaintiff failed to obtain personal jurisdiction in the prior action. That issue concerns how the § 205(a) exception is to be interpreted and applied under New York law (and not under Argentine law or U.S. sovereign immunities law). As shown below, none of the circumstances in the present case engages the exception.

**2. CPLR § 205(a) extends the limitation period here. The dismissal of Plaintiffs' prior action due to a curable standing defect was not within § 205(a)'s exception for "failure to obtain personal jurisdiction over the defendant," as a matter of New York limitations law.**

As a matter of New York law applying CPLR § 205(a) and under the circumstances described in the previous section, dismissal of the prior action based on a curable standing defect did not engage the statutory exception for "failure to obtain personal jurisdiction" in the prior action. "To so read the statute" – a reading by which the prior action, in which the plaintiff lacked standing, is regarded as a "nullity" from which a § 205(a) extension of limitations could not be obtained -- "would be to strip it [§ 205(a)] of a major part of its designated role" of allowing similar claims asserted in a follow-on action to proceed on the merits, when the defendant was originally given notice of plaintiff's claim. *George v. Mt. Sinai Hospital*, 47 N.Y.2d 170, 176, 390 N.E.2d 1156, 417 N.Y.S.2d 231 (1979). *See also Hakala v. Deutsche Bank AG,* 343 F.3d 111, 113-17 (2d Cir. 2003) (describing the predicate for application of a § 205(a) extension as dismissal of the prior action "by

reason of some curable defect," to be interpreted based on "the primary goal of a limitation period – to give the defendant timely notice of the existence of the claim so that it could take steps to prepare for the litigation").

CPLR § 205(a) provides:

> If an action is timely commenced and is terminated in any other manner than by a voluntary discontinuance, a failure to obtain personal jurisdiction over the defendant, a dismissal of the complaint for neglect to prosecute the action, or a final judgment upon the merits, the plaintiff . . . may commence a new action upon the same transaction or occurrence or series of transactions or occurrences within six months provided that the new action would have been timely commenced at the time of commencement of the prior action and that service upon defendant is effected within such six-month period.

SPA-22. The "failure to obtain personal jurisdiction over the defendant" exception is the only limitation issue raised by Argentina and invoked by the district court.

Plaintiffs' 2017 action was dismissed by this Court's decision holding that Argentine law requires judicial authorization for a trustee's delegation to another trust party to bring suit with respect to trust property (which authorization Plaintiffs had not at that time obtained). This Court's decision was not based on any other ground. The decision concluded: "For the foregoing reasons, the judgment of the district court is affirmed." A-390. None of the "foregoing reasons" in this Court's decision mentioned New York personal jurisdiction.

As a matter of New York law concerning how § 205(a) is interpreted and applied, this Court's dismissal did not constitute a termination of the action for

failure by Plaintiffs to obtain personal jurisdiction over Argentina, as explained below.

### a. Procedural background on "personal jurisdiction" in Plaintiffs' 2017 action

In this litigation's history, only Argentina's early and untenable contention that Plaintiffs' 2017 action was "really" seeking to enforce the Tax Credit Program (CC and CCF) obligations, on which Argentina had not consented to jurisdiction and service of process, and not bond obligations, could have implicated personal jurisdiction issues.

After this Court's March 2020 decision sidelined that approach, Argentina had to accept that the action concerned enforcement of the bond obligations; its theory that the FAA provisions did not apply was obviously untenable. This Court's remand for consideration of Argentine trust law concerning entitlement to sue *on the bonds,* and the subsequent proceedings on remand, confirmed that obligations under the bonds were at issue. Neither the district court nor this Court further analyzed actual New York personal jurisdiction requirements for the bond claims in any of their decisions, since the requirements are plainly stated in the FAA. It has remained undisputed that Argentina consented to New York personal jurisdiction and that Plaintiffs' service of process on BNA complied with § 22 of the 1994 FAA.

### b. Background of CPLR § 205(a)

CPLR § 205(a) is a remedial statute which has at its core the strong public

policy consideration that controversies should be adjudicated on their merits. The extension of the limitation period provided by § 205(a) is to "remedy[] what might otherwise be the harsh consequence of applying a limitation period where the defending party has had timely notice of the action." *Matter of Goldstein v. New York State Urban Dev. Corp.,* 13 N.Y.3d 511, 521, 893 N.E.2d 635, 893 N.Y.S.2d 753 (2008). Section 205(a) provides "a second opportunity to the claimant who has failed the first time around because of some error pertaining neither to the claimant's willingness to prosecute in a timely fashion nor to the merits of the underlying claim." *George v. Mt. Sinai Hosp.,* 47 N.Y.2d 170, 178–179, 390 N.E.2d 1156, 417 N.Y.S.2d 231 (1979). The remedial concept of the statute "has existed in New York law since at least 1788." *Reliance Ins. Co. v. PolyVision Corp.,* 9 N.Y.3d 52, 56, 876 N.E.2d 898, 845 N.Y.S.2d 212 (2006).

Historically, the exception to the statute's extension of the limitation period due to a plaintiff's prior "failure to obtain personal jurisdiction over the defendant" was added to § 205(a) by amendment in 1992 to make up for the contemporaneous shift in New York practice from commencing an action by service of process to commencement by filing the summons and complaint in court. After that shift to commencement by filing, the "timely commenced" requirement in the opening phrase of "old" § 205(a) no longer ensured that effective service on the defendant was thereby a condition for an extension under the statute, so the exception for

33

"failure to obtain personal jurisdiction over the defendant" was added to provide that assurance. The subsequent decisions on the personal jurisdiction exception mostly turn on whether the summons and complaint were validly served. *See Hambric v. McHugh,* 289 A.D.2d 290, 734 N.Y.S.2d 596 (2d Dep't 2001) (service unduly delayed); *Tenenbaum v. Setton,* 49 Misc. 3d 39 (App. Term 2d Dep't 2015) (service in violation of Sabbath prohibition); *see also Parker v. Mack,* 61 N.Y.2d 114, 460 N.E.2d 1316, 472 N.Y.S.2d 882, (1984) (before 1992 amendment, service of process was included within the "timely commenced" requirement).

That background should be academic in the present case, however, because of Argentina's consent to jurisdiction over it in § 22 of the 1994 FAA, removing personal jurisdiction as an issue (*compare JDM Import Co. v. Shree Ramkrishna Exports Pvt. Ltd.,* 22 Civ. 4042 (VEC) S.D.N.Y. Mar. 24, 2023, slip op. at 6-7). Argentina has not contended that its consent to personal jurisdiction was inoperative or that BNA had not been served in accordance with FAA § 22. Argentine bondholders have effectively served Argentina via BNA's midtown office for many years, for bond enforcement actions in the Southern District.

### c. New York caselaw is clear that a plaintiff's curable lack of standing does not constitute a failure to obtain personal jurisdiction over the defendant under § 205(a)

New York caselaw on the personal jurisdiction exception in § 205(a) is clear that a plaintiff's curable lack of standing or capacity in the prior action does not

negate or void prior effective service of process, does not undercut personal jurisdiction, and does not preclude the six-month extension provided by § 205(a).

*Brown v. Lutheran Medical Ctr.,* 939 N.Y.S.2d 817 (Sup. Ct. Kings Co. 2012), *aff'd,* 107 A.D.3d 837, 968 N.Y.S.2d 526 (2d Dep't 2013), involved a prior negligence and wrongful death case improperly commenced by the decedent's husband as her "proposed guardian ad litem" even though she was still alive at the time. After she died, defendants moved to dismiss "for lack of capacity to sue based on the failure to have a proper court-appointed guardian." Supreme Court granted dismissal on that basis "with prejudice." 939 N.Y.S.2d at 819.

The *Brown* plaintiffs sued again, invoking § 205(a) to extend limitations. On a dismissal motion in the new action, the court stated:

> Plaintiffs rely on the holding in *Carrick v. Central Gen. Hosp.,* 51 N.Y.2d 242, 434 N.Y.S.2d 130, 414 N.E.2d 632 (1980), [as holding that even though] the plaintiff's failure to commence the first lawsuit through a duly-appointed administrator ... was fatally flawed, ... the existence of such a fatal flaw is not in itself a legitimate ground for denying the plaintiffs use of CPLR 205(a), *id.* at 248. ...

> Defendants oppose by contending that the prior action was dismissed because of a lack of standing and was void *ab initio,* since Brown had no standing to bring a lawsuit on behalf of his wife, then living. ... [Defendants] assert ... that the defect is jurisdictional, thus rendering the provisions of CPLR 205(a) inapplicable.

*Id.* at 819-20. The court ruled:

> Defendants' arguments are devoid of merit. ... The fundamental purpose of the statute is served when the defendant is given timely notice of the cause of action when asserted by or on behalf of the injured

35

party ... Thus, an "error" relating to the identity of the named plaintiff in the first action does not bar recommencement of the action pursuant to CPLR 205(a). ...

[D]efendants' challenge based upon lack of jurisdiction is unavailing. It is true that when an action is dismissed for lack of personal jurisdiction based on defective service, the original action was never "commenced" for purposes of CPLR 205(a), and the six-month extension is therefore unavailable (*see Fleming v. Long Island R.R.,* 72 N.Y.2d 998, 534 N.Y.S.2d 371, 530 N.E.2d 1291 [1988]). However, contrary to defendants' contentions, "a party's lack of standing does not constitute a jurisdictional defect" [citing cases]. Moreover, plaintiff's lack of capacity to pursue the claims prior to the issuance of the Letters of Administration is not a dismissal on the merits and does not bar relief under § 205(a), since the original action was timely commenced (*see Snodgrass v. Professional Radiology*, 50 A.D.3d 883, 884, 855 N.Y.S.2d 243 ["Insofar as the issue involves whether the six-month extension provision of CPLR 205(a) applies, the original action was timely commenced, notwithstanding the lack of capacity of the plaintiff to pursue the claims prior to the issuance of the letters of administration"] [2008]).

*Id.* at 820. The decision was completely affirmed on defendants' appeal, including with respect to limitations. The decision demonstrates that dismissal of a first action for plaintiff's lack of standing or capacity does not negate personal jurisdiction acquired by that plaintiff's timely service of process *ab initio* and does not prevent the plaintiff from qualifying for § 205(a)'s six-month limitation extension in a later action.

*See also Cannellas v. Lentz,* 396 F. Supp. 2d 435, 439 (S.D.N.Y. 2005) (Cedarbaum, J.) (applying § 205(a); holding that "defendant's argument that plaintiff's prior action was never 'commenced' because plaintiff lacked standing to

sue at the time the action was brought is without merit"); *Diffley v, Allied-Signal, Inc.,* 921 F.2d 421, 423-24 (2d Cir. 1990) (rejecting defendant's argument that applying § 205(a) would improperly retroactively "cure" inclusion of a non-diverse plaintiff in the first action, destroying subject-matter jurisdiction; "application of § 205(a) ... neither affects nor circumvents that dismissal of the prior action; it creates no 'retroactive' diversity jurisdiction of the prior action ... Instead, § 205(a) merely extends the period for filing a claim.").

Plaintiffs cited and explained these authorities to the district court but they were not mentioned in its dismissal decision.

*Brown* also establishes that under New York law, the follow-on court should determine what actually happened in the prior action when deciding whether § 205(a)'s exceptions apply. In *Brown,* despite the first court's characterization of its dismissal as being "with prejudice," the follow-on court (in the decision being discussed here) held that the first court's dismissal was *not* a "final judgment upon the merits" (one of the exceptions to § 205(a)). The caselaw thus indicates that a court examining application of § 205(a) in a follow-on action ascertains the actual ground(s) of dismissal of the first action, when deciding whether any of the statutory exceptions is operative.

Thus, in the present case, even though the district court's orders recited lack of personal jurisdiction as one of the Rule 12(b) grounds for its dismissals of the

prior action, the record shows that actual lack of personal jurisdiction or lack of service of process on Argentina with respect to claims on the bonds was not urged by Argentina and was not actually considered or applied by the district court, or by this Court as the ground for its May 2023 decision. Lack of judicial authorization was the sole and curable basis for the ultimate dismissal of Plaintiffs' prior action. The district court's denial of § 205(a)'s extension of the limitation period on Plaintiffs' bonds here was accordingly an error of law.

> **d. Argentina's sovereign status does not affect the conclusion that Plaintiffs may invoke § 205(a) to extend the limitation period applicable to their claims**

It is also clear that application of § 205(a) under the circumstances in this case is not hindered by Argentina's status as a sovereign.

*Yonkers Contracting Co. v. Port Auth. Trans-Hudson Corp.,* 93 N.Y.2d 375, 712 N.E.2d 678, 690 N.Y.S.2d 512 (1999), involved a contract claim by the plaintiff contractor against a subsidiary of the Port Authority, which holds sovereign status under state law. The decision holds that the plaintiff did not qualify for a § 205(a) extension because the statute waiving the Port Authority's sovereign immunity expressly incorporated as a "condition precedent" a requirement of timely suit (within one year of accrual of the claim) – which the court distinguished from normal statutes of limitation, which address timeliness in more general terms and in other statutes, and which § 205(a) by its terms allows to be extended.

Regarding the Port Authority's sovereign immunity waiver, the Court of Appeals held: "In a single enactment, the State not only consented to suits against Port Authority but also expressly incorporated within the act a requirement of timely suit as an integral part of its waiver of sovereign immunity. ... Thus, CPLR 205(a) is inapplicable because, here, the 'right to seek relief is specifically conditioned upon compliance with a particular time requirement rather than, or in addition to, a Statute of Limitations.'" *See also Hakala v. Deutsche Bank AG,* 343 F.3d 111, 116 (2d Cir. 2003) (applying a § 205(a) extension in the context of a statutory petition to vacate an arbitration award; distinguishing *Yonkers Contracting*).

The circumstances of the present action fall on the permissive side of the "statutory condition precedent" / "statute of limitations" divide. Hundreds of Argentine bond enforcement cases have been litigated and (mostly) settled based on application of New York's six-year statute of limitations for breach of contract claims on the bonds. The FSIA's provisions governing federal jurisdiction over claims against foreign sovereigns, 28 U.S.C. §§ 1330, 1605(a), 1608 (1976), SPA-30, 33, 40, do not include or incorporate any time restriction on commencement of suit as an integral part of the enactment's waiver of sovereign immunity. Nor was there any hint in *Yonkers Contracting* that the plaintiff's initial failure to satisfy the statutory pre-condition for suing the Port Authority – plaintiff had not engaged in an alternative dispute resolution process first – would have barred plaintiff's suit *ab*

39

*initio* on *personal jurisdiction* grounds.

In the present case, this Court's 2023 affirmance of dismissal of Plaintiffs' bond claims for failure to obtain judicial authorization was based on Argentine trust law; the dismissal did not hinge on Argentina's status as a sovereign. If the defendant in Plaintiffs' enforcement claims had been a private (non-sovereign) bond issuer, and the bonds happened to have been held in an Argentine trust (for any reason), the Argentine trust law analysis applicable to Plaintiffs' standing presumably would have been the same. In that light, the status of Plaintiffs' curable lack of standing here was parallel to the status of the plaintiffs in the cases cited above where courts considering the § 205(a) exceptions refused to find standing deficits to be disqualifying. The failed-to-obtain-personal-jurisdiction exception was limited to its normal context of lack of minimum contacts (or defendant's waiver thereof) or plaintiff's failure to achieve successful service of process.

The district court's insistence that a curable lack of standing was a jurisdictionally disqualifying factor here depended on conclusory reasoning: "without the ability to sue under the FAA, Plaintiffs cannot demonstrate a basis for subject-matter and personal jurisdiction." 2024 Dismissal Op. at 12, SPA-12. The district court went further and asserted that "On appeal, the Court of Appeals acknowledged the same ... Thus, the plain text of the two court opinions makes clear that the [district court] ruled, in part, on personal jurisdiction grounds." *Id* at 13,

SPA-13.

In that passage, the district court's assertion that *this* Court had "acknowledged the same" cited only to this Court's recitation of *the district court's listing* of lack of personal jurisdiction as *one* of the Rule 12(b) grounds for dismissal *asserted by Argentina* (Argentina had also asserted lack of subject-matter jurisdiction, insufficient service of process, and failure to state a claim). *Id.* To be clear, *this Court's* May 2023 decision affirming dismissal *did not say anything* equating lack of standing with lack of personal jurisdiction, under § 205(a) or otherwise.

The district court's assertion that "without the ability to sue under the FAA, Plaintiffs cannot demonstrate a basis for ... personal jurisdiction" was just conclusory, and for the purposes that matter here (the exception in § 205(a) if a plaintiff failed to obtain personal jurisdiction), the New York caselaw is to the contrary: a curable lack of standing does *not* equate to lack of personal jurisdiction, as described above.

In addition to the New York authorities interpreting § 205(a) discussed above, it is notable that the foundational § 205(a) New York caselaw on lack of personal jurisdiction cited by the district court, 2024 Dismissal Op. at 8, SPA-8, contained a significant caveat: the court "is required to dismiss an action if service was improper or incomplete 'unless it appears that proper service may still be obtained.' *Garcia v.*

41

*City of New York,* No. 15 Civ. 7470 (ER), 2017 WL 1169640, at *4 (S.D.N.Y. Mar. 29, 2017) (quoting *Romandette v. Weetabix Co.,* 807 F.2d 309, 311(2d Cir. 1986))."[11] The caveat "unless it appears that proper service may still be obtained" signals that, even in that district court's view, such an inconclusive defect in service would *not* give rise to a determination of failure to obtain personal jurisdiction that is disqualifying for § 205(a) purposes – which is exactly what the New York authorities hold by noting that "curable" defects are not jurisdictionally disqualifying for § 205(a) purposes (*Hakala* and *Diffley*).

Curable standing defects do not give rise to failures to obtain personal jurisdiction under § 205(a).

### e. Under New York law, § 205(a) is to be liberally construed in favor of extending limitation periods, based on a judicial preference for deciding cases on their merits

Many of the concepts that have inspired courts' long-time conscientious application of § 205(a) so as to allow disputes to be resolved on their merits also underlie the principle that the statute is to be "liberally construed." That principle goes so far as to allow a § 205(a) extension even when one of the statutory exceptions admittedly applies. In *Dyer v. Cahan,* 150 A.D.2d 172, 173, 150 N.Y.S.2d 785 (1st Dep't 1989), the plaintiff's prior action was dismissed without prejudice for lack of

---

[11] At the same point in *Garcia,* the court noted: "The Second Circuit has held that FRCP 4 is to be construed liberally 'to further the purpose of finding personal jurisdiction in cases in which the party has receive actual notice.'" *Id.*

subject matter jurisdiction absent complete diversity "and also for neglect to prosecute," which is a § 205(a) exception; nevertheless a § 205(a) extension was granted "in light of the broad and liberal purpose for which CPLR 205(a) was intended."

The statutory purpose of § 205(a) of adjudicating controversies on their merits when the defendant has been given timely notice of the plaintiff's claims, even though one of the exceptions arguably applies, further suggests that any doubt that Plaintiffs' action is timely should be rejected.

**C.** **Plaintiffs' claims in the present action on their 2017 bonds are also timely because the claims were filed within six years post-maturity plus 228 days (the COVID-related extension promulgated by Executive Orders in 2020)**

Plaintiffs' 2017 bonds matured on January 30, 2017. The six-year limitation period on New York contract claims to recover principal ran on January 30, 2023, except that limitation periods were tolled between March 20 and November 3, 2020, extending the limitation period by a total of 228 days. This was based on a series of Executive Orders issued by Governor Cuomo in connection with the COVID-19 pandemic. *See* N.Y. Executive Law § 29-A, SPA-24; 9 NYCRR 8.202.8 (March 20, 2020) (first order), SPA-26; 9 NYCRR 8.202.72 (November 3, 2020) (terminating tolling as of the next day), SPA-28.

Plaintiffs commenced the present action by filing it on July 28, 2023, which

43

was well within that extended limitation period for claims on the 2017 bonds. Plaintiffs asserted this tolling in response to Argentina's motion to dismiss below. The tolling extended the limitation period such that Plaintiffs' filing of the present action was timely with respect to the 2017 bonds, even without consideration of a § 205(a) extension.

In opposition to Argentina's motion to dismiss on limitations, Plaintiffs cited *Murphy v. Harris,* 210 A.D.3d 410, 177 N.Y.S.3d 559 (1st Dep't 2022), the First Department decision holding that the Executive Orders had a full tolling effect. In its reply brief (filed January 9, 2024), Argentina argued that the Orders should operate only as a "suspension" of limitations *expiring during* the period covered by the Orders, and that state law governing executive orders (in this case, Executive Law § 29-A, SPA-24) did not allow full tolling. By the date of Argentina's reply brief, however, all four New York Appellate Division departments had held definitively that the Executive Orders fully tolled (stopped the running of) limitations for the period March 20 – November 3, 2020. *See Brash v. Richards,* 195 A.D.3d 582, 149 N.Y.S.3d 560 (2d Dep't 2021); *Matter of Roach v. Cornell Univ.,* 207 A.D.3d 931, 172 N.Y.S.3d 215 (3d Dep't 2022) (listing all Executive Orders); *Murphy v. Harris,* 210 A.D.3d 410, 177 N.Y.S.3d 559 (1st Dep't 2022); *Harden v. Weinraub,* 221 A.D.3d 1460 (4th Dep't 2023). Argentina's reply brief on this issue below did not mention that authority.

The district court rejected the tolling effect of the Executive Orders by quoting *Verne v. N.Y.C. Dep't of Education,* No. 21 Civ. 5427 (JPC), 2022 WL 4626533 at *6 (S.D.N.Y. Sept. 30, 2022), holding that plaintiff Verne's invocation of the Orders was without merit "because '[t]he COVID-19 pandemic alone is insufficient to warrant equitable tolling without a more specific personal reason.'" 2024 Dismissal Op. at 14, SPA-14. The district court noted that Plaintiffs here did not provide any "reason for how the COVID-19 pandemic affected their ability to file these claims." *Id.*

The district court's citation to a holding about equitable tolling was inapposite. Plaintiffs relied on the Executive Orders themselves and did not invoke equitable tolling.[12] Nor had Argentina's reply brief mentioned equitable tolling or suggested any such doctrine was relevant.

The other decision cited by the district court was *Loeb v. County of Suffolk,* No. 22 Civ. 6410 (HG), 2023 WL 4163117, at *3 (E.D.N.Y. June 23, 2023), for the proposition that the Executive Orders were only a partial suspension of limitations, because otherwise plaintiffs would get "an unwarranted windfall." 2024 Dismissal Op. at 15 (alternative holding), SPA-15. That decision's "suspension" approach has

---

[12] In *Verne,* the plaintiff raised equitable tolling to avoid limitations on her federal anti-discrimination claims because the district court had found that the Executive Orders on tolling did not apply to claims arising under federal law. In the present case, the bonds are governed by New York law.

45

been rejected by New York appellate courts in favor of full tolling, as noted above. The *Loeb* decision no longer has any useful value on this point.

Plaintiffs' claims on their 2017 bonds are timely as a matter of law even apart from a CPLR § 205(a) extension.

**D.  The district court erred in applying collateral estoppel, based on part of its 2021 dismissal decision, to find that "reassembly" of the bonds is a condition for Plaintiffs' bond enforcement claims**

In one page near the end of its 24-page decision in 2021 dismissing Plaintiffs' claims on standing grounds for lack of judicial authorization, the district court had also held that Plaintiffs would be required to "reaggregate" their bonds before bringing suit to enforce the bonds, echoing a contention raised by Argentina's expert on the motion. 2021 Dismissal Op. at 22-23, A-382-383. Plaintiffs included that ground of the 2021 dismissal decision in their appeal to this Court, and the issue was briefed, but this Court affirmed on the judicial authorization ground alone, without reaching the "reaggregation"/"reassembly" issue. In fact, in describing its judicial authorization holding, this Court noted twice that it was assuming *arguendo* that Plaintiffs were "*not* required" to "reaggregate" or "reassemble" their bonds. 2023 Appeal Op. at 3, 4 (emphasis added), A-388, 389.

On its subsequent motion to dismiss in the district court below, Argentina argued the same substance of its "reassembly" position and re-submitted the same expert's declaration and reply declaration it used before; Plaintiffs opposed on the

same grounds as in the earlier proceeding. However, the district court departed from the parties' approach of substantively re-arguing the "reassembly" issue and ruled *sue sponte* only that its 2021 decision on "reassembly" should be given collateral estoppel effect.

### 1. Collateral estoppel cannot be based on a prior lower court decision that is appealed and the issue for which estoppel is claimed is not reached or ruled on by the appellate court

This aspect of collateral estoppel has been addressed by the New York Court of Appeals as follows: "We hold that collateral estoppel does not prevent relitigation of a ruling that was an alternative basis for a trial-level decision, where an appellate court affirmed the decision without addressing that ruling." *Tydings v. Greenfield, Stein & Senior, LLP,* 11 N.Y.3d 195, 197, 897 N.E.2d 1004, 868 N.Y.S.2d 563 (2008). *Accord, Gelb v. Royal Globe Insurance Co.,* 798 F.2d 38, 44-45 (2d Cir. 1986) (federal law) ("[I]f an appeal is taken and the appellate court affirms on one ground and disregards the other, there is no collateral estoppel as to the unreviewed ground"); *see Restatement (Second) of Judgments* § 27 & comment o (Am. Law Inst. 1982).

The district court apparently was not aware of the above definitive authority.

**2. The district court's 2021 dismissal decision itself held that judicial authorization is an "alternative remedy" to "reassembly." Because Plaintiffs have obtained judicial authorization, the prior decision on "reassembly" could not give rise to an estoppel in the present action.**

In addition, as noted in the fact section above, the district court's 2021 decision explicitly held that, for plaintiffs in a bond enforcement action, obtaining judicial authorization was "an alternative remedy" to reassembly. 2021 Dismissal Op. at 23, A-383. Plaintiffs obtained judicial authorization in response to this Court's decision on appeal in 2023. Therefore, according to the terms of the district court's 2021 decision, once judicial authorization was obtained, "reassembly" was no longer a live issue, *id.,* and the 2021 decision was if anything persuasive *against* Argentina's assertion of the defense in the present action.[13]

**3. If this Court reaches this substantive issue on this appeal: Argentina's defense that Tax Credit Program participants must "reassemble" their bonds as a condition to filing an enforcement action in New York is untenable as a matter of fact and law**

The district court's decision below on "reassembly" appears to have been grounded solely on its analysis of collateral estoppel, which, as described above, was an error of law. Plaintiffs nevertheless briefly summarize here the substantive reasons why Argentina's effort to impose a "reassembly" condition on Plaintiffs'

---

[13] Plaintiffs' complaint in the present action pled that judicial authorization had been obtained. Complaint ¶¶ 21-22, A-24. Under the law of collateral estoppel, this meant the prior decision and the current situation did not present "identical" issues on "reassembly."

action does not reflect a plausible interpretation of Argentine law that can be applied in this action, and the defense was not a legitimate issue or a sound basis for dismissing this case.[14]

Global bonds held by investors are electronic records maintained through members of the bond clearing systems; there are no real bond certificates or interest coupons. "Disassembly" (etc.) in a physical sense is thus a misnomer. After Plaintiffs received and began using CCFs (which *were* real certificates) to claim tax credits, the semi-annual interest components of the bonds were "used up" economically, just as they had been when interest was credited virtually pre-default; but none of those transactions involved *bond* "*disassembly*" in any meaningful sense.[15]

The district court recognized this by acknowledging in its 2024 dismissal decision that "it may be cumbersome for Plaintiffs to return their CCs and the economic value of the tax-credit certificates [CCFs] and terminate the trust" in order

---

[14] If this Court does not decide the substance of the issue on this appeal, and the case continues, Argentina will undoubtedly raise the defense again and probably it will need to be resolved on a future appeal.

[15] If there is any doubt about "actual" "disassembly" or "reassembly" of Plaintiffs' bonds held in trust at Caja, Caja's executive director Mr. Berney certified in writing on November 24, 2023 (as submitted by Plaintiffs on the motion below) that Caja "maintains on deposit" the trust bonds, which "are the same instruments as were originally deposited into the Trust by the Trustor" – *i.e.,* clearing system entries showing original and complete, not "disassembled," bonds. Certifications by Caja de Valores re Plaintiffs' Current Bondholdings, A-455, 457.

to meet the conditions for filing a lawsuit in New York (according to the district court's view). The district court added that a judicial authorization order would provide "an alternative remedy," as noted above. Such an order (which Plaintiffs obtained) then mooted Argentina's entire "reassembly" defense.

But the district court was correct to suggest that the real meaning of the government's putative "reassembly" requirement comes down to money: Argentina seeks to require program participants, as a condition for their bringing suit in New York, to *repay* every dollar or peso of tax credit program value they had received over the years (about 10 and 15 years' worth, in Plaintiffs' case, from default to maturity on their bonds), to the government.

There is no provision in the Trust Agreements, in the FAA, or in any bond or program documents stating that program participants who later seek a judgment from a New York court under New York law to enforce their bonds – especially for repayment of *principal – must first pay a refund* to the government of the interest-based tax credit amounts they received. There is no legal basis for applying such a (euphemistic) "reassembly" requirement as a *pre-condition for a bondholder's legal action* against the government to enforce the "unconditional" obligations owed to bondholders under the FAA and governed by New York law.

The government's and the district court's retort is that a "reassembly"

condition has been recognized by the Supreme Court of Argentina.[16] That is a vast over-reading of the decision, at least as applied to the present situation.

In that litigation, Tax Credit Program participant bondholders claimed that the terms they were offered by the government for entering the 2005 and 2010 "exchange" settlements were unconstitutionally "disproportionate or damaging" to their rights, as compared to the terms offered to other bondholders. That "disproportion" claim was rejected by the Supreme Court. *Domec* at 6, A-430. In describing the proposed (voluntary) settlement terms, the Supreme Court noted that participating bondholders would be required to "reconstitute" their bonds, *id.* at 4, A-428, but it obviously did not say anything about conditions that might apply to bondholders' legal actions to enforce their bonds in New York. (Plaintiffs did not enter the exchange settlements.)

While Argentina may wish that the *Domec* decision somehow sets conditions for cases like the present action, a close look at the decision confirms it simply does not. The government has never explained why the conditions imposed on bondholders for entry into the voluntary exchange offers decades ago should have any bearing on this New York lawsuit, which seeks to enforce Argentina's clear and

---

[16] *Domec Compania de Artefactos Domesticos S.A.I.C. y F. v. Republic of Argentina,* 265/2011, 47-D (Arg. Sup. Ct. Nov. 27, 2014) ("*Domec*"), A-425. A second cited decision adopted *Domec* in a half-page opinion issued seven months later. *Bugliotti v. Republic of Argentina,* 134/2012 (Arg. Sup. Ct. July 14, 2015) c/EN-Pen s/amparo, July 14, 2015, A-448.

unconditional payment obligations under New York law.[17]

Moreover, as noted earlier, the Argentine law that established the Tax Credit Program, Decree 1005/2001, stated that the government's "commitments will be fully complied with upon maturity in the usual manner" (Whereas clause, ninth paragraph on p. 2, SPA-44) – making clear that the government agreed to and did recognize its obligation to repay bond principal upon maturity. The "usual manner" proviso cannot fairly be read to allow a possible requirement for program participants to refund the amounts of all tax credits received as a condition for

---

[17] Plaintiffs' experts on Argentine law, Mr. Carregal and Mr. Silva, addressed the "reassembly" issue in their Joint Declaration submitted by Plaintiffs in opposition to Argentina's second motion to dismiss below. Joint Declaration ¶¶ 55-60, A-320-321. They opined: "Whatever may have been the requirements for bondholder participants in the Tax Credit Program *to qualify for the government's Exchange Offers in 2005 and 2010,* those requirements are not relevant, as far as we can tell, to collection on the bonds under New York law and jurisdiction." *Id.* ¶ 59 (emphasis added), A-321.

They also disagreed with the position of Argentina's expert Mr. Bottini that "the only way a lawsuit on the bonds can proceed, by either the Trustee or Plaintiffs, is that 'the trust must be terminated in order for the original bondholder rights to be reinstated.'" They noted that Plaintiffs had requested to terminate the trusts in order to receive back the bonds in 2015, but the Ministry of Economy notifed Caja that "it did not seem applicable to proceed" with Plaintiffs' request, *i.e.,* denying it, leading Carregal and Silva to conclude that: "It seems that Mr. Bottini insists it is necessary for Plaintiffs to proceed in a way that was blocked by the Republic. In any event, there is no fair reading of the Trust Agreement as providing that Plaintiffs would need to terminate the agreement in order for the trustee or its permitted substitute to be able to sue to collect on the bonds." *Id.* ¶ 60, A-321. Indeed, the several provisions in the Trust Agreement concerning termination of the trusts say nothing about any requirement to "reassemble" bonds or to refund tax credits that had been received by bondholders.

enforcing the bonds' commitment of principal repayment. That assurance was directed to bondholders, like Plaintiffs, who were placing their bonds in the Tax Credit Program trusts in 2001.

**E.    The district court erred in applying collateral estoppel based on the prior action to preclude Plaintiffs from opposing Argentina's argument of lack of personal jurisdiction in the present action**

The district court described Argentina's "primary" arguments on the motion to dismiss below as "(1) that the claims are time-barred under New York state's six-year statute of limitations for contract claims, and (2) that Plaintiffs are not entitled to sue on the bonds as a matter of Argentine law." 2024 Dismissal Op. at 9-10, SPA-9-10.

The limitation dismissal below had no antecedent in prior decisions so collateral estoppel would not apply to that issue.

Alternatively, the only "Argentine law" discussed in the dismissal below involved (1) the requirement of judicial authorization to sue, in order to establish Plaintiff's standing, which the district court acknowledged the Plaintiffs had now "sought and obtained ... from an Argentine court" (*id.* at 18, SPA-18); and (2) "reassembly" of the bonds, which the district court stated "remained a precondition to jurisdiction." *Id.* It would thus appear that the district court's extensive discussion below of collateral estoppel against "relitigating issues of jurisdiction" (*id.* at 15 (heading), SPA-15), must have pertained to the "reassembly" issue – which, as

shown in the previous sections of this brief, does not qualify for collateral estoppel treatment because (a) this Court did not reach the issue when Plaintiffs appealed it and (b) the district court's own order held that a judicial authorization order, as later obtained by Plaintiffs, would render "reassembly" nugatory.

*\*\*\**

In the last paragraph of its reply brief to the district court on its motion to dismiss below,[18] Argentina argued as follows:

> Plaintiffs assert that the bonds are "unconditional" obligations governed by New York law and that the relevant Argentine Supreme Court precedents requiring reassembly of the bonds in order to bring suit are therefore inapplicable [citing Plaintiffs' brief]. Plaintiffs' arguments ignore that, by signing the Trust Agreement, they relinquished their beneficial interest in the bonds, and consented to any dispute being governed by Argentine law, not New York law [citing Decree 1005/2001, Art. 3, SPA-45]. And, because the Plaintiffs disassembled their bonds – and have not yet reconstituted them – they cannot bring suit on the bond documents themselves; instead, they can only bring suit based on the Trust Agreement, which is governed by Argentine law. *See* Bottini Decl. ¶¶ 8-9 [A-74-75].

That passage is revealing. Initially, as noted in the previous section, the *Domec* decision says nothing (involving "reassembly" or otherwise) about requirements "in order to bring suit" on the bonds. Next, by arguing that "by signing the Trust Agreement, [Plaintiffs] relinquished their beneficial interest in the bonds,"

---

[18] *I.e.,* in a context where Plaintiffs could not respond, even at an oral argument, since the district court denied Plaintiffs' request for oral argument on the motion, as it has always done in this action.

Argentina was baldly rejecting the central holding of this Court on the first appeal in this case: that Plaintiffs' suit was <u>not</u> barred simply because Plaintiffs entered their bonds into the trusts, and that Plaintiffs had <u>not</u> thereby relinquished "ownership" of their bonds. 2020 Appeal Op. at 1, 3, A-273, 275.

Similarly (continuing to analyze the passage quoted above), none of the trust documents (including the Trust Agreements) provides that "any dispute" *over the bonds* would be "governed by Argentine law, not New York law." The passage only cites Article 3 of Decree 1005/2001, which says that *the "CCFs"* issued under the program "shall be regulated by the Law" of Argentina, SPA-45 (emphasis added) – but it says nothing about the law governing the *bonds*. Argentina is approaching these issues in an alternative reality.

Finally, neither Mr. Bottini nor any other source has explained the basis for Argentina's position that, once the issuance of CCFs under the Tax Credit Program in 2001 was deemed automatically to "disassemble" the underlying bonds, the process *then somehow evolved* into a "reassembly" requirement many years later, which is now transformed into a condition that bondholders must *refund* all the interest credits they received during the program – in order to file a New York lawsuit to recover principal on their bonds under New York law. The district court's decision that Plaintiffs cannot bring suit because of this chimerical "reassembly"-cum-refund condition does not withstand scrutiny.

## CONCLUSION

The district court's order dismissing the action should be reversed and the case remanded for Argentina to file its answer.

Dated: February 11, 2025

Respectfully submitted,

/s/ Michael C. Spencer
Milberg Coleman Bryson Phillips
  Grossman, PLLC
100 Garden City Plaza, Suite 500
Garden City, NY 11530
(212) 594-5300

*Attorneys for Plaintiffs-Appellants*

**Certificate of Compliance
With Type-Volume Limitation, Typeface Requirements,
and Type Style Requirements**

1.      This document complies with the type-volume limitation of Fed. R.

App. P. 32(a)(7)(B) and Local Rule 32.1(a)(4)(A) because, excluding the parts of

the document exempted by Fed. R. App. P. 32(f), this document contains 13,704

words.

2.      This document complies with the typeface requirements of Fed. R.

App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6)

because it has been prepared in a proportionally spaced typeface using Microsoft

Word for Mac version 16.93 in Times New Roman 14 point.

   /s/ Michael C. Spencer_____

Michael C. Spencer
Attorney for Plaintiffs-Appellants
February 11, 2025

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 11th day of February 2025, by the
CM/ECF filing of this document, a true and correct copy of the foregoing Brief
and Special Appendix for Plaintiffs-Appellants was served on counsel for
Defendant-Appellee pursuant to Local Rule 25.1(h)(1)&(2).

   /s/ Michael C. Spencer_____

# SPECIAL APPENDIX

# TABLE OF CONTENTS

PAGE

Memorandum and Order of the Honorable Loretta A. Preska Appealed
    From, dated September 30, 2024.................................. SPA-1

Judgment, dated September 30, 2024................................ SPA-21


**New York Law**

N.Y. Civil Practice Law and Rules § 205........................... SPA-22

N.Y. Executive Law § 29-A ........................................ SPA-24

9 NYCRR 8.202.8 (March 20, 2020) ................................. SPA-26

9 NYCRR 8.202.72 (November 3, 2020) .............................. SPA-28


**U.S. Law – Foreign Sovereign Immunities Act**

28 U.S.C. § 1330, Actions against foreign states..................... SPA-30

28 U.S.C. § 1605, General exceptions to the jurisdictional immunity
    of a foreign state .............................................. SPA-33

28 U.S.C. § 1608, Service; time to answer; default.................. SPA-40


**Argentina — Laws and Rules**

Decree 1005/2001, dated August 9, 2001 ........................... SPA-43

ii

PAGE

Resolution 415/2001, dated August 28, 2001 ........................ SPA-54

Resolution 692/2001, dated November 15, 2001 ................... SPA-60

Law No. 24,441, excerpted Articles 1 to 26, Title I, Trusts ........... SPA-65

Law 27,249, dated March 31, 2016.................................. SPA-70

Civil and Commercial Code (2015) - Art. 958,
    Freedom of the parties to enter into contracts.................... SPA-74

Civil and Commercial Code (2015) - Art. 959, Binding Effect ........ SPA-75

Civil and Commercial Code (2015) Chapter 30, Trusts, Chapter 31,
    Trust Ownership - Articles 1666-1707 .......................... SPA-76

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EUCLIDES BARTOLOMÉ BUGLIOTTI, MARIA CRISTINA DE BIASI, ROXANA INÉS ROJAS, DENISE LAURET, AND MARIA CARLA GONANO, | |
| Plaintiffs, | No. 23 CV 6588 (LAP) |
| -against- | MEMORANDUM & ORDER |
| THE REPUBLIC OF ARGENTINA, | |
| Defendant. | |

LORETTA A. PRESKA, Senior United States District Judge:

Euclides Bartolomé Bugliotti, Maria Cristina De Biasi, Roxana Inés Rojas, Denise Lauret, and Maria Carla Gonano (collectively, "Plaintiffs") bring this second action against the Republic of Argentina ("the Republic") for damages resulting from the Republic's alleged default on bonds.[1] The Republic moves to dismiss the action pursuant to Federal Rules of Civil Procedure 12(b)(1), (2), (5), and (6).[2] Plaintiffs oppose.[3] For the following reasons, the Republic's motion to dismiss is granted.

I. **Background**

This is Plaintiffs' second action against the Republic and the Republic's third 12(b) motion before the Court. This action

---

[1] (See Compl., dated July 28, 2023 [dkt. no. 1].)

[2] (See Def.'s Notice of Mot. to Dismiss, dated Oct. 16, 2023 [dkt. no. 17]; Def.'s Mem. of Law in Supp. of Mot. to Dismiss ("Def.'s

(continued on the following page)

arises between Plaintiffs, who are citizens and residents of Argentina, and the Republic, a foreign state under the Foreign Sovereign Immunities Act ("FSIA"). (See Compl. ¶ 2); see 28 U.S.C. § 1603(a).

## A.   **Factual Background**

The instant action derives from the same "[b]onds, claims, transactions, and occurrences . . . as in the prior action [before this Court,] 17 Civ. 9934." (Compl. ¶ 23.)  The Court presumes familiarity with the facts and lengthy history of the prior case, which this Court and the Court of Appeals have recounted at length.

In short, Plaintiffs are the beneficiaries of trusts holding $35.8 million of Argentine bonds.  (Id. at 2.)  Plaintiffs originally purchased the bonds pursuant to the Fiscal Agency Agreement dated October 19, 1994 ("FAA").  (Id. ¶¶ 6-7.)  The terms of the FAA required the Republic to make payments for principal

_____

Br."), dated Oct. 16, 2023 [dkt. no. 18]; Def.'s Notice under Rule 44.1, dated Oct. 16, 2023 [dkt. no. 19]; Decl. of Rathna J. Ramamurthi in Supp. of Mot. to Dismiss ("Ramamurthi Decl."), dated Oct. 16, 2023 [dkt. no. 20]; Def.'s Reply Mem. of Law in Supp. of Mot to Dismiss, dated Jan. 9, 2024 [dkt. no. 33]; Decl. of Rathna J. Ramamurthi in Supp. of Reply, dated Jan. 9, 2024 [dkt. no. 34]; Decl. of Carlos M. Tombeur in Supp. of Reply, dated Jan. 9, 2024 [dkt. no. 35]; Decl. of Caja de Valores in Supp. of Reply, dated Jan. 9, 2024 [dkt. no. 36].)

[3] (See Pl.'s Mem. of Law in Opp'n to Mot. to Dismiss ("Opp'n Br."), dated Nov. 27, 2023 [dkt. no. 27]; Decl. of Michael C. Spencer in Opp'n to Mot. to Dismiss ("Spencer Decl."), dated Nov. 27, 2023 [dkt. no. 28]; Decl. of Mario A. Carregal & Roberto E. Silva, Jr., dated Nov. 27, 2023 [dkt. no. 29]; Notice under Rule 44.1, dated Nov. 27, 2023 [dkt. no. 30].)

and interest on the bonds. (Id. ¶ 9.) Moreover, under the FAA, the Republic appointed Banco de la Nación Argentina as its agent for service of process, waived sovereign immunity, and submitted to the jurisdiction of this Court. (Id. ¶ 10.)

In or around November 2001, Plaintiffs subscribed to a Tax Credit Program, whereby Plaintiffs agreed to place their bonds in trust with Caja de Valores, S.A. ("Caja") and, in exchange, received custody certificates and tax credits. (Id. ¶ 12.) Under the Program, Plaintiffs could credit any unpaid interest on their bonds toward local tax liabilities. (Id. ¶¶ 12, 15); Bugliotti v. Republic of Arg. ("Bugliotti I"), No. 17 Civ. 9934 (LAP), 2019 WL 586091, at *2 (S.D.N.Y. Jan. 15, 2019).

The Trust Agreement governing this transaction provides, in relevant part, that the trust "is governed by . . . [Argentine] Law 24[,]441 . . . ." Bugliotti v. Republic of Arg. ("Bugliotti IV"), 67 F.4th 102, 105 (2d Cir. 2023) (citing Trust Agreement § 2.1). In turn, Article 18 of Law 24,441 provides that the trustee (Caja) may "exercise all actions necessary to defend the [bonds]" but notes that a "judge may authorize the trustor or the beneficiary to exercise actions instead of the trustee[] . . . ." See id. (citation omitted). Moreover, Section 5 of the Trust Agreement requires "the disassembly of the [bonds] for their crediting as [tax-credit certificates or custody certificates] . . . ." (See Ramamurthi Decl., Ex. 2.3 § 5(iii).)

3

Plaintiffs do not allege that the Trust Agreement contains a waiver of sovereign immunity or submission of jurisdiction.

On or around December 24, 2001, the Republic declared a moratorium on the payment of principal and interest on bonds issued under the FAA. (Compl. ¶ 13.) Plaintiffs allege that the Republic has not made any payments on these bonds since it instituted the moratorium. (Id. ¶ 14.)

Plaintiffs' bonds matured on February 21, 2012, and January 30, 2017, respectively. (Id. ¶ 15.)

B.    **Procedural History**

As relevant here, Plaintiffs filed suit in federal court on December 20, 2017 (the "Earlier Action"), seeking damages and injunctive relief based on the Republic's alleged non-payment on the bonds.[4]   The Republic moved to dismiss, arguing lack of subject-matter jurisdiction, lack of personal jurisdiction, insufficient service of process, and failure to state a claim. (See Spencer Decl., Ex. 4.) The Court dismissed the Earlier Action on January 15, 2019, concluding that Plaintiffs' participation in the Tax Credit Program constituted an "exchange" of Plaintiffs' bonds, such that Plaintiffs no longer "owned" bonds under the FAA. See Bugliotti I, 2019 WL 586091, at *2-3.  The Court concluded

---

[4] Plaintiffs also commenced amparo proceedings in Argentina, which were the subject of some discussion in the Earlier Action.  As the amparo proceedings do not bear on the instant motion, the Court omits further mention of them here.

that Plaintiffs therefore could not rely on the Republic's waiver of sovereign immunity under the FAA and the Court lacked jurisdiction to hear the matter. See id.

The Court of Appeals vacated the judgment as to damages, holding that the relevant question was "not whether Plaintiffs 'own' the bonds but whether they may sue to enforce them[,]" and it remanded the case for a determination of whether Plaintiffs are "entitled to sue to enforce the bonds." Bugliotti v. Republic of Arg. ("Bugliotti II"), 952 F.3d 410, 411 (2d Cir. 2020). The Court of Appeals instructed this Court to apply Federal Rule of Civil Procedure 44.1 to interpret whether, under Argentine law, Plaintiffs retained a right to sue on the bonds in federal court. See id. at 414.

On remand, the Republic renewed its motion to dismiss for lack of subject-matter jurisdiction, lack of personal jurisdiction, and insufficient service of process, (see Spencer Decl., Ex. 11), and the parties briefed the question of whether, under Argentine law, Plaintiffs maintained a right to bring suit on the bonds held in trust. The Court again dismissed the Earlier Action, concluding that Caja held an exclusive right to enforce the bonds, and Caja had not delegated that right to Plaintiffs. Bugliotti v. Republic of Arg. ("Bugliotti III"), No. 17 Civ. 9934 (LAP), 2021 WL 1225971, at *7-8 (S.D.N.Y. Mar. 31, 2021).

The Court also held that no party could bring suit on the bonds unless they were first "reassembled" by returning the custody certificates and economic value of the tax—credit certificates and terminating the trust. (Id. at *7-9.) The Court then noted that, still, Plaintiffs were not without recourse because Article 18 of Law 24,441 permits Plaintiffs to seek judicial authorization to enforce the bonds instead of Caja. See id. at *9 (citing Law No. 24,441, Art. 18, Jan. 9, 1995, B.O. 28061 (Arg.)).

Plaintiffs again appealed the dismissal order to the Court of Appeals. In recounting the procedural history below, the Court of Appeals recited this Court's determination that "no party — Caja or Plaintiffs — could bring suit under the bonds without first reassembling [them] . . . ." Bugliotti IV, 67 F.4th at 104 (emphasis added). It also quoted the Court's holding that "'Plaintiffs lack[ed] standing to bring suit to enforce the [bonds] . . . under Argentine trust law,' and therefore, could not 'invoke the [FAA's] service[-]of[-] process and jurisdictional [waivers] under the FSIA.'" See id. (quoting Bugliotti III, 2021 WL 1225971, at *9). The Court of Appeals affirmed the judgment, holding that "Plaintiffs do not have the right to recover the bonds under Argentine law." See id. at 107.

After the Court of Appeals ruled, Plaintiffs applied for judicial authorization orders from Argentine Commercial Court No. 9. (Compl. ¶ 20.) On June 21, 2023, Argentine Commercial

6

Court No. 9 issued such orders authorizing Plaintiffs to bring suit in place of Caja.  (Id. ¶¶ 2, 20; id., Ex. A.)  Plaintiffs do not allege that they have reassembled the bonds.

Plaintiffs filed the instant action on July 28, 2023, seeking damages for principal and post-maturity interest on the bonds, as well as an award of Plaintiffs' costs and attorney's fees and any pre-judgment interest.  (Id. ¶ 40.)  Plaintiffs again rely on the jurisdictional waivers and service-of-process provisions under the FAA to bring this suit.

## II.  Legal Standards

The Republic moves to dismiss this action pursuant to Federal Rules of Civil Procedure 12(b)(1), (2), (5), and (6).

### A.  Rule 12(b)(1)

On a Rule 12(b)(1) motion, a district court "must accept as true all material factual allegations in the complaint, but [may] not . . . draw interferences from the complaint favorable to plaintiffs."  Wasman v. Cliffs Nat. Res. Inc., 222 F. Supp. 3d 281, 286 (S.D.N.Y. 2016) (citation and internal quotation marks omitted).  The plaintiffs, as the non-moving party, bear the burden of proving subject-matter jurisdiction by a preponderance of the evidence.  See Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000) (citation omitted); Davis v. Kosinksy, 217 F. Supp. 3d 706, 707 (S.D.N.Y. 2016).  A court may also refer to evidence outside of the pleadings.  Makarova, 201 F.3d at 11.

### B.    Rule 12(b)(2)

Under Rule 12(b)(2), the plaintiffs bear the burden of demonstrating personal jurisdiction over the defendant. _Troma Entm't, Inc. v. Centennial Pictures Inc._, 729 F.3d 215, 217 (2d Cir. 2013). To meet this burden, the plaintiffs must make a _prima facie_ showing of facts, which, "if credited by the ultimate trier of fact, would suffice to establish [personal] jurisdiction over the defendant." _O'Neill v. Asat Tr. Reg (In re Terrorist Attacks on Sept. 11, 2001)_, 714 F.3d 659, 673 (2d Cir. 2013) (quotation marks omitted).

### C.    Rule 12(b)(5)

Rule 12(b)(5) provides for dismissal of a claim for improper service of process. Fed. R. Civ. P. 12(b)(5). "[T]he plaintiff bears the burden of proving [the] adequacy" of service. _Mende v. Milestone Tech., Inc._, 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003) (internal quotation marks and citation omitted). In evaluating whether service of process was proper under a Rule 12(b)(5) motion to dismiss, a court must look to Federal Rule of Civil Procedure 4. The Court is required to dismiss an action if service was improper or incomplete "unless it appears that proper service may still be obtained." _Garcia v. City of New York_, No. 15-CV-7470 (ER), 2017 WL 1169640, at *4 (S.D.N.Y. Mar. 28, 2017) (quoting _Romandette v. Weetabix Co._, 807 F.2d 309, 311 (2d Cir. 1986)). In analyzing a motion to dismiss under Rule 12(b)(5), the Court may look outside

8

the four corners of the complaint to determine whether it has jurisdiction.  Garcia, 2017 WL 1169640, at *4.

    **D.**   **Rule 12(b)(6)**

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead sufficient facts "to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A court must accept as true all well-pleaded facts and must draw all reasonable inferences in favor of the plaintiff. Twombly, 550 U.S. at 566.  But the court is not bound to accept as true legal conclusions that are couched as factual allegations. Iqbal, 556 U.S. at 678.  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  Id. (citing Twombly, 550 U.S. at 557).  If there are insufficient factual allegations to raise a right to relief above the speculative level, the complaint must be dismissed. Twombly, 550 U.S. at 555.

## III. **Discussion**

The Republic moves, again, to dismiss the instant action for lack of subject-matter jurisdiction, lack of personal jurisdiction, insufficient service of process, and failure to state a claim.  The Republic primarily argues (1) that the claims are time-barred under New York state's six-year statute of limitations for contract claims, and (2) that Plaintiffs are not

entitled to sue on the bonds as a matter of Argentine law. The Court agrees.

**A.    Plaintiffs' Claims Are Time-Barred**

The Republic argues first that Plaintiffs' claims are time-barred by New York's C.P.L.R. § 213(2). Under C.P.L.R. § 213(2), "an action upon a contractual obligation or liability, expressed or implied," must be "commenced within six years." The limitations period for principal and post-maturity interest begins to run the day after bond maturity. See Lucesco Inc. v. Republic of Arg., No. 16 Civ. 7638 (LAP), 2018 WL 9539167, at *2 (S.D.N.Y. Sept. 10, 2018) (citation omitted), aff'd, 788 F. App'x 764, 769 (2d Cir. 2019); see also Ajdler v. Province of Mendoza, 768 F. App'x 78, 79 (2d Cir. 2019) ("Once a creditor can no longer establish a right to repayment of principal, there is no basis or foundation upon which to allege a right to repayment of post-maturity interest." (quotation omitted)). Here, the bonds matured on February 21, 2012, and January 30, 2017, respectively. (Compl. ¶ 15). As such, the limitations period on the 2012 bonds expired on February 21, 2018, and the limitations period on the 2017 bonds expired on January 30, 2023. See C.P.L.R. § 213(2); (see also Def.'s Br. at 12 (citing Compl. ¶ 15).) Plaintiffs do not contest that C.P.L.R. § 213(2) applies, that the limitations periods have run, and that, absent an exception, the claims are barred.

Rather, Plaintiffs argue that New York's "savings statute," C.P.L.R. § 205(a), applies and saves the time-barred claims. In the alternative, Plaintiffs argue that Executive Order 202.8 (the "COVID-19 Order") tolls the statute of limitations by 228 days, such that the claims on the 2017 bonds are still timely. (See Opp'n Br. at 8-16.)

### i.  C.P.L.R. § 205(a)

Under C.P.L.R. § 205(a), a party may commence a new action within six months after termination of an earlier action unless the earlier action was dismissed for "voluntary discontinuance, a failure to obtain personal jurisdiction over the defendant, a dismissal of the complaint for neglect to prosecute the action, or a final judgment upon the merits."  See C.P.L.R. § 205(a). The parties disagree whether the Court dismissed the Earlier Action on personal jurisdiction grounds. (See Def.'s Br. at 12-14; Opp'n Br. at 8-16.)

The Republic contends that the Court ruled on personal jurisdiction, which renders § 205(a) inapplicable and bars Plaintiffs' claims. (See Def.'s Br. at 13.) Plaintiffs argue that the Court cabined its holding to whether Plaintiffs had standing to enforce the terms of the FAA – a basis separate from personal jurisdiction. (See, e.g., Opp'n Br. at 12.) Plaintiffs' narrow reading ignores the plain text of the Court's holdings and

that, without the ability to sue under the FAA, Plaintiffs cannot demonstrate a basis for subject-matter and personal jurisdiction.

To take a step back, "the FSIA provides the sole basis for obtaining jurisdiction over a foreign state in federal court . . . ." Reiss v. Societe Centrale du Groupe Des Assurances Nationales, 235 F.3d 738, 746 (2d Cir. 2000) (quoting Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 439 (1989)). Under the FSIA, a district court may exercise personal jurisdiction over a foreign state where (1) it has original jurisdiction over the claim, and (2) service has been made under 28 U.S.C. § 1608. 28 U.S.C. § 1330(b) (emphasis added). A district court has original jurisdiction over "any nonjury civil action against a foreign state . . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity. . . ." Id. § 1330(a). Put another way, subject-matter jurisdiction exists under the FSIA when there is (1) a nonjury civil action, (2) against a foreign state, (3) a claim for relief in personam, and (4) no entitlement to immunity. As to the fourth element, specifically, a foreign state is "presumptively immune from the jurisdiction of United States courts" unless an exception applies. See Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993); see also 28 U.S.C. §§ 1605-07 (listing FSIA exceptions). Waiver is one such exception.

Plaintiffs' complaint in the Earlier Action invoked the terms of the FAA to argue that the Republic had waived immunity and submitted to the jurisdiction of this Court. (See Compl., Bugliotti v. Republic of Arg., No. 17-cv-9934 (S.D.N.Y. filed on Dec. 20, 2017), ECF 1 ¶ 10.) The Court, in concluding that Plaintiffs lacked standing to sue on the FAA, held that Plaintiffs could "not invoke the 1994 FAA Bonds' service of process and jurisdictional provisions under the FSIA." Bugliotti III, 2021 WL 1225971, at *9. Because Plaintiffs relied on the FAA to allege a basis for jurisdiction – that is, that the Republic had waived immunity and submitted to this Court's jurisdiction, — and Plaintiffs did not allege any other basis for subject-matter or personal jurisdiction, the Court concluded that it lacked jurisdiction and dismissed the Earlier Action.

On appeal, the Court of Appeals acknowledged the same, applying a de novo standard of review for lack of subject-matter and personal jurisdiction and reciting the Court's conclusion that Plaintiffs "could not invoke the FAA's service-of-process and jurisdictional waivers under the FSIA." See Bugliotti IV, 67 F.4th at 104. Thus, the plain text of two court opinions makes clear that the Court ruled, in part, on personal jurisdiction grounds.

Accordingly, as the Court dismissed the Earlier Action for lack of personal jurisdiction, § 205(a) does not apply to the instant action, and Plaintiffs' claims are barred by § 213(2).

13

ii.  **The COVID-19 Order**

Alternatively, Plaintiffs argue that the COVID-19 Order tolls the six-year statute of limitations by 228 days, such that Plaintiffs' claims on the 2017 bonds are timely.  (See Opp'n Br. at 16.)  Plaintiffs are incorrect.

The COVID-19 Order, like § 205(a), does not apply to Plaintiffs' claims.  Under the COVID-19 Order, former Governor Andrew Cuomo declared a state of emergency due to the COVID-19 pandemic and "toll[ed]" the limitations periods prescribed under New York's procedural laws "to cope with the disaster emergency" or "to assist or aid in coping with such disaster."  N.Y. Comp. Codes R. & Regs. tit. 9, § 8.202.8 (2020).  Governor Cuomo extended the tolling period, through successive executive orders, until November 3, 2020 – 228 days from the effective date.  See id. § 8.202.72.

Plaintiffs' effort to invoke the COVID-19 Order to toll the six-year statute of limitations by 228 days is without merit because "[t]he COVID-19 pandemic alone is insufficient to warrant equitable tolling without a more specific personal reason."  See Verne v. N.Y.C. Dep't of Educ., No. 21-CV-5427, 2022 WL 4626533, at *6 (S.D.N.Y. Sept. 30, 2022).  Plaintiffs provide no reason for how the COVID-19 pandemic affected their ability to file these claims.  To the contrary, between May 8, 2020 and October 5, 2020 – while the COVID-19 Order was in effect – Plaintiffs were

14

**SPA-15**

busy preparing expert testimony and briefing the issues ultimately considered in Bugliotti III. (See Bugliotti v. Republic of Arg., No. 17-cv-9934 (S.D.N.Y. filed May 8, 2020-Oct. 5, 2020), ECF 26-46.) That Plaintiffs were actively litigating during this span demonstrates, in the first instance, that Plaintiffs were capable of meeting filing deadlines and did not require assistance "coping" during the COVID-19 pandemic.

Permitting Plaintiffs to benefit from the COVID-19 tolling period now, nearly four years after its expiration and without a specific reason as to why, would result in "an unwarranted windfall" to Plaintiffs. See Loeb v. Cnty. of Suffolk, No. 22-CV-6410 (HG), 2023 WL 4163117, at *3 (E.D.N.Y. June 23, 2023). Thus, the COVID-19 Order does not apply to Plaintiffs' claims on the 2017 bonds, and these claims remain time-barred.

**B.   Plaintiffs Are Collaterally Estopped from Relitigating Issues of Jurisdiction**

Even assuming arguendo that any of Plaintiffs' claims were timely, they would nonetheless fail because Plaintiffs are collaterally estopped from relitigating issues of jurisdiction. Although preclusion doctrines are typically considered affirmative defenses subject to waiver, see Fed. R. Civ. P. 8(c), a court may nonetheless raise issues of collateral estoppel sua sponte where, as here, the prior action was brought before the same court and deference to the prior determinations promotes judicial economy.

15

See Doe v. Pfrommer, 148 F.3d 73, 80 (2d Cir. 1998) (observing that a court may, sua sponte, raise collateral estoppel issues); see also Grieve v. Tamerin, 269 F.3d 149, 154 (2d Cir. 2001). The doctrine of collateral estoppel, or issue preclusion, serves to conserve judicial resources and to relieve parties of the cost and vexation of repeat litigation. See Montana v. United States, 440 U.S. 147, 153-54 (1979) (explaining that the doctrine of collateral estoppel is "central to the purpose for which civil courts have been established").

Collateral estoppel bars relitigation of a specific factual or legal issue in a second proceeding where (1) the identical issue was raised in a prior proceeding, (2) the issue was actually litigated and decided, (3) the precluded party had a full and fair opportunity to litigate the issue in the earlier action, and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits. See Grieve, 269 F.3d at 153 (citation and internal quotation marks omitted); MMA Consultants 1, Inc. v. Republic of Peru, 245 F. Supp. 3d 486, 518 (S.D.N.Y. 2017) (citing Ball v. A.O. Smith Corp., 451 F.3d 66, 69 (2d Cir. 2006), aff'd, 719 F. App'x 47 (2d Cir. 2017).

Collateral estoppel, unlike the doctrine of claim preclusion, may apply to determinations of jurisdiction. Zapata v. HSBC Holdings PLC, 414 F. Supp. 3d 342, 348 (E.D.N.Y. 2019); see also Ins. Co. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456

U.S. 694, 702 n.9 (1982) ("It has long been the rule that [collateral estoppel] appl[ies] to jurisdictional determinations – both subject matter and personal."). That is, a dismissal for lack of jurisdiction may bar a party's invocation of jurisdiction in a second action based on the same facts. See Stengel v. Black, 486 F. App'x 181, 183 (2d Cir. 2012) (summary order); see also Reed v. Columbia St. Mary's Hosp., 782 F.3d 331, 335 (7th Cir. 2015).

Plaintiffs bring this second action for claims predicated on the same causes of actions and factual allegations as the Earlier Action. Plaintiffs concede as much, alleging that "[t]he [b]onds, claims, transactions, and occurrences at issue in the present action are the same as in the prior action 17 Civ. 9934 . . . ." (See Compl. ¶ 23.) Plaintiffs contend here that a judicial authorization order permits them to sue on the bonds under the FAA because they are not required to reassemble the bonds. (See Opp'n Br. at 18-20.) As explained below, Plaintiffs are collaterally estopped from relitigating issues previously decided by this Court in reaching its jurisdictional determinations. See Bugliotti III, 2021 WL 1225971, at *7-9 (concluding that Plaintiffs must reassemble the bonds before invoking the provisions of the FAA).

To be sure, each element of collateral estoppel is met. As discussed, the jurisdictional issues at bar are identical to those presented in the Earlier Action. The only additional fact is that,

since the Court of Appeals affirmed dismissal and terminated the Earlier Action, Plaintiffs have sought and obtained a judicial authorization order from an Argentine court. (See Compl. ¶ 21; id., Ex. A.) Still, absent reassembly of the bonds, this fact is insufficient to change the legal result or to establish a different basis for jurisdiction. See also JDM Import Co. Inc. v. Shree Ramkrishna Exports Pvt., Ltd., 2023 WL 2632179, at *5 (S.D.N.Y. Mar. 24, 2023) (considering identicalness).

Plaintiffs also had a full and fair opportunity to litigate these issues, which were actually litigated and decided in the Earlier Action. The Republic has now moved three times to dismiss Plaintiffs' claims, in part, for lack of subject-matter jurisdiction and lack of personal jurisdiction. (See Def.'s Notice of Mot. to Dismiss; Spencer Decl., Exs. 4, 11.) Plaintiffs have known the Republic's arguments for dismissal since the Republic filed its first motion to dismiss in 2018. Additionally, the Court already considered whether Plaintiffs could invoke the terms of the FAA to exercise jurisdiction over the Republic, and the Court determined that, regardless of the party seeking to enforce the bonds, reassembly of the bonds remained a precondition to jurisdiction.[5] See Bugliotti III, 2021 WL 1225971, at *7-9.

---

[5] The Court observes that Plaintiffs also rely on the FAA's service-of-process provisions for bringing this suit. (See Opp'n Br. at 7 (noting that Plaintiffs served a summons and the Complaint

(continued on the following page)

Accordingly, Plaintiffs had a full and fair opportunity to litigate the issues, which the court considered and decided in the Earlier Action.

Last, resolution of these issues was necessary to support a valid and final judgment on the merits. See DDR Const. Servs., Inc. v. Siemens Indus., Inc., 770 F. Supp. 2d 627, 649 (S.D.N.Y. 2011) (quoting MTS, Inc. v. 200 E. 87th Street Assocs., 899 F. Supp. 1180, 1184 (S.D.N.Y. 1995)) (explaining that an issue is necessary when it is not "mere dictum"); see also 18 Wright et al. § 4421. Although "a dismissal for lack of jurisdiction is not an adjudication on the merits of a claim, . . . such a dismissal precludes [relitigation] of the issue[s] it decided." Stengel, 486 F. App'x at 183. Because the Court dismissed the Earlier Action for lack of jurisdiction, its determinations were "necessary" to the ultimate judgment.

Accordingly, the doctrine of collateral estoppel applies to the issues of jurisdiction. Plaintiffs' attempt to relitigate these points now through opposition papers is tantamount to their requesting reconsideration of the prior determinations. Thus, even if Plaintiffs could allege timely claims, they would be

--------

"as prescribed in the 1994 FAA for service of process on Argentina for bond matters," that is, "by serving Banco de la Nación Argentina in New York[] on August 16, 2023").) Although the Court need not reach the issue of service to dispose of this case, the Court notes that the method of service is also improper in light of the Court's prior holdings.

collaterally estopped from relitigating the issues of jurisdiction. Plaintiffs' claims must therefore fail.

####    C.    **Remaining Arguments**

In light of the foregoing conclusions, the Court need not reach the parties' remaining arguments.

#### IV.    **Plaintiffs' Request for Oral Argument**

On November 27, 2023, Plaintiffs filed a letter requesting oral argument on the Republic's pending motion to dismiss. (See dkt. no. 31.) Because the Court decides the Republic's motion on the papers, Plaintiffs' request for oral argument is DENIED as moot.

#### V.    **Conclusion**

For the foregoing reasons, the Republic's motion to dismiss (dkt. no. 17), is GRANTED. The Clerk of the Court is directed to mark the above-captioned case as closed and any open letter motions denied as moot.


**SO ORDERED.**

Dated:    September 30, 2024
          New York, New York

_____
LORETTA A. PRESKA
Senior United States District Judge

**SPA-21**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X
EUCLIDES BARTOLOMÉ BUGLIOTTI, MARIA
CRISTINA DE BIASI, ROXANA INÉS ROJAS,
DENISE LAURET, AND MARIA CARLA
GONANO,

Plaintiffs,

-against-                                                    23 **CIVIL** 6588 (LAP)

**JUDGMENT**

THE REPUBLIC OF ARGENTINA,

Defendant.
----------------------------------------------------------------X

It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Memorandum and Order dated September 30, 2024, Republic's motion to

dismiss is granted; accordingly, the case is closed.

**Dated:** New York, New York

September 30, 2024

**DANIEL ORTIZ**

_____

**Acting Clerk of Court**

BY: _____

**Deputy Clerk**

Search all cases and statute...   JX      Sign In

Statutes, codes, and regulations   /   Consolidated Laws of...   /   Chapter - CIVIL PRA...
/   Article 2 - LIMITATIO...   /   Section 205 - Termin...

# N.Y. C.P.L.R. § 205

 **Download PDF**

Current through 2024 NY Law Chapter 679

---

Section 205 - Termination of action

---

(**a**) New action by plaintiff. If an action is timely commenced and is terminated in any other manner than by a voluntary discontinuance, a failure to obtain personal jurisdiction over the defendant, a dismissal of the complaint for neglect to prosecute the action, or a final judgment upon the merits, the plaintiff, or, if the plaintiff dies, and the cause of action survives, his or her executor or administrator, may commence a new action upon the same transaction or occurrence or series of transactions or occurrences within six months after the termination provided that the new action would have been timely commenced at the time of commencement of the prior action and that service upon defendant is effected within

**Previous Section**
Section 204 - Stay of commencement of action; demand for arbitration

---

**Next Section**
Section 205-A - Termination of certain actions related to real property

such six-month period. Where a dismissal is one for neglect to prosecute the action made pursuant to rulethirty-two hundred sixteen of this chapter or otherwise, the judge shall set forth on the record the specific conduct constituting the neglect, which conduct shall demonstrate a general pattern of delay in proceeding with the litigation.

(**b**) Defense or counterclaim. Where the defendant has served an answer and the action is terminated in any manner, and a new action upon the same transaction or occurrence or series of transactions or occurrences is commenced by the plaintiff or his successor in interest, the assertion of any cause of action or defense by the defendant in the new action shall be timely if it was timely asserted in the prior action.

(**c**) Application. This section also applies to a proceeding brought under the workers' compensation law but shall not apply to any proceeding governed by section two hundred five-a of this article.

*N.Y. CPLR 205*

Amended by New York Laws 2022, ch. 821, Sec. 5, eff. 12/30/2022, op. to actions commenced on an instrument described in CPLR 213(4) in which a final judgment of foreclosure and sale has not been enforced.



Sign In

Search all cases and statutes...                    JX

Statutes, codes, and regulations  /  Consolidated Laws of...
/  Chapter - EXECUTIVE  /  Article 2-B - STATE A...
/  Section 29-A - Suspe...

# N.Y. Exec. Law § 29-A


⬇  Download PDF

Current through 2024 NY Law Chapter 679

Section 29-A - Suspension of other laws

**1.** Subject to the state constitution, the federal constitution and federal statutes and regulations, the governor may by executive order temporarily suspend specific provisions of any statute, local law, ordinance, or orders, rules or regulations, or parts thereof, of any agency during a state disaster emergency, if compliance with such provisions would prevent, hinder, or delay action necessary to cope with the disaster.

**2.** Suspensions pursuant to subdivision one of this section shall be subject to the following standards and limits:

**a.** no suspension shall be made for a period in excess of thirty days, provided, however, that upon reconsideration of all of the relevant facts and circumstances, the governor may extend the suspension for additional periods not to exceed thirty days each;

**b.** no suspension shall be made which does not safeguard the health and welfare of the public and which is not reasonably

casetext
Part of Thomson Reuters

Sign In

suspended and the terms and conditions of the suspension;

**d.** the order may provide for such suspension only under particular circumstances, and may provide for the alteration or modification of the requirements of such statute, local law, ordinance, order, rule or regulation suspended, and may include other terms and conditions;

**e.** any such suspension order shall provide for the minimum deviation from the requirements of the statute, local law, ordinance, order, rule or regulation suspended consistent with the disaster action deemed necessary; and f. when practicable, specialists shall be assigned to assist with the related emergency actions to avoid needless adverse effects resulting from such suspension.

**3.** Such suspensions shall be effective from the time and in the manner prescribed in such orders and shall be published as soon as practicable in the state bulletin.

**4.** The legislature may terminate by concurrent resolution executive orders issued under this section at any time.

*N.Y. Exec. Law § 29-A*

Amended by New York Laws 2020, ch. 23,Sec. 2, eff. 3/3/2020, exp. 4/30/2021.

See New York Laws 2021, ch. 71, Sec. 4.



No. 202.8

<u>E X E C U T I V E   O R D E R</u>

**Continuing Temporary Suspension and Modification of Laws
Relating to the Disaster Emergency**

**WHEREAS,** on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York;

**WHEREAS,** both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

**WHEREAS,** in order to facilitate the most timely and effective response to the COVID-19 emergency disaster, it is critical for New York State to be able to act quickly to gather, coordinate, and deploy goods, services, professionals, and volunteers of all kinds; and

**NOW, THEREFORE,** I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through April 19, 2020 the following:

- In accordance with the directive of the Chief Judge of the State to limit court operations to essential matters during the pendency of the COVID-19 health crisis,  any specific time limit for the commencement, filing, or service of any legal action, notice, motion, or other process or proceeding, as prescribed by the procedural laws of the state, including but not limited to the criminal procedure law, the family court act, the civil practice law and rules, the court of claims act, the surrogate's court procedure act, and the uniform court acts, or by any other statute, local law, ordinance, order, rule, or regulation, or part thereof, is hereby tolled from the date of this executive order until April 19, 2020;
- Subdivision 1 of Section 503 of the Vehicle and Traffic Law, to the extent that it provides for a period of validity and expiration of a driver's license, in order to extend for the duration of this executive order the validity of driver's licenses that expire on or after March 1, 2020;
- Subdivision 1 of Section 491 of the Vehicle and Traffic Law, to the extent that it provides for a period of validity and expiration of a non-driver identification card, in order to extend for the duration of this executive order the validity of non-driver identification cards that expire on or after March 1, 2020;
- Sections 401, 410, 2222, 2251, 2261, and 2282(4) of the Vehicle and Traffic law, to the extent that it provides for a period of validity and expiration of a registration certificate or number plate for a motor vehicle or trailer, a motorcycle, a snowmobile, a vessel, a limited use vehicle, and an all-terrain vehicle, respectively, in order to extend for the duration of this executive order the validity of such registration certificate or number plate that expires on or after March 1, 2020;
- Section 420-a of the vehicle and traffic law to the extent that it provides an expiration for temporary registration documents issued by auto dealers to extend the validity of such during the duration of this executive order.
- Subsection (a) of Section 602 and subsections (a) and (b) of Section 605 of the Business Corporation Law, to the extent they require meetings of shareholders to be noticed and held at a physical location.

**NOW, THEREFORE**, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of Executive Order through April 19, 2020:

- The provisions of Executive Order 202.6 are hereby modified to read as follows: Effective on March 22 at 8 p.m.: All businesses and not-for-profit entities in the state shall utilize, to the maximum extent possible, any telecommuting or work from home procedures that they can safely utilize. Each employer shall reduce the in-person workforce at any work locations by 100% no later than March 22 at 8 p.m. Any essential business or entity providing essential services or functions shall not be subject to the in-person restrictions. An entity providing essential services or functions whether to an essential business or a non-essential business shall not be subjected to the in-person work restriction, but may operate at the level necessary to provide such service or function. Any business violating the above order shall be subject to enforcement as if this were a violation of an order pursuant to section 12 of the Public Health Law.
- There shall be no enforcement of either an eviction of any tenant residential or commercial, or a foreclosure of any residential or commercial property for a period of ninety days.
- Effective at 8 p.m. March 20, any appointment that is in-person at any state or county department of motor vehicles is cancelled, and until further notice, only on-line transactions will be permitted.
- The authority of the Commissioner of Taxation and Finance to abate late filing and payment penalties pursuant to section 1145 of the Tax Law is hereby expanded to also authorize abatement of interest, for a period of 60 days for a taxpayers who are required to file returns and remit sales and use taxes by March 20, 2020, for the sales tax quarterly period that ended February 29, 2020.



G I V E N   under my hand and the Privy Seal of the

State in the City of Albany this

twentieth day of March in the year

two thousand twenty.

BY THE GOVERNOR

Secretary to the Governor

SPA-28



State of New York

Executive Chamber

No. 202.72

E X E C U T I V E   O R D E R

**Continuing Temporary Suspension and Modification of Laws
Relating to the Disaster Emergency**

**WHEREAS,** on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

**WHEREAS,** both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

**NOW, THEREFORE, I, ANDREW M. CUOMO,** Governor of the State of New York, by virtue of the authority vested in me by the Constitution and the Laws of the State of New York, do hereby find that a disaster continues to exist for which affected state agencies and local governments are unable to respond adequately. Therefore, pursuant to the authority vested in me by the Constitution of the State of New York and Section 28 of Article 2-B of the Executive Law, I hereby continue for thirty days the declaration of the State Disaster Emergency effective March 7, 2020, as set forth in Executive Order 202. This Executive order shall remain in effect through December 3, 2020.

**IN ADDITION,** I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, or to provide any directive necessary to respond to the disaster, do hereby continue the suspensions and modifications of law, and any directives not superseded by a subsequent directive, contained in Executive Orders 202 up to and including 202.21, and 202.27, 202.28, 202.29, 202.30, 202.31, 202.38, 202.39, 202.40, 202.41, 202.42, 202.43, 202.48, 202.49, 202.50, 202.51, 202.52, 202.55, 202.55.1, 202.56, 202.60, 202.61, 202.62, 202.63, as continued and contained in Executive Orders 202.67 and 202.68 for another thirty days through December 3, 2020, except:

- Subdivision (a) of Section 301 of the Vehicle and Traffic Law, to the extent that it requires annual safety inspections and at least biennial emissions inspections, shall no longer be suspended or modified, and provided no penalty shall attach to the failure to obtain such inspection until December 1, 2020;

- Subdivision 1 of Section 491 of the Vehicle and Traffic law, to the extent that it provides for a period of validity and expiration of a non-driver identification card, shall no longer be suspended or modified;

- Sections 401, 410, 2222, 2251, 2251, and 2282(4) of the Vehicle and Traffic law, to the extent that it provides for a period of validity and expiration of a registration certificate or number plate for a motor vehicle or trailer, a motorcycle, a snowmobile, a vessel, a limited use vehicle, and an all-terrain vehicle, shall no longer be suspended or modified, but provided that no penalty shall attach to the failure to extend such registration until December 1, 2020;

- Section 420-a of the Vehicle and Traffic law, to the extent that it provides an expiration for temporary registration documents issued by auto dealers shall no longer be suspended or modified;

- Pursuant to Executive Order 202.67, the suspension for civil cases in Executive Order 202.8, as modified and extended in subsequent Executive Orders, that tolled any specific time limit for the commencement, filing, or service of any legal action, notice, motion, or other process or proceeding as prescribed by the procedural laws of the state, including but not limited to the family court act, the civil practice law and rules, the court of claims act, the surrogate's court procedure act, and the uniform court acts, or by any statute, local law, ordinance, order, rule, or regulation, or part thereof, is hereby no longer in effect as of November 4, 2020, provided any criminal procedure law suspension remains in effect and provided that all suspensions of the Family Court Act remain in effect until November 18, 2020 and thereafter continue to remain in effect for those juvenile delinquency matters not involving a detained youth and for those child neglect proceedings not involving foster care.

- To the extent Executive Order 202.61 modified subdivision 1 of section 579 of the Public Health Law to require reporting of COVID-19 and influenza test results by additional clinical laboratories within 3 hours, such modification is continued and amended to permit such laboratories to report results to the Department within 24 hours, provided the Department may require more frequent reporting if deemed necessary;

**IN ADDITION,** I hereby temporarily suspend or modify the following from the date of this Executive Order through December 3, 2020:

- Sections 732 and 743 of the Real Property Actions and Proceedings Law are modified to the extent necessary to provide that the time to answer in any summary eviction proceeding for nonpayment of rent that is pending on the date of the issuance of this Executive Order will be sixty days.

**IN ADDITION,** by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I do hereby issue the following directives through December 3, 2020:

- The directive contained in Executive Order 202.61, along with implementing guidance, requiring clinical laboratories and licensed professionals authorized by the Department of Health Physician Office Laboratory Evaluation Program to administer a test for COVID-19 or influenza to report results of COVID-19 and influenza tests to the Department within three hours, is hereby modified to permit clinical laboratories and those licensed professionals with reporting requirements to report results to the Department within 24 hours, provided the Department may require more frequent reporting if deemed necessary.



G I V E N   under my hand and the Privy Seal of the

State in the City of Albany this third

day of November in the year two

thousand twenty.

BY THE GOVERNOR

Secretary to the Governor

LII > U.S. Code > Title 28 > PART IV > CHAPTER 85 > § 1330

Quick search by citation:

**Title** [enter title] **Section** [section] [Go!]

# 28 U.S. Code § 1330 - Actions against foreign states

U.S. Code  Notes

**(a)** The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

**(b)** Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.

**(c)** For purposes of subsection (b), an appearance by a foreign state does not confer personal jurisdiction with respect to any claim for relief not arising out of any transaction or occurrence enumerated in sections 1605–1607 of this title.

(Added Pub. L. 94–583, § 2(a), Oct. 21, 1976, 90 Stat. 2891.)

 **U.S. Code Toolbox**

Law about...

Articles from Wex

Table of Popular Names

Parallel Table of Authorities

How current is this?

LII  > U.S. Code  > Title 28  > PART IV  > CHAPTER 97  > **§ 1605**

Quick search by citation:

**Title** [ enter title        ⇅ ]  **Section** [ section          ]  [ Go! ]

# 28 U.S. Code § 1605 - General exceptions to the jurisdictional immunity of a foreign state

U.S. Code    Notes

---

**(a)** A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

**(1)** in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver;

**(2)** in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

**(3)** in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is

engaged in a commercial activity in the United States;

**(4)** in which rights in property in the United States acquired by succession or gift or rights in immovable property situated in the United States are in issue;

**(5)** not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to—

    **(A)** any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or

    **(B)** any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights; or

**(6)** in which the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States, or to confirm an award made pursuant to such an agreement to arbitrate, if (A) the arbitration takes place or is intended to take place in the United States, (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards, (C) the underlying claim, save for the agreement to arbitrate, could have been brought in a United States court under this section or section 1607, or (D) paragraph (1) of this subsection is otherwise applicable.

**(b)** A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which a suit in admiralty is brought to enforce a maritime lien against a vessel or cargo of the foreign state, which maritime lien is based upon a commercial activity of the foreign state: *Provided*, That—

    **(1)** notice of the suit is given by delivery of a copy of the summons and of the complaint to the person, or his agent, having possession of the vessel or cargo

against which the maritime lien is asserted; and if the vessel or cargo is arrested pursuant to process obtained on behalf of the party bringing the suit, the service of process of arrest shall be deemed to constitute valid delivery of such notice, but the party bringing the suit shall be liable for any damages sustained by the foreign state as a result of the arrest if the party bringing the suit had actual or constructive knowledge that the vessel or cargo of a foreign state was involved; and

**(2)** notice to the foreign state of the commencement of suit as provided in section 1608 of this title is initiated within ten days either of the delivery of notice as provided in paragraph (1) of this subsection or, in the case of a party who was unaware that the vessel or cargo of a foreign state was involved, of the date such party determined the existence of the foreign state's interest.

**(c)** Whenever notice is delivered under subsection (b)(1), the suit to enforce a maritime lien shall thereafter proceed and shall be heard and determined according to the principles of law and rules of practice of suits in rem whenever it appears that, had the vessel been privately owned and possessed, a suit in rem might have been maintained. A decree against the foreign state may include costs of the suit and, if the decree is for a money judgment, interest as ordered by the court, except that the court may not award judgment against the foreign state in an amount greater than the value of the vessel or cargo upon which the maritime lien arose. Such value shall be determined as of the time notice is served under subsection (b)(1). Decrees shall be subject to appeal and revision as provided in other cases of admiralty and maritime jurisdiction. Nothing shall preclude the plaintiff in any proper case from seeking relief in personam in the same action brought to enforce a maritime lien as provided in this section.

**(d)** A foreign state shall not be immune from the jurisdiction of the courts of the United States in any action brought to foreclose a preferred mortgage, as defined in section 31301 of title 46. Such action shall be brought, heard, and determined in accordance with the provisions of chapter 313 of title 46 and in accordance with the principles of law and rules of practice of suits in rem, whenever it appears that had the vessel been privately owned and possessed a suit in rem might have been maintained.

**[(e)** , (f) Repealed. Pub. L. 110–181, div. A, title X, § 1083(b)(1)(B), Jan. 28, 2008, 122 Stat. 341.]

**(g) LIMITATION ON DISCOVERY.—**

**(1) IN GENERAL.—**

**(A)** Subject to paragraph (2), if an action is filed that would otherwise be barred by section 1604, but for section 1605A or section 1605B, the court, upon request of the Attorney General, shall stay any request, demand, or order for discovery on the United States that the Attorney General certifies would significantly interfere with a criminal investigation or prosecution, or a national security operation, related to the incident that gave rise to the cause of action, until such time as the Attorney General advises the court that such request, demand, or order will no longer so interfere.

**(B)** A stay under this paragraph shall be in effect during the 12-month period beginning on the date on which the court issues the order to stay discovery. The court shall renew the order to stay discovery for additional 12-month periods upon motion by the United States if the Attorney General certifies that discovery would significantly interfere with a criminal investigation or prosecution, or a national security operation, related to the incident that gave rise to the cause of action.

**(2) SUNSET.—**

**(A)** Subject to subparagraph (B), no stay shall be granted or continued in effect under paragraph (1) after the date that is 10 years after the date on which the incident that gave rise to the cause of action occurred.

**(B)** After the period referred to in subparagraph (A), the court, upon request of the Attorney General, may stay any request, demand, or order for discovery on the United States that the court finds a substantial likelihood would—

**(i)** create a serious threat of death or serious bodily injury to any person;

**(ii)** adversely affect the ability of the United States to work in cooperation with foreign and international law enforcement agencies in investigating violations of United States law; or

**(iii)** obstruct the criminal case related to the incident that gave rise to the cause of action or undermine the potential for a conviction in such case.

**(3) EVALUATION OF EVIDENCE.—**
The court's evaluation of any request for a stay under this subsection filed by the Attorney General shall be conducted ex parte and in camera.

**(4) BAR ON MOTIONS TO DISMISS.—**
A stay of discovery under this subsection shall constitute a bar to the granting of a motion to dismiss under rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure.

**(5) CONSTRUCTION.—**
Nothing in this subsection shall prevent the United States from seeking protective orders or asserting privileges ordinarily available to the United States.

**(h) JURISDICTIONAL IMMUNITY FOR CERTAIN ART EXHIBITION ACTIVITIES.—**

**(1) IN GENERAL.—**If—

**(A)** a work is imported into the United States from any foreign state pursuant to an agreement that provides for the temporary exhibition or display of such work entered into between a foreign state that is the owner or custodian of such work and the United States or one or more cultural or educational institutions within the United States;

**(B)** the President, or the President's designee, has determined, in accordance with subsection (a) of Public Law 89–259 (22 U.S.C. 2459(a)), that such work is of cultural significance and the temporary exhibition or display of such work is in the national interest; and

**(C)** the notice thereof has been published in accordance with subsection (a) of Public Law 89–259 (22 U.S.C. 2459(a)),

any activity in the United States of such foreign state, or of any carrier, that is associated with the temporary exhibition or display of such work shall not be considered to be commercial activity by such foreign state for purposes of subsection (a)(3).

**(2) EXCEPTIONS.—**

**(A)** Nazi-era claims.—Paragraph (1) shall not apply in any case asserting jurisdiction under subsection (a)(3) in which rights in property taken in

violation of international law are in issue within the meaning of that subsection and—

> **(i)** the property at issue is the work described in paragraph (1);

> **(ii)** the action is based upon a claim that such work was taken in connection with the acts of a covered government during the covered period;

> **(iii)** the court determines that the activity associated with the exhibition or display is commercial activity, as that term is defined in section 1603(d); and

> **(iv)** a determination under clause (iii) is necessary for the court to exercise jurisdiction over the foreign state under subsection (a)(3).

**(B)** Other culturally significant works.—In addition to cases exempted under subparagraph (A), paragraph (1) shall not apply in any case asserting jurisdiction under subsection (a)(3) in which rights in property taken in violation of international law are in issue within the meaning of that subsection and—

> **(i)** the property at issue is the work described in paragraph (1);

> **(ii)** the action is based upon a claim that such work was taken in connection with the acts of a foreign government as part of a systematic campaign of coercive confiscation or misappropriation of works from members of a targeted and vulnerable group;

> **(iii)** the taking occurred after 1900;

> **(iv)** the court determines that the activity associated with the exhibition or display is commercial activity, as that term is defined in section 1603(d); and

> **(v)** a determination under clause (iv) is necessary for the court to exercise jurisdiction over the foreign state under subsection (a)(3).

**(3) DEFINITIONS.—**For purposes of this subsection—

**(A)** the term "work" means a work of art or other object of cultural significance;

**(B)** the term "covered government" means—

    **(i)** the Government of Germany during the covered period;

    **(ii)** any government in any area in Europe that was occupied by the military forces of the Government of Germany during the covered period;

    **(iii)** any government in Europe that was established with the assistance or cooperation of the Government of Germany during the covered period; and

    **(iv)** any government in Europe that was an ally of the Government of Germany during the covered period; and

**(C)** the term "covered period" means the period beginning on January 30, 1933, and ending on May 8, 1945.

(Added Pub. L. 94–583, § 4(a), Oct. 21, 1976, 90 Stat. 2892; amended Pub. L. 100–640, § 1, Nov. 9, 1988, 102 Stat. 3333; Pub. L. 100–669, § 2, Nov. 16, 1988, 102 Stat. 3969; Pub. L. 101–650, title III, § 325(b)(8), Dec. 1, 1990, 104 Stat. 5121; Pub. L. 104–132, title II, § 221(a), Apr. 24, 1996, 110 Stat. 1241; Pub. L. 105–11, Apr. 25, 1997, 111 Stat. 22; Pub. L. 107–77, title VI, § 626(c), Nov. 28, 2001, 115 Stat. 803; Pub. L. 107–117, div. B, § 208, Jan. 10, 2002, 115 Stat. 2299; Pub. L. 109–304, § 17(f)(2), Oct. 6, 2006, 120 Stat. 1708; Pub. L. 110–181, div. A, title X, § 1083(b)(1), Jan. 28, 2008, 122 Stat. 341; Pub. L. 114–222, § 3(b)(2), Sept. 28, 2016, 130 Stat. 853; Pub. L. 114–319, § 2(a), Dec. 16, 2016, 130 Stat. 1618.)

Quick search by citation:

**Title** [enter title    ⇕]  **Section** [section          ]  [ Go! ]

# 28 U.S. Code § 1608 - Service; time to answer; default

U.S. Code    Notes

**(a)** Service in the courts of the United States and of the States shall be made upon a foreign state or political subdivision of a foreign state:

**(1)** by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or

**(2)** if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or

**(3)** if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or

**(4)** if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk

of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

As used in this subsection, a "notice of suit" shall mean a notice addressed to a foreign state and in a form prescribed by the Secretary of State by regulation.

**(b)** Service in the courts of the United States and of the States shall be made upon an agency or instrumentality of a foreign state:

**(1)** by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality; or

**(2)** if no special arrangement exists, by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States; or in accordance with an applicable international convention on service of judicial documents; or

**(3)** if service cannot be made under paragraphs (1) or (2), and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state—

**(A)** as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request or

**(B)** by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served, or

**(C)** as directed by order of the court consistent with the law of the place where service is to be made.

**(c)** Service shall be deemed to have been made—

**(1)** in the case of service under subsection (a)(4), as of the date of transmittal

SPA-42

indicated in the certified copy of the diplomatic note; and

**(2)** in any other case under this section, as of the date of receipt indicated in the certification, signed and returned postal receipt, or other proof of service applicable to the method of service employed.

**(d)** In any action brought in a court of the United States or of a State, a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state shall serve an answer or other responsive pleading to the complaint within sixty days after service has been made under this section.

**(e)** No judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court. A copy of any such default judgment shall be sent to the foreign state or political subdivision in the manner prescribed for service in this section.

(Added Pub. L. 94–583, § 4(a), Oct. 21, 1976, 90 Stat. 2894.)



💼 U.S. Code Toolbox

Law about...

PUBLIC DEBT

12/21/2017

**PUBLIC DEBT**

**Decree 1005/2001**

**Regime for settlement of tax obligations using Public Debt Securities. Exceptions. *Letras del Tesoro* [translator's note: short-term Treasury Bills, or "LETES" in Spanish]. Tax Credit Certificates. Federal Co-Participation Tax System. Validity.**

Buenos Aires, 8/9/2001

WITH REGARD TO Law No. 11,683, text consolidated in 1998 and its amendments; Law No. 25,414; Law No. 25,453; and Decree No. 1397 of June 12, 1979, and

RECITALS:

Whereas the seriousness of the economic emergency the Republic of Argentina now requires adoption of measures complementing those from Law No. 25,453, which will allow achievement of a balanced budget, including servicing of interest payments for the public debt.

Whereas, consistent with the decisions adopted in the area of budgetary administration, the adverse climate now facing that value of the public credit must be remedied as soon as possible, since its deterioration is seriously compromising short-term revitalization of the economy.

Whereas in relation to this, the high yields being recorded for Public Debt Securities demonstrate the lack of confidence being with respect to the commitment of the NATIONAL GOVERNMENT, or that of other jurisdictions, with respect to the corresponding financial obligations.

Whereas that lack of confidence is reducing demand for Argentine securities, including among individuals who in the future will have to make payments for the taxes corresponding to their activities.

Whereas all of this is affecting the cost of credit and threatening to disturb the progress of the economy, while also damaging the ability of the NATIONAL GOVERNMENT to collect tax revenues and producing the associated effects with respect to social benefits that must be paid out, while also affecting the ability to recover employment levels that are required by the urgent needs of the Republic of Argentina as a society.

Whereas the lack of confidence described still does not correspond with the decision of the authorities of the REPUBLIC OF ARGENTINA to adopt all measures necessary to service its public debt, which is based upon the certain knowledge that protecting it is fundamental for consolidation of the economic recovery, by reestablishing the cycle of consumption and investment regardless of the sacrifices that may be necessary in order to do so.

Whereas that decision, and the resulting efforts required from the people of Argentina, will become less burdensome to the extent that repatriation can be achieved for the highest amount of public debt possible, since in such a case the resulting circulation of wealth will contribute to the revitalization of the economy. This will also allow improvement of tax collection efforts, with recovery of the levels originally budgeted along with the respective remunerations and earnings, thus decreasing the efforts required for servicing of the public debt and making it possible, as the case may be, to reduce the tax burden that is affecting consumption and investment, or that is disturbing the economic activity of particular sectors or regions.

Whereas it is very important to emphasize that a high proportion of the total public debt is now concentrated in both the financial system and in the savings accumulated in the retirement and pension system, which means that any difficulties that may arise to pay principal or interest could cause serious harm to the voluntary and institutional savings of the people of Argentina.

Whereas furthermore, the prices at which Argentine securities are currently being traded on the secondary markets now represent a great opportunity for local residents, since these prices make mass repatriation of the portion of the public debt being held by non-residents both possible and very desirable.

Whereas such repatriation has the major advantage of allowing the majority of the amounts paid out for servicing of interest and repayment of principal to be reinvested or consumed within the country itself.

1

PUBLIC DEBT

12/21/2017

Whereas an increase in the proportion of Argentine securities being held by residents will provide the advantages of a significant increase in wealth being maintained within the local environment when appreciation in value occurs.

Whereas the guarantees introduced by the legislation will allow an increase in value of the public credit, which is currently scarce.

Whereas with respect to short-term liquidity instruments from the National Treasury, mechanisms must be applied to allow these to serve as a means for settling or paying national taxes, in a manner that encourages their circulation and decreases their financial yields to reasonable levels for the terms for which they are issued, since these are essential instruments for managing short-term liquidity both for the National Treasury and for the financial system.

Whereas in accordance with the delegation of powers enacted under Law No. 25,414, the NATIONAL EXECUTIVE BRANCH is authorized to make available all tax exemptions that may be useful for increasing the competitiveness of the national economy, and since there is no option with a more positive effect on the aforementioned capacities of the national production efforts than the one that would be produced by a substantial drop in interest rates.

Whereas in relation to this, it is important to have a suitable arrangement, under the terms described in Article 113, second paragraph, of Law No. 11,683, text consolidated in 1998 and its amendments, to allow settlement of outstanding tax debts by using National Public Debt Securities.

Whereas this must be adequately complemented by other measures that can grant real advantages to those who have regularly complied with payment of their taxation and social benefit commitments, and who plan to do so in the future.

That in relation to this, a general plan for settlement of outstanding tax debts using National Public Debt Securities allows the use of market incentives to favor those who comply with their obligations in relation to past-due payments.

Whereas, furthermore, the possibility of obtaining Tax Credit Certificates [translator's note: in Spanish, "Certificados de Crédito Fiscal," or "CCFs"] by depositing National Public Debt Securities at CAJA DE VALORES SOCIEDAD ANONIMA, in a manner that makes the securities unavailable, and with the CCFs issued in exchange for the coupons or interest payments for those securities, will also allow the use of market incentives in favor of those who plan to regularly comply with their tax obligations in the future, favoring to the greatest extent taxpayers who acquire Public Securities on the securities market at current values, with the magnitude of this advantage decreasing as the price of such Public Securities increases.

Whereas this does not require any fiscal effort by the NATIONAL GOVERNMENT, since its commitments will be fully complied with upon maturity in the usual manner.

Whereas these measures should in no way affect the Federal Co-Participation Taxation system according to the criteria of economic reality, such that the Provinces and the AUTONOMOUS CITY OF BUENOS AIRES will not suffer any harm, nor will they benefit, by the situation where the prices for public debt on the market depreciate, and where prices below the technical value are being recorded.

Whereas the GENERAL DEPARTMENT OF LEGAL AFFAIRS of the MINISTRY OF THE ECONOMY has performed the actions for which it is responsible.

Whereas the present is being ordered in exercise of the authorities conferred under Article 99, paragraphs 1 and 2 of the NATIONAL CONSTITUTION, as well as the authorities delegated pursuant to Article 113, second paragraph, of Law No. 11,683, text consolidated in 1998 and its amendments, and under Law No. 25,414.

And as such,

THE PRESIDENT OF THE NATION OF ARGENTINA

HEREBY DECREES:

**Art. 1** – The short-term Treasury Bills (LETES) that are issued as of the date of the present decree's publication in the Official Gazette, shall have upon their maturity final settlement powers for payment of national taxation obligations, under the conditions established for cash in Article 36 of Decree No. 1,397 of June 12, 1979 and its amendments, with the exception of payments and contributions to Social Security or payments to the system of Health Insurance and Occupational Risk Insurance, the Tax on Bank Account Transactions, and compliance with the obligations that correspond to Tax Withholding and Collection Agents. THE FEDERAL PUBLIC REVENUE ADMINISTRATION,

2

PUBLIC DEBT

12/21/2017

an autarkic entity under the scope of the MINISTRY OF THE ECONOMY, shall settle tax obligations up to the amount of the short-term Treasury Bills received, with this amount being fully allocated to the responsibility of the Republic of Argentina for purposes of the corresponding distribution under the Federal Taxation Co-Participation system.

**Art. 2** – The MINISTRY OF THE ECONOMY is hereby authorized to issue Tax Credit Certificates (CCFs), which shall be recorded by book entry, for the amount equivalent to the interest coupons from the National Public Debt Securities that are deposited up until December 31, 2001, and held in custody for such purposes at CAJA DE VALORES SOCIEDAD ANONIMA, or where is otherwise determined by the coordinating body for the Financial Administration Systems of the National Public Sector. The maximum authorized amount for issuance of Tax Credit Certificates (CCFs) for each future fiscal year shall be the amount set forth in the Budget of the National Administration corresponding to the year 2001 for servicing interest payments for the Public Securities issued. During the current fiscal year, the maximum amount shall be determined as the balances outstanding for such concept. The respective securities shall be transferred into a fiduciary account at CAJA DE VALORES SOCIEDAD ANONIMA, or where is otherwise determined by the coordinating body for the Financial Administration Systems of the National Public Sector, with the securities then being unavailable to their holder. CAJA DE VALORES SOCIEDAD ANONIMA, or any other party to which the authority corresponds, shall issue custody certificates for the amount equivalent to the principal to be repaid for the corresponding securities, with these certificates being freely transferable. The holders shall not be able to exercise the maturity acceleration clauses agreed upon in the terms and conditions for issuance of the respective securities.

*(**Infoleg note***: Authorization to issue the Tax Credit Certificates (CCFs) is canceled under art. 1 of <u>Decree No. 1645/2001</u>.*)*

**Art. 3** – The Tax Credit Certificates (CCFs) shall be issued in the currency corresponding to the interest coupons they represent. Their maturity date shall be simultaneous with that of the coupon payments; they shall be freely transferable by their holders; they shall be regulated by the Law of the REPUBLIC OF ARGENTINA; and in the event of a dispute, they shall be subject to the jurisdiction of the competent Federal Courts.

**Art. 4** – The Tax Credit Certificates (CCFs) shall have, as of their maturity date, final settlement power for payment of national taxation obligations that become payable from that maturity date onwards, under the conditions established for cash in Article 36 of Decree No. 1,397 and its amendments, with the exception of payments and contributions to Social Security or payments to the system of Health Insurance and Occupational Risk Insurance, the Tax on Bank Account Transactions, and compliance with the obligations that correspond to Tax Withholding and Collection Agents. The FEDERAL PUBLIC REVENUE AGENCY, an autarkic entity under the scope of the MINISTRY OF THE ECONOMY, shall receive the Tax Credit Certificates (CCFs) upon their maturity for purposes of settling the respective taxes, into the account provided for this purpose in conformity with Article 8 of Decree No. 979 of August 1, 2001, with the corresponding debit to the respective accounts of the depositors, and with this amount then being fully allocated to the responsibility of the Republic of Argentina for purposes of the corresponding distribution under the Federal Taxation Co-Participation system.

The Tax Credit Certificates (CCFs) issued shall be canceled if payments are made for servicing of the interest coupons they represent or when they are applied to payment of taxes, in which case the respective coupons are considered to be canceled and settled.

**Art. 5** – Depositors shall be able to withdraw, at any time but only once, the Public Debt Securities they have deposited at CAJA DE VALORES SOCIEDAD ANONIMA, or where is otherwise determined by the coordinating body for the Financial Administration Systems of the National Public Sector, by handing in the custody certificates for the amount equivalent to the outstanding principal, along with the Tax Credit Certificates (CCFs) with application still pending that may have been issued to them, which shall then be debited against their account and voided.

**Art. 6** – The MINISTRY OF THE ECONOMY is hereby authorized, for future issuances of Public Debt Securities and at its sole discretion, to provide holders of these with a time period of no less than NINETY (90) days, counted from the time of their issuance, to deposit these securities at CAJA DE VALORES SOCIEDAD ANONIMA, or in the location determined by the coordinating body for the Financial Administration Systems of the National Public Sector, under the conditions established in the present decree, thereby receiving Tax Credit Certificates (CCFs) for the respective interest coupons, in cases where there is a balance available for such purposes.

*(**Infoleg note***: Authorization to issue the Tax Credit Certificates (CCFs) is canceled under art. 1 of <u>Decree No. 1645/2001</u>.*)*

**Art. 7** – Subject to the amendments resulting from the present decree, the provisions found in Decree No. 979/01 in relation to the Tax Credit Certificates are applicable, except those relating to time periods.

**Art. 8** – All debts owed in relation to national taxes, customs duties, and contributions to Social Security—with the exception of payments to the system of Health Insurance and to the Administrators of Occupational Risk Insurance—and where collection is the responsibility of the FEDERAL

PUBLIC DEBT

12/21/2017

PUBLIC REVENUE AGENCY, an autarkic entity under the scope of the MINISTRY OF THE ECONOMY, and that have become due and payable as of June 30, 2001, inclusive, may be settled up until December 31, 2001 by tendering National Public Debt Securities with a final maturity date of up until December 31, 2005, at their technical value and under the applicable terms and conditions.

Settlement of tax debts under the terms and conditions of the present system shall include a partial waiver of interest and penalties, under the terms, and according to the modalities, established for this purpose by the FEDERAL PUBLIC REVENUE AGENCY, an autarkic entity under the scope of the MINISTRY OF THE ECONOMY.

The FEDERAL PUBLIC REVENUE AGENCY, an autarkic entity under the scope of the MINISTRY OF THE ECONOMY, is hereby authorized to issue the complementary regulations for purposes of applying the payment and settlement arrangement made available under the present decree.

The gains resulting from application of National Public Debt Securities for settlement of tax obligations, as made available under the present system, shall be considered exempt from Income Tax. These exempt gains shall be the difference between the technical value at which the Securities were issued and their market value (according to the quotation determined according to the procedure established by the Authority for Application) on their date of acquisition, or the market value corresponding to the day before the date upon which the present decree is published in the Official Gazette when holding of the Securities used for such settlement was pre-existent.

**Art. 9** – The system described in Article 8 of the present decree shall be applicable also to obligations that, as of the date of publication of the present decree in the Official Gazette, are the subject of an ongoing administrative dispute or administrative or judicial proceedings, as long as the responsible party agrees to unconditionally withdraw or renounce, as the case may be, all such actions and rights, including the right to action for recovery, also assuming payment of the costs and expenses related to the case, and provided that the requirements established by the regulations that further develop the present measure are complied with.

This withdrawal or renouncement may be either full or partial, and may take place at any stage of the administrative process or administrative or judicial proceedings, as the case may be.

**Art. 10** – For purposes of distribution under the Federal Co-Participation Tax system, the National Public Debt Securities received for purposes of settling taxes that are subject to co-participation shall be calculated at the market value on the day of their allocation, based upon the quotation determined according to the procedures established by the Authority for Application.

**Art. 11** – Replacement is hereby ordered of Article 61 of Decree No. 1,397/79 and its amendments, which regulate Law No. 11,683, text as consolidated in 1998 and its amendments, which shall now have the following wording:

"ARTICLE 61. – The authority to agree upon settlements only includes legal acts that consolidate, update, or finalize the tax credit, without affecting its integrity or unavailability, except when such agreements involve settlement of tax debts using National Public Debt Securities."

**Art. 12** – For the present decree, the Authority for Application shall be the MINISTRY OF THE ECONOMY.

**Art. 13** –The present decree shall enter into effect as of its date of publication in the Official Gazette.

**Art. 14** – It is hereby ordered that communication, publication, submittal to the National Department of the Official Registry, and filing shall take place. – [President] DE LA RUA. – Chrystian G. Colombo. – Domingo F. Cavallo.

*(**Infoleg note:** pursuant to art. 39 of Law No. 27,198, Official Gazette of 11/4/2015, the suspension established by article 1 of Decree No. 493/2004, Official Gazette of 04/22/2004 is maintained during fiscal year 2016. **Previous suspensions**: art. 42 of Law No. 27,008, Official Gazette 11/18/2014; art. 54 of Law No. 26,895, Official Gazette 10/22/2013; art. 37 of Law No. 26,784, Official Gazette 11/05/2012; art. 49 of Law No. 26,728, Official Gazette 12/28/2011)*

*(**Infoleg note:** art. 50 of Law No. 26,546, Official Gazette 11/27/2009 states that the suspension established by article 1 of Decree No. 493/2004 shall be extended until the National Executive Branch standardizes, under the terms of article 51 of the cited law (26,546), the certificates issued in the context of the decrees cited in the present article. For such purposes, it is hereby ordered that the National Executive Branch shall be authorized to issue the corresponding regulations. **Previous suspensions**: art. 54 of Law No. 26,422, Official Gazette 11/21/2008; art. 54 of Law No. 26,337, Official Gazette 12/28/2007; art. 58 of Law No. 26,198, Official Gazette 1/10/2007; art. 42 of Law No. 26,078, Official Gazette 1/12/2006)*

PUBLIC DEBT

12/21/2017

*(**Infoleg note:** Art. 1 of <u>Decree No. 493/2004</u>, Official Gazette 4/22/2004 suspends the system established in the present Decree for settlement of national tax obligations using public debt securities, until the voluntary exchange operation for External Public Debt Securities as described in article 24 of <u>Decree No. 1387/2001</u> has been finalized. Period of effect: beginning on the day of its publication in the Official Gazette).*

*(**Infoleg note:** Art. 1 of <u>Decree No. 1657/2002</u>, Official Gazette 9/6/2002 suspends the system established in this decree for settlement of national tax obligations using public debt securities, among others, for a period of NINETY (90) days, counted from the date of publication of Decree 1657/2002.)*

AFFIDAVIT OF TRANSLATOR
REGARDING ACCURACY OF TRANSLATION

STATE OF NEW YORK )

:ss.:

COUNTY OF NEW YORK )

EZEQUIEL SANCHEZ HERRERA, being duly sworn, deposes and says:

I am a lawyer employed by Cleary Gottlieb Steen & Hamilton LLP presently residing and working within the State of New York and declare:

I am proficient with the Spanish language and the English language, have had prior experience in translating documents in those languages, have reviewed the foregoing document (Decree 1005/2001 dated August 9, 2001) translated from Spanish into English and believe that the translation is complete and accurate.

Ezequiel Sánchez Herrera

Sworn to before me this
5th day of March, 2018

Notary Public

John Piacomento
Notary Public, State of New York
No. 01PL6353933
Qualified in Kings County
Certificate on File in New York County
Commission Expires January 30, 2021



**DEUDA PUBLICA**

**Decreto 1005/2001**

**Régimen de cancelación de obligaciones tributarias con Títulos de la Deuda Pública. Excepciones. Letras del Tesoro (LETES). Certificados de Crédito Fiscal. Coparticipación Federal de Impuestos. Vigencia.**

Bs. As., 9/8/2001

VISTO las Leyes N° 11.683, texto ordenado en 1998 y sus modificaciones, N° 25.414 y N° 25.453 y el Decreto N° 1397 del 12 de junio de 1979, y

CONSIDERANDO:

Que la gravedad de la emergencia económica que padece la Nación Argentina obliga a la adopción de medidas complementarias a las de la Ley N° 25.453, que permitirán alcanzar el equilibrio presupuestario, incluyendo el pago de los servicios de intereses de la deuda pública.

Que, congruente con las decisiones adoptadas en el campo de la administración presupuestaria, debe revertirse lo antes posible el clima adverso a la valorización del crédito público, cuya depreciación compromete seriamente la pronta reactivación de la economía.

Que en tal sentido, los altos rendimientos que registran los Títulos de la Deuda Pública son demostrativos de la falta de confianza que se advierte, respecto a los compromisos del ESTADO NACIONAL o de las demás jurisdicciones, respecto a sus correspondientes obligaciones financieras.

Que esa falta de confianza mantiene retraída la demanda de títulos argentinos, incluyendo a quienes deberán afrontar en el futuro el pago de los impuestos correspondientes a su actividad.

Que ello afecta el costo del crédito y amenaza con perturbar la marcha de la economía, dañando la capacidad recaudatoria del ESTADO NACIONAL, con los efectos que ello tiene respecto a las prestaciones que se deben atender, así como la recuperación de niveles de empleo que resulten acordes a las urgencias de la Nación Argentina en el campo social.

Que la falta de confianza aludida no se condice todavía con la decisión de los poderes de la REPUBLICA ARGENTINA de adoptar todos los recaudos para honrar el crédito público, en la seguridad que su resguardo resulta fundamental para consolidar la recuperación de la economía, recreando el ciclo de consumo e inversión, más allá de los sacrificios que fueren necesarios para ello.

Que esa decisión y el esfuerzo consecuente del pueblo argentino, serán menos gravosos en la medida que se logre la repatriación del mayor volumen posible de deuda pública, ya que en tal caso la circulación de riqueza consecuente contribuirá a la reactivación de la economía. Ello permitirá, además, mejorar la recaudación de impuestos, recuperar los niveles originalmente presupuestados, así como las remuneraciones y haberes respectivos, disminuyendo de ese modo los esfuerzos necesarios para afrontar los servicios de la deuda pública y posibilitando, en su caso, reducir la carga tributaria que afecta el consumo y la inversión, o distorsiona la actividad económica de sectores o regiones.

Que resulta muy importante destacar que tanto el sistema financiero, como los ahorros acumulados en el sistema de jubilaciones y pensiones, concentran una alta proporción del total de la deuda pública, por lo que cualquier dificultad que pudiere presentarse para atender sus servicios de amortización o intereses, podría causar graves perjuicios a los ahorros voluntarios e institucionales del pueblo argentino.

Que, por otra parte, los precios a los que actualmente se comercializan los títulos argentinos en los mercados secundarios ofrecen una gran oportunidad a los residentes locales, ya que tornan posible y muy conveniente una masiva repatriación de aquella parte de la deuda pública que detentan los no residentes.

Que tal repatriación tiene la gran ventaja de permitir que el producido del pago de los servicios de renta y amortización se reinvierta o consuma mayoritariamente en el país.

# SPA-50

Que un aumento de la participación de residentes en la tenencia de títulos argentinos, permitirá mantener en el medio local las ventajas de un significativo aumento de riqueza

cuando se produzca su revalorización.

Que las seguridades brindadas por la legislación permitirán valorizar el crédito público que hoy escasea.

Que en lo que respecta a los instrumentos de liquidez de corto plazo del Tesoro Nacional, deben arbitrarse los mecanismos para que tengan efectos cancelatorios de los impuestos nacionales, de modo de facilitar su circulación y disminuir sus rendimientos financieros a lo razonable para los plazos a los que están emitidos, ya que constituye un instrumento esencial para la administración de la liquidez de corto plazo, tanto del Tesoro Nacional cuanto del sistema financiero.

Que, por su parte, corresponde al PODER EJECUTIVO NACIONAL, conforme a la delegación de facultades efectuada por la Ley Nº 25.414, disponer todas aquellas exenciones tributarias que resulten útiles para aumentar la competitividad de la economía nacional, y no hay mayor influencia en la referida aptitud de las fuerzas productivas nacionales, que la que se derivaría de una baja sustancial de la tasa de interés.

Que resulta importante en tal sentido disponer un arreglo adecuado, en los términos previstos por el Artículo 113, segundo párrafo, de la Ley Nº 11.683, texto ordenado en 1998 y sus modificaciones, con el fin de permitir la cancelación de las deudas fiscales pendientes en Títulos de la Deuda Pública Nacional.

Que ello debe completarse adecuadamente, con otras medidas que otorguen ventajas ciertas a quienes han cumplido regularmente con sus compromisos impositivos y previsionales y planean hacerlo en el futuro.

Que en tal sentido, un plan general de cancelación de deudas fiscales pendientes con Títulos de la Deuda Pública Nacional, permite utilizar incentivos de mercado a favor de quienes cumplan con sus obligaciones atrasadas.

Que por otra parte, la posibilidad de obtener Certificados de Crédito Fiscal (CCF) mediante el depósito indisponible de Títulos de la Deuda Pública Nacional en la CAJA DE VALORES SOCIEDAD ANONIMA, como contrapartida de los cupones o servicios de intereses de los referidos títulos, permite también utilizar incentivos de mercado a favor de quienes planean cumplir regularmente sus obligaciones tributarias en el futuro, favoreciéndose en mayor medida todos aquellos contribuyentes que adquieran Títulos Públicos en el mercado a los valores actuales, reduciéndose la magnitud de la ventaja a medida que los Títulos Públicos suban de precio.

Que al ESTADO NACIONAL, ello no le reporta ningún esfuerzo fiscal, ya que cumplirá plena y regularmente sus compromisos al vencimiento.

Que estas medidas en nada deben afectar el sistema de Coparticipación Federal de Impuestos, conforme al criterio de realidad económica, a fin de que las Provincias o la CIUDAD AUTONOMA DE BUENOS AIRES, no sufran menoscabo alguno por tal circunstancia ni se beneficien por la depreciación de la deuda pública en el mercado, donde registra precios inferiores a su valor técnico.

Que la DIRECCION GENERAL DE ASUNTOS JURIDICOS del MINISTERIO DE ECONOMIA ha tomado la intervención que le corresponde.

Que el presente se dicta en ejercicio de las facultades conferidas por el Artículo 99, incisos 1 y 2 de la CONSTITUCION NACIONAL, así como aquellas que le fueran delegadas por el Artículo 113, segundo párrafo, de la Ley Nº 11.683, texto ordenado en 1998 y sus modificaciones y la Ley Nº 25.414.

Por ello,

EL PRESIDENTE DE LA NACION ARGENTINA

DECRETA:

**Artículo 1º** — Las Letras del Tesoro (LETES) que se emitan a partir de la fecha de la publicación en el Boletín Oficial del presente decreto, tendrán poder cancelatorio definitivo a su vencimiento para el pago de obligaciones tributarias nacionales, en las condiciones que prevé el Artículo 36 del Decreto Nº 1397 de fecha 12 de junio de 1979 y sus modificaciones para el dinero en efectivo, con excepción de los aportes y contribuciones a la Seguridad Social o destinadas al régimen de Obras Sociales y Riesgos del Trabajo, el Impuesto a los Créditos y Débitos en Cuentas Bancarias y el cumplimiento de las obligaciones que correspondan a los Agentes de Retención y Percepción de impuestos. La ADMINISTRACION FEDERAL DE INGRESOS PUBLICOS, entidad

# SPA-51

autárquica en el ámbito del MINISTERIO DE ECONOMIA, cancelará las obligaciones tributarias hasta el importe de las Letras del Tesoro recibidas, que se imputará íntegramente a cargo de la Nación Argentina a los efectos de la distribución que corresponde de la Coparticipación Federal de Impuestos.

**Art. 2º** — Autorízase al MINISTERIO DE ECONOMIA a emitir Certificados de Crédito Fiscal (CCF), que serán escriturales, por el importe equivalente a los cupones de intereses de los Títulos de la Deuda Pública Nacional que se depositen hasta el 31 de diciembre de 2001, en custodia a estos efectos, en la CAJA DE VALORES SOCIEDAD ANONIMA o donde el órgano coordinador de los Sistemas de Administración Financiera del Sector Público Nacional determine. El monto máximo autorizado a emitir de Certificados de Crédito Fiscal (CCF) para cada ejercicio futuro, será el previsto en el Presupuesto de la Administración Nacional correspondiente al año 2001 para la atención de los servicios de renta de los Títulos Públicos emitidos. Durante el corriente ejercicio el monto máximo resultará de los saldos pendientes de utilización por tal concepto. Los títulos respectivos serán transferidos a una cuenta fiduciaria en la CAJA DE VALORES SOCIEDAD ANONIMA o donde el órgano coordinador de los sistemas de Administración Financiera del Sector Público Nacional determine, siendo indisponibles para su titular. La CAJA DE VALORES SOCIEDAD ANONIMA o quien corresponda, emitirá certificados de custodia por el importe equivalente a la amortización del capital de los títulos correspondientes, los que serán libremente transferibles. Los titulares no podrán ejercer las cláusulas de aceleración de vencimiento pactadas en las condiciones de emisión de los títulos respectivos.

*(Nota Infoleg: Por art. 1° del Decreto N° 1645/2001 se cancela la autorización para emitir los Certificados de Crédito Fiscal (CCF) )*

**Art. 3º** — Los Certificados de Crédito Fiscal (CCF) serán emitidos en la moneda que corresponda a los cupones de intereses que representen. Su vencimiento será simultáneo al de aquéllos, serán transferibles libremente por sus titulares, y estarán regidos por la Ley de la REPUBLICA ARGENTINA, y en caso de controversia se someterán a la jurisdicción de los Tribunales Federales competentes.

**Art. 4º** — Los Certificados de Crédito Fiscal (CCF) tendrán poder cancelatorio definitivo a su vencimiento para el pago de obligaciones tributarias nacionales con vencimiento a partir de entonces, en las condiciones que prevé el Artículo 36 del Decreto Nº 1397/79 y sus modificaciones para el dinero en efectivo, con excepción de los aportes y contribuciones a la Seguridad Social o destinados al régimen de Obras Sociales y Riesgos del Trabajo, el Impuesto a los Créditos y Débitos en Cuentas Bancarias y el cumplimiento de las obligaciones que correspondan a los Agentes de Retención y Percepción de impuestos. La ADMINISTRACION FEDERAL DE INGRESOS PUBLICOS, entidad autárquica en el ámbito del MINISTERIO DE ECONOMIA, recibirá los Certificados de Crédito Fiscal (CCF) vencidos a los efectos de la cancelación de los respectivos tributos, en la cuenta habilitada de conformidad al Artículo 8º del Decreto Nº 979 del 1º de agosto de 2001, con débito a las respectivas cuentas de los depositantes, e imputará el importe correspondiente íntegramente a cargo de la Nación Argentina a los efectos de la distribución que corresponda de la Coparticipación Federal de Impuestos.

Los Certificados de Crédito Fiscal (CCF) emitidos se cancelarán mediante el pago de los servicios de renta de los cupones que representan o mediante su aplicación al pago de impuestos, en cuyo caso, extinguen y cancelan los cupones respectivos.

**Art. 5º** — Los depositantes podrán retirar en cualquier momento y por única vez los Títulos de la Deuda Pública que hubieren depositado en la CAJA DE VALORES SOCIEDAD ANONIMA o donde el órgano coordinador de los Sistemas de Administración Financiera del Sector Público Nacional determine, devolviendo los certificados de custodia por el importe equivalente a la amortización del capital y los Certificados de Crédito Fiscal (CCF) pendientes de aplicación que se les hubieran acreditado, los que serán debitados de su cuenta y cancelados.

**Art. 6º** — Autorízase al MINISTERIO DE ECONOMIA a disponer a su sola discreción, que en las futuras emisiones de Títulos de la Deuda Pública, sus titulares gocen de un lapso no menor a los NOVENTA (90) días contados desde el momento de su emisión para depositarlos en la CAJA DE VALORES SOCIEDAD ANONIMA o donde el órgano coordinador de los Sistemas de Administración Financiera del Sector Público Nacional determine en las condiciones establecidas en el presente decreto, recibiendo Certificados de Crédito Fiscal (CCF) por los cupones de intereses respectivos, en caso de existir saldo disponible para tales fines.

*(Nota Infoleg: Por art. 1° del Decreto N° 1645/2001 se cancela la autorización para emitir los Certificados de Crédito Fiscal (CCF) )*

**Art. 7º** — Con las modificaciones que resultan del presente decreto, es aplicable, en lo pertinente, a los Certificados de Crédito Fiscal (CCF), lo dispuesto a su respecto en el Decreto Nº 979/01, salvo lo relativo en cuanto a plazos.

**Art. 8º** — Todas las deudas en concepto de tributos nacionales, tributos aduaneros y contribuciones a la seguridad social —con excepción de las destinadas al régimen de Obras Sociales y cuotas a las Administradoras de Riesgos del Trabajo—, cuya recaudación se encuentra a cargo de la ADMINISTRACION FEDERAL DE

INGRESOS PUBLICOS, entidad autárquica en el ámbito del MINISTERIO DE ECONOMIA, vencidas y pendientes de cancelación al 30 de junio de 2001, inclusive, podrán cancelarse hasta el 31 de diciembre de 2001 mediante la entrega de Títulos de la Deuda Pública Nacional, con vencimiento final hasta el 31 de diciembre de 2005, a su valor técnico, en las condiciones específicas que se dispongan al respecto.

La cancelación de deudas fiscales en los términos del presente régimen implicará la eximición parcial de intereses y sanciones, en los términos y de acuerdo a las modalidades que a tal efecto establezca la ADMINISTRACION FEDERAL DE INGRESOS PUBLICOS, entidad autárquica en el ámbito del MINISTERIO DE ECONOMIA.

Facúltase a la ADMINISTRACION FEDERAL DE INGRESOS PUBLICOS, entidad autárquica en el ámbito del MINISTERIO DE ECONOMIA, a dictar las normas complementarias a los fines de la aplicación del arreglo de cancelación que se dispone en el presente decreto.

El resultado originado como consecuencia de la aplicación de los Títulos de la Deuda Pública Nacional a la cancelación de obligaciones tributarias dispuesta por el presente régimen, se considerará exento del Impuesto a las Ganancias. Dicho resultado exento será la diferencia entre el valor técnico al cual fueron imputados los Títulos y el valor de mercado de los mismos —según cotización determinada de acuerdo al procedimiento que establezca la Autoridad de Aplicación—, a la fecha de su adquisición, o el correspondiente al día anterior a la publicación del presente decreto en el Boletín Oficial, cuando la tenencia de los Títulos utilizados en la cancelación fuera preexistente.

**Art. 9°** — Podrán incluirse en el régimen previsto en el artículo 8° del presente decreto, aquellas obligaciones que se encuentren en curso de discusión administrativa, contencioso administrativa o judicial, a la fecha de publicación del presente decreto en el Boletín Oficial, en tanto el responsable se allanare incondicionalmente y, en su caso, desista y renuncie a toda acción y derecho, incluso el de repetición, asumiendo el pago de las costas y gastos causídicos y en la medida que cumpla con los requisitos que establezca la reglamentación de la presente medida.

El allanamiento o desistimiento podrá ser total o parcial y procederá en cualquier etapa o instancia administrativa, contencioso administrativa o judicial, según corresponda.

**Art. 10.** — A los efectos de la distribución de la Coparticipación Federal de Impuestos, los Títulos de la Deuda Pública Nacional recibidos para la cancelación de impuestos coparticipables se computarán al valor de mercado del día de su imputación, según cotización determinada de acuerdo al procedimiento que establezca la Autoridad de Aplicación.

**Art. 11.** — Sustitúyese el Artículo 61 del Decreto N° 1397/79 y sus modificaciones, reglamentario de la Ley N° 11.683, texto ordenado en 1998 y sus modificaciones, el que quedará redactado de la siguiente forma:

"ARTICULO 61. - La facultad de hacer arreglos sólo comprende los actos jurídicos que consolidan, actualizan o perfeccionan el crédito fiscal sin afectar su integridad e indisponibilidad, excepto cuando se trate de arreglos que involucren la cancelación de deudas tributarias con Títulos de la Deuda Pública Nacional".

**Art. 12.**— La Autoridad de Aplicación del presente decreto será el MINISTERIO DE ECONOMIA.

**Art. 13.**— El presente decreto entrará en vigencia a partir del día de su publicación en el Boletín Oficial.

**Art. 14.**— Comuníquese, publíquese, dése a la Dirección Nacional del Registro Oficial y archívese.— DE LA RUA. — Chrystian G. Colombo. — Domingo F. Cavallo.

**(Nota Infoleg:** por art. 39 de la Ley N° 27.198 B.O. 4/11/2015 se dispone que la suspensión establecida por el artículo 1° del Decreto N° 493/2004 B.O. 22/04/2004 se mantiene durante el ejercicio 2016. **Suspensiones anteriores:** art. 42 de la Ley N° 27.008 B.O. 18/11/2014; art. 54 de la Ley N° 26.895 B.O. 22/10/2013; art. 37 de la Ley N° 26.784 B.O. 05/11/2012; art. 49 de la Ley N° 26.728 B.O. 28/12/2011)

**(Nota Infoleg:** por art. 50 de la Ley N° 26.546 B.O. 27/11/2009 se dispone que la suspensión establecida por el artículo 1° del Decreto N° 493/2004, se extenderá hasta que el Poder Ejecutivo nacional normalice en los términos del artículo 51 de la ley de referencia (26.546) los certificados emitidos en el marco de los decretos mencionados en el presente artículo. A tal fin, facúltase al Poder Ejecutivo nacional al dictado de las normas correspondientes. **Suspensiones anteriores:** art. 54 de la Ley N° 26.422 B.O. 21/11/2008; art. 54 de la Ley N° 26.337 B.O. 28/12/2007; art. 58 de la Ley N° 26.198 B.O. 10/1/2007; art. 42 de la Ley N° 26.078 B.O. 12/1/2006)

*(**Nota Infoleg:** Por art. 1° del Decreto N° 493/2004 B.O. 22/4/2004 se suspende el régimen previsto en el presente Decreto para la cancelación de obligaciones tributarias nacionales con títulos de la deuda pública, hasta tanto haya finalizado la operación de canje voluntario de Títulos de la Deuda Pública Externa contemplada en el artículo 24 del Decreto N° 1.387/2001. Vigencia: a partir del día de su publicación en el Boletín Oficial).*

*(**Nota Infoleg:** Por art. 1° del Decreto N° 1657/2002 B.O. 6/9/2002, se suspende el régimen de cancelación de obligaciones tributarias nacionales con títulos de la deuda pública, previsto en este decreto, entre otros, por el plazo de NOVENTA (90) días a partir de la publicación del decreto 1657/2002.)*

# SPA-54

12/21/2017

Ministry of the Economy



**Ministry of the Economy**

**TAXES**

**Resolution 415/2001**

**Regulations on the procedure for issuing Tax Credit Certificates applicable to the payment of taxes that become due in the future, and for use of public debt securities to settle taxes and other contributions due and payable as of June 30, 2001.**

Buenos Aires, 8/28/2001

WITH REGARD TO File No. 010-000481/2001 of the Register of the MINISTRY OF THE ECONOMY and Decree No. 1005 of August 9, 2001, and

RECITALS:

Whereas the NATIONAL EXECUTIVE BRANCH has issued Decree No. 1005/2001, which establishes a general plan for settlement of tax debts due and payable as of June 30, 2001 by submitting public debt securities, and payment of future tax debts by issuing Tax Credit Certificates [translator's note: in Spanish, *Certificados de Crédito Fiscal*, or "CCFs"].

Whereas, additionally, pursuant to article 2 the MINISTRY OF THE ECONOMY is authorized to issue Tax Credit Certificates (CCFs) for public securities deposited up until December 31, 2001 to be held in custody.

Whereas, furthermore, in articles 1 and 4 of Decree No. 1005/2001 it is established that the system described shall not include settlement of obligations corresponding to the UNIFIED SOCIAL SECURITY SYSTEM or those dedicated to the system for HEALTH INSURANCE AND OCCUPATIONAL RISK INSURANCE, the Tax on Bank Account Transactions, or compliance with the obligations corresponding to Tax Withholding and Collection Agents.

Whereas article 12 of the cited Decree designates the MINISTRY OF THE ECONOMY as the Authority for Application in relation to this.

Whereas it is considered necessary to provide regulations for the procedure that allows issuance of Tax Credit Certificates (CCFs) for payment of future tax obligations; and for use of public debt securities to settle tax debts that are due and payable as of June 30, 2001.

Whereas furthermore, it is necessary to establish the maximum amounts of the Tax Credit Certificates (CCFs) to be issued for the program established under article 2 of Decree No. 1005/2001.

Whereas the GENERAL DEPARTMENT OF LEGAL AFFAIRS of this Ministry has performed the actions for which it is responsible.

Whereas the present measure is being issued by virtue of the authorities conferred by article 12 of Decree No. 1005 of August 9, 2001.

And as such,

THE MINISTRY OF THE ECONOMY

HEREBY RESOLVES:

**Article 1** – To approve, within the context of Decree No. 1005 of August 9, 2001, the regulations for the procedure appearing as an Annex to the present Resolution, for:

a) issuance of the Tax Credit Certificates (CCFs) applicable to the payment of taxes that become due and payable in the future; and

Ministry of the Economy

12/21/2017

b) settlement of taxes and other contributions due and payable as of June 30, 2001 by using public debt securities.

Furthermore, the FEDERAL PUBLIC REVENUE AGENCY [translator's note: in Spanish, *Administracion Federal de Ingresos Publicos*, or "AFIP"] shall issue the necessary complementary regulations so that the procedures established in the Annex to the present Resolution become applicable.

**Art. 2 –** It is hereby established that the maximum amounts for issuance of Tax Credit Certificates (CCFs) for operations taking place within the context of article 2 of Decree No. 1,005 of August 9, 2001 shall be the following:

a) for the year 2001, up to an amount of THREE BILLION SIX HUNDRED SEVENTY-EIGHT MILLION FIVE HUNDRED FORTY-SEVEN THOUSAND FOUR HUNDRED AND FIVE PESOS (ARS 3,678,547,405); this amount shall be reduced to the extent that, as time passes, servicing of interest payments takes place beginning on August 9, 2001; and

b) beginning in the year 2002, an amount of up to NINE BILLION FORTY-ONE MILLION FOUR HUNDRED EIGHTY-EIGHT THOUSAND SEVEN HUNDRED PESOS (ARS 9,041,488,700).

**Art. 3 –** Authorization is hereby granted to the Secretary of Finance, Mr. Daniel MARX; or to the Vice-Secretary of Financing, Mr. Julio DREIZZEN; or to the National Director of the National Office of Public Credit, Mr. Federico Carlos MOLINA; or to the Director of External Financing, Mr. Norberto Mauricio LOPEZ ISNARDI; or to the Director of the Public Debt Administration, the accountant Mr. Jorge AMADO, for signing, by any of them without distinction, all of the documentation that may be necessary in order to put into effect the procedures approved in article 1 of the present Resolution.

**Art. 4 –** It is hereby ordered that communication, publication, submission to the National Department of the Official Registry, and filing shall take place. – Domingo F. Cavallo.

ANNEX

### PROCEDURE FOR PAYMENT OF

### TAXES USING PUBLIC SECURITIES

A. APPLICATION OF PUBLIC SECURITIES FOR PAYMENT OF FUTURE TAXES.

I. *LETRAS DEL TESORO* (short-term Treasury Bills, abbreviated in Spanish as "LETES").

Holders of *Letras del Tesoro* (abbreviated as "LETES" in Spanish and hereinafter) originally issued beginning on August 10, 2001, may apply these as a means of payment against national tax obligations according to the provisions found in article 1 of Decree No. 1,005 of August 9, 2001, beginning on their maturity date. In such cases, the holder of the securities must instruct the party depositing them at the *CAJA DE VALORES S.A.* (SECURITIES DEPOSITORY CORP., and hereinafter the "CAJA") to transfer them into a fiduciary account of the "CAJA" and to request issuance of the Tax Credit Certificate ("CCF") for the unpaid amount corresponding to the LETE, which shall be represented by crediting into the respective accounts and sub-accounts, with maturity occurring on the planned payment date, and with the following information being included:

a) The ISIN, CUSIP, Common Code and/or Abbreviated Code from "CAJA" for the type represented.

b) Amount of the LETE.

c) Maturity date of the LETE.

d) Name or company name of the holder of the "CCF."

When a holder of a "CCF" decides to apply it, beginning on its maturity date, to payment of taxes that become due and payable no earlier than the maturity date of that "CCF," the holder must ask its depositor to transfer it into an account of the SECRETARIAT OF THE TREASURY and a sub-account held in the name of the "AFIP" at "CAJA." As a result of that transfer, "CAJA" shall issue a transfer receipt document that shall be given to the party making the deposit and ordering that transfer, for subsequent delivery to the party applying the "CCF," and with that document including, in addition to the information described above, the following:

a) the CUIT [translator's note: single taxpayer identification code; in Spanish, *Código Único de Identificación Tributaria*, or "CUIT"] number.

# SPA-56

Ministry of the Economy

12/21/2017

b) the Entity Code that identifies CAJA DE VALORES S.A. as the entity authorized to provide information to the "AFIP," which in this case will be 502.

"CAJA" shall electronically transfer a file containing information related to the transferred "CCFs" to "AFIP" and to the NATIONAL OFFICE OF PUBLIC CREDIT [translator's note: in Spanish, *Oficina Nacional de Credito Publico*, or "ONCP"],  reporting to the SECRETARIAT OF FINANCE at the MINISTRY OF THE ECONOMY, with the receipts issued also being thus transferred. This act of transferring shall in itself produce the effects of canceling and settling the respective tax obligations, as long as the taxpayer has submitted Form 688/A to "AFIP."

"ONCP" shall perform daily reporting to "AFIP" regarding the exchange rate that must be applied in order to determine the value settled for the certificates submitted. To determine the exchange rate for the dollar, the provisions found in article 1 of Law No. 23,928, which is amended by Law No. 25,445, shall be taken into account.

II. NATIONAL PUBLIC DEBT SECURITIES (other than "LETES")

The holders of National Public Debt Securities that decide to deposit their securities at "CAJA" up until December 31, 2001 shall, pursuant to article 2 of Decree No. 1005 of August 9, 2001, have until December 31, 2001 to instruct the party making the deposit for them at "CAJA" to transfer the securities into a fiduciary account of "CAJA," where they shall remain deposited and unavailable to their holder.

For the security in question, "CAJA" shall separate the portion representing the interest from the portion representing the principal. For the portion that is principal, custody certificates shall be issued, which shall be represented by crediting of the amount equivalent to the Nominal Value of the security into the respective accounts and sub-accounts, and with these certificates being freely transferable.

For the portion representing interest, Tax Credit Certificates ("CCFs") shall be issued, up to the maximum amount authorized for such issuance as determined in the present Resolution, and these shall be represented by crediting into the respective accounts and sub-accounts.

If upon maturity of a "CCF" the NATIONAL TREASURY makes payment for the corresponding interest, "CAJA" shall credit this to the holder of the respective "CCF" and shall then cancel it.

Otherwise, the holder of the "CCF" that has matured but that has not been paid may apply it to payment as compensation for taxes, as long as the date these taxes become due and payable is not prior to the maturity date of that "CCF."

The "CCFs" shall contain at least the following information:

a) The ISIN, CUSIP, Common Code and/or Abbreviated Code from CAJA DE VALORES S.A., with this last number corresponding to the type represented.

b) 1. If Certificates with a Variable Coupon are involved: the Original Nominal Value of the security being represented, the Interest Maturity Number that the "CCF" represents, and the applicable Base Rate and corresponding margin.

Beginning at the time when the value of the corresponding coupon is established, "CAJA" shall record the Currency and Amount of the corresponding coupon in the respective accounts and sub-accounts.

2. If Certificates with a Fixed-Income Coupon are involved: the Currency and Amount for the corresponding Coupon.

"ONCP" shall provide daily notification to "AFIP" regarding the exchange rates to be applied in the case of certificates issued in currencies other than the Peso. In order to determine the exchange rate for the dollar, the provisions found in article 1 of Law No. 23,928, which is amended by Law No. 25,445, shall be taken into account.

When applying the payment for the interest corresponding to the holder of the "CCF," "CAJA" shall first verify whether the "CCF" has been applied to the payment of taxes, and if so, the amount being paid shall be refunded to the NATIONAL GOVERNMENT. When a holder of a "CCF" that has matured but that remains unpaid decides to apply it to payment of taxes, the holder must ask its depositor to transfer it into an account of the SECRETARIAT OF THE TREASURY and a sub-account held in the name of  "AFIP" at "CAJA." As a result of that transfer, "CAJA" shall issue a transfer receipt document that shall be given to the party making the deposit and ordering that transfer, for subsequent delivery to the party applying the "CCF." "CAJA" shall electronically transfer to "AFIP" and "ONCP" of the SECRETARIAT OF FINANCE at the MINISTRY OF THE ECONOMY a file containing information related to the "CCFs" transferred, with the receipts issued also being thus transferred, with the following details:

a) Identification of the "CCF" that has been assigned to payment of taxes.

12/21/2017                                Ministry of the Economy

b) Amount of the "CCFs" transferred.

c) The Entity Code that identifies CAJA DE VALORES S.A. as the entity authorized to provide information to "AFIP," which in this case will be 503.

d) The name or company name of the holder of the "CCFs", including the party's CUIT.

This act of transferring shall in itself produce the effects of canceling and settling the respective tax obligations, as long as the taxpayer has submitted Form 688/A to "AFIP."

"ONCP" shall notify "CAJA" in cases where future issuances of public debt securities include clauses that allow their holders to deposit their securities at "CAJA" in order to receive "CCFs" for the corresponding interest payments.

B. APPLICATION OF PUBLIC SECURITIES FOR PAYMENT OF TAXES DUE AND PAYABLE AS OF JUNE 30, 2001.

When a holder of public securities that have a maturity date of up until December 31, 2005 wishes to use these to pay tax debts that have become due but have not been paid as of June 30, 2001, then pursuant to article 8 of Decree No. 1005 of August 9, 2001, the holder must deposit these at "CAJA," which shall transfer them into the sub-account that "AFIP" holds at that entity, and shall then issue a "Transfer Receipt," which the taxpayer will have to submit in order to settle the associated tax obligations.

"CAJA" shall electronically transfer to "AFIP" and "ONCP" of the SECRETARIAT OF FINANCE at the MINISTRY OF THE ECONOMY a file containing information related to the securities that have been applied via this mechanism, with the following details:

a) The ISIN, CUSIP, Common Code and/or Abbreviated Code from CAJA DE VALORES S.A., with the last code corresponding to the type being transferred.

b) Original Nominal Value of the security.

c) Information on the holder/taxpayer, including the CUIT number.

d) The Entity Code that identifies CAJA DE VALORES S.A. as the entity authorized to provide information to "AFIP," which in this case will be 504.

The Department of Public Debt Administration, which reports to "ONCP," shall provide daily notification to "AFIP" regarding:

a) The exchange rates to be applied in the case of certificates issued in currencies other than the Peso. In order to determine the exchange rate for the dollar, the provisions found in article 1 of Law No. 23,928, which is amended by Law No. 25,445, shall be taken into account; and

b) the technical value of the securities involved.

IMPORTANT:

1) In all cases, the exchange rate that shall be applied is the one determined for the day prior to the day upon which the "CCF" or the corresponding securities, are deposited into the sub-account of "AFIP" at "CAJA."

2) The Technical Value that shall be applied is the one determined on the day the corresponding securities are deposited into the sub-account of "AFIP" at "CAJA."

3) Emails with digital signatures shall be used for all exchanges of information that must take place among the various entities.

For purposes of article 10 of Decree No. 1005/2001 the following definitions shall apply:

"Market Value" at the Technical Parity Percentage is understood to be the effective price consisting of the sum of the price of the principal and accrued interest, divided by the technical value, with "ONCP" providing daily notification to "AFIP".

"Technical Value" is the sum of the Residual Nominal Value and Accrued Interest at a particular date.

Case 1:17-cv-09934-LAP   Doc #: 8-3   Filed 03/05/18   Page 6 of 12 Page ID #: 50

Ministry of the Economy

12/21/2017

AFFIDAVIT OF TRANSLATOR
REGARDING ACCURACY OF TRANSLATION

STATE OF NEW YORK )

                              :ss.:

COUNTY OF NEW YORK )

EZEQUIEL SANCHEZ HERRERA, being duly sworn, deposes and says:

I am a lawyer employed by Cleary Gottlieb Steen & Hamilton LLP presently residing and working within the State of New York and declare:

I am proficient with the Spanish language and the English language, have had prior experience in translating documents in those languages, have reviewed the foregoing document (Resolution 415/2001 dated August 28, 2001) translated from Spanish into English and believe that the translation is complete and accurate.

_____
Ezequiel Sánchez Herrera

Sworn to before me this
5th day of March, 2018

_____
Notary Public

John Finamore
Notary Public, State of New York
No. 01PL6353933
Qualified in Kings County
Certificate on File in New York County
Commission Expires January 30, 2021

Ministry of the Economy

12/21/2017



**Ministry of the Economy**

**PUBLIC DEBT**

**Resolution 692/2001**

**It is hereby established that the instruments entitled Custody Certificates, which are issued by the National Government in exchange for the public securities deposited at Caja de Valores S.A., as established in Decree No. 1,005/2001 and Decree No. 1,226/2001, shall have the status of public securities.**

Buenos Aires, 11/15/2001

WITH REGARD TO File No. 173-000792/2001 of the Register of the MINISTRY OF THE ECONOMY; Law No. 11,683, text organized in 1998 and its amendments; Law No. 25,414; Law No. 24,453; Decree No. 1,397 of June 12, 1979; Decree No. 1005 of August 9, 2001; and Decree No. 1226 of October 2, 2001, and

RECITALS:

Whereas article 2 of Decree No. 1005/2001 authorizes the MINISTRY OF ECONOMY to issue Tax Credit Certificates [translator's note: in Spanish, *Certificados de Crédito Fiscal*, or "CCFs"] for the amount equivalent to the interest coupons from the national public debt securities that are deposited into custody for such purposes at CAJA DE VALORES S.A. up until December 31, 2001.

Whereas in the above-mentioned article it is established that CAJA DE VALORES S.A., or the party authorized to do so, shall issue custody certificates in the amount equivalent to repayment of the principal for the corresponding securities, with these certificates being freely transferable, and with the holders prohibited from exercising the maturity acceleration clauses agreed upon in the terms and conditions of issuance for the respective securities.

Whereas article 1 of Decree No. 1226/2001 authorizes the MINISTRY OF THE ECONOMY to issue, for all national public debt securities with principal that is fully or partially subject to repayment up until December 31, 2003, CCFs for the amount equivalent to the coupons to be paid on principal and interest when these have maturity dates up until December 31, 2003, regardless of the denomination and currency in which they were issued, for an amount up to the equivalent of a NOMINAL VALUE OF ONE BILLION PESOS (Nominal Value of ARS 1,000,000,000.–). In order for the CCFs to be received, the instruments must be deposited up until December 31, 2001 at CAJA DE VALORES S.A., where they must remain deposited and held in custody for such purposes.

Whereas the final part of the article cited in the previous recital establishes that CAJA DE VALORES S.A., or else the party authorized to do so, shall issue custody certificates for the corresponding securities, for the coupons to be paid on principal and interest when the CCFs will not be issued, with these certificates being freely transferable, and with the holders prohibited from exercising the maturity acceleration clauses agreed upon in the terms and conditions of their respective securities.

Whereas CAJA DE VALORES S.A. shall issue deposit receipts for the public debt securities it receives from their holders.

Whereas given that the custody certificates are issued in exchange for the public securities that are deposited at CAJA DE VALORES S.A., and since these are used to embody an obligation that is accessory to the principal obligation, it is appropriate that they should have the status of public securities.

Whereas it is understood to be necessary to establish that the custody certificates are issued by the same entity that issued the principal obligation to which they are an accessory, that is, by the NATIONAL GOVERNMENT.

Whereas in both article 12 of Decree No. 1005/2001 and article 5 of Decree No. 1226/2001 the MINISTRY OF THE ECONOMY is designated as the Authority for Application for these decrees.

Whereas according to the provisions established in Decree No. 1005/2001 and Decree No. 1226/2001, custody certificates are to be issued by the NATIONAL GOVERNMENT by means of the MINISTRY OF THE ECONOMY.

# SPA-61

12/21/2017

Ministry of the Economy

Whereas the GENERAL DEPARTMENT OF LEGAL AFFAIRS of this Ministry has performed the actions for which it is responsible.

Whereas the undersigned is authorized to enact the present measure pursuant to the provisions found in article 12 of Decree No. 1005 of August 9, 2001 and Decree No. 1226 of October 2, 2001.

And as such,

THE MINISTRY OF THE ECONOMY

HEREBY RESOLVES:

**Article 1 –** It is hereby established that the instruments entitled Custody Certificates, issued by the NATIONAL GOVERNMENT by means of this Ministry in exchange for the public securities deposited at CAJA DE VALORES S.A. pursuant to the provisions established in Decree No. 1005 of August 9, 2001 and Decree No. 1226 of October 2, 2001, shall have the status of public securities.

**Art. 2 –** It is hereby ordered that communication, publication, submittal to the National Department of the Official Registry, and filing shall take place. – Domingo F. Cavallo.

AFFIDAVIT OF TRANSLATOR
REGARDING ACCURACY OF TRANSLATION

STATE OF NEW YORK )

                              :ss.:

COUNTY OF NEW YORK )

  EZEQUIEL SANCHEZ HERRERA, being duly sworn, deposes and says:

  I am a lawyer employed by Cleary Gottlieb Steen & Hamilton LLP presently

residing and working within the State of New York and declare:

  I am proficient with the Spanish language and the English language, have had

prior experience in translating documents in those languages, have reviewed the foregoing

document (Resolution 692/2001 dated November 15, 2001) translated from Spanish into English

and believe that the translation is complete and accurate.

            _____

             Ezequiel Sánchez Herrera

Sworn to before me this
5th day of March, 2018

_____
  Notary Public

John Pisaamento
Notary Public, State of New York
No. 01PI6353933
Qualified in Kings County
Certificate on File in New York County
Commission Expires January 30, 2021

# SPA-63

12/21/2017                                          Ministerio de Economía



**Ministerio de Economía**

**DEUDA PUBLICA**

**Resolución 692/2001**

**Establécese que revestirán el carácter de títulos públicos los instrumentos denominados Certificados de Custodia que emita el Estado Nacional como contrapartida de los títulos públicos que se depositen en la Caja de Valores S.A., conforme lo establecido en los Decretos Nros. 1005/2001 y 1226/2001.**

Bs. As., 15/11/2001

VISTO el Expediente Nº 173-000792/2001 del Registro del MINISTERIO DE ECONOMIA, "las leyes Nº 11.683, texto ordenado en 1998 y sus modificaciones, Nº 25.414 y Nº 24.453, los Decretos Nº 1397 de fecha 12 de junio de 1979, Nº 1005 de fecha 9 de agosto de 2001 y Nº 1226 de fecha 2 de octubre de 2001, y

CONSIDERANDO:

Que el artículo 2º del Decreto Nº 1005/2001 autoriza al MINISTERIO DE ECONOMIA a emitir Certificados de Crédito Fiscal (CCF), por el importe equivalente a los cupones de intereses de los títulos de la deuda pública nacional que se depositen hasta el 31 de diciembre de 2001, en custodia a estos efectos en la CAJA DE VALORES S.A.

Que el mencionado artículo establece que la CAJA DE VALORES S.A., o quien corresponda, emitirá certificados de custodia por el importe equivalente a la amortización del capital de los títulos correspondientes, los que serán libremente transferibles, prohibiéndoles a los titulares ejercer las cláusulas de aceleración de vencimiento pactadas en las condiciones de emisión de los títulos respectivos.

Que por el artículo 1º del Decreto Nº 1226/ 2001 se autoriza al MINISTERIO DE ECONOMIA a emitir, por todos aquellos títulos de la deuda pública nacional que tengan amortizaciones de capital total o parcial hasta el 31 de diciembre de 2003, Certificados de Crédito Fiscal (CCF) por el importe equivalente a los cupones de capital e interés con vencimiento hasta el 31 de diciembre de 2003 cualquiera sea la denominación y moneda en que se hubieran emitido, por hasta el equivalente de VALOR NOMINAL PESOS MIL MILLONES (V. N. $ 1.000.000.000,-) Para recibir Certificados de Crédito Fiscal (CCF) los instrumentos se deberán depositar hasta el 31 de diciembre de 2001 en la CAJA DE VALORES S.A., donde quedarán depositados en custodia a estos efectos.

Que en la última parte del artículo mencionado en el considerando anterior, se determina que la CAJA DE VALORES S.A., o quien corresponda, emitirá certificados de custodia por los cupones de amortización del capital e interés de los títulos correspondientes sobre los que no se emitieran Certificados de Crédito Fiscal (CCF) que serán libremente transferibles, no pudiendo los titulares ejercer las cláusulas de aceleración de vencimiento pactadas en las condiciones de emisión de los títulos respectivos.

Que la CAJA DE VALORES S.A. emitirá constancias de depósito por los títulos de la deuda pública que reciba de los titulares de los mismos.

Que dado que los certificados de custodia se emiten como contrapartida de los títulos públicos que se depositen en la CAJA DE VALORES S.A., y toda vez que los mismos documentan una obligación accesoria de la principal, corresponde que los mismos revistan el carácter de títulos públicos.

Que se entiende necesario determinar que los certificados de custodia sean emitidos por quien emitió la obligación principal del que ellos son accesorios, esto es, el ESTADO NACIONAL.

Que tanto en el artículo 12 del Decreto Nº 1005/2001 como en el artículo 5º del Decreto Nº 1226/2001 se designa al MINISTERIO DE ECONOMIA como Autoridad de Aplicación de los mismos.

Que conforme lo establecen los Decretos Nº 1005/2001 y Nº 1226/2001 quien corresponde emitir los certificados de custodia es el ESTADO NACIONAL a través del MINISTERIO DE ECONOMIA.

# SPA-64

12/21/2017                                          Ministerio de Economía

Que la DIRECCION GENERAL DE ASUNTOS JURIDICOS de este Ministerio ha tomado la intervención que le compete.

Que el suscrito se encuentra facultado para el dictado de la presente medida en virtud de lo dispuesto por el artículo 12° del Decreto N° 1005 de fecha 9 de agosto de 2001 y el Decreto N° 1226 de fecha 2 de octubre de 2001.

Por ello,

EL MINISTRO DE ECONOMIA

RESUELVE:

**Artículo 1°** — Dispónese que los instrumentos denominados Certificados de Custodia que emita el ESTADO NACIONAL, a través de este Ministerio, como contrapartida de los títulos públicos que se depositen en la CAJA DE VALORES S.A., conforme a lo establecido en los Decretos N° 1005 de fecha 9 de agosto de 2001 y N° 1226 de fecha 2 de octubre de 2001, revestirán el carácter de títulos públicos.

**Art. 2°** — Comuníquese, publíquese, dése a la Dirección Nacional del Registro Oficial y archívese. — Domingo F. Cavallo.

**Law. No. 24,441. Excerpt articles 1 to 26**

**Title I**

**Trusts**

**Chapter I**

**Art. 1:** There will be a trust whenever a person (settlor) transfers the trust property title to another person (trustee), who is bound to manage it for the benefit of whoever is appointed by the agreement (beneficiary), and to transfer it upon a specific period of time or fulfillment of a term to the settlor, the beneficiary, or the residual beneficiary.

**Art. 2:** The trust agreement must identify the beneficiary, who may be an individual or a legal entity, that may or may not exist at the time of the execution of the agreement. In the last case, the trust agreement must contain all the information to enable the future identification thereof.

More than one beneficiary may be appointed who, unless otherwise specified, shall receive equal benefits. In the event of non-acceptance, waiver, or death, substitute beneficiaries shall be appointed.

If none of the beneficiaries were to accept, all the beneficiaries die, or none of them exist, the beneficiary shall be the residual beneficiary. If the residual beneficiary does not exist, resigns, or does not accept, the beneficiary shall be the settlor.

The right of the beneficiary may be transferred *inter vivos* or upon death, unless otherwise stipulated by the settlor.

**Art. 3:** The trust may also be constituted by will, executed under any of the formalities established by the Civil Code, and shall contain at least some of the statements required by Article 4. In the event that the trustee appointed by will does not accept its designation, the provisions of Article 10 hereof shall apply.

**Chapter II**

**The Trustee**

**Art. 4:** The trust agreement must also contain the following:

a)  Identification of the property subject to the agreement. If such identification is not possible upon the execution of the trust, it shall include a detailed description of the requirements and characteristics to be met by the property;
b)  Specification of the manner in which other assets may be included in the trust;
c)  The term or condition to which the trust property is subject to, which shall not exceed thirty (30) years as of its execution, unless the beneficiary is an incapable person. In this event, it may last until the death of the beneficiary or cessation of incapacity;
d)  Destination of the property upon trust termination;
e)  Trustee's rights and responsibilities and the way to appoint its replacement, should it be discontinued.

**Art. 5:** The trustee may be an individual or legal entity. Only financial institutions

authorized to operate as such may publicly offer themselves to act as trustees, subject to the provisions of the relevant laws, and any legal entity so authorized by the National Securities Commission, which shall establish the requirements to be met.

**Art. 6:** The trustee must comply with the obligations established by law or the trust agreement, following the discretion and diligence of the good businessman honoring the confidence that has been placed in him.

**Art. 7:** The agreement may not excuse the trustee from its reporting duty, which may be requested by the beneficiary in accordance with the contractual provisions, nor from negligence or willful misconduct which the beneficiary or the people under its watch may incur into, nor from the prohibition to acquire the trust property for themselves.

In all cases, trustees shall comply with their reporting duty to the beneficiaries at intervals not exceeding one (1) year.

**Art. 8:** Unless otherwise stipulated, the trustee shall be entitled to the reimbursement of expenditures and to a remuneration. If it has not been established in the agreement, it shall be determined by the court taking into account the nature of the assignment and the importance of the duties to be performed.

**Art. 9:** The trustee shall cease to act as such due to:

a)  Judicial removal due to breach of duty, upon request of the settlor; or upon request by the beneficiary with a summons of the settlor;
b)  Death or legally stated incapacity, for individuals;
c)  Dissolution, for legal entities;
d)  Bankruptcy or liquidation;
e)  Resignation, when the agreement expressly authorizes this reason. The resignation shall be effective after the trust property has been transferred to the substitute trustee.

**Art. 10:** If the trustee ceases, it shall be replaced by the substitute appointed in the agreement or in accordance with the procedure contemplated by the trustee. If there is no substitute or the substitute does not accept the appointment, the court must appoint one of the entities authorized to act as trustee in accordance with what is provided in Article 19. The trust property shall be transferred to the new trustee.

### Chapter III

### Effects of the Trust

**Art. 11:** A trust property is established on the trust assets; this trust property is governed by the provisions of Title VII, Book III, of the Civil Code, and by the provisions of this Law, for tangible assets, or by those provisions related to the nature of the assets when these are intangible.

**Art. 12:** The trust nature of the property shall be effective against third parties upon the fulfillment of any required formalities, depending on the nature of the respective assets.

**Art. 13:** In the case of registrable property, the relevant registries must record the trust

transfer of the property in the name of the trustee. When the agreement sets forth so, the trustee will acquire the trust property over other assets purchased with the proceeds of the trust property or with the gains of disposal thereof, which shall be evidenced in the purchase documents and in the relevant registries.

**Art. 14:** The trust assets constitute a separate estate from the estate of the trustee and the settlor. The objective liability of the trustee, as established in Article 1113 of the Civil Code, is limited to the value of the trust assets whose risk or fault caused the damage if the trustee could not reasonably have been insured.

**Art. 15:** The trust assets are exempt from any individual or joint action by the trustee's creditors. The settlor's creditors may not attack the trust property, except in the event of fraud. The beneficiary's creditors may exercise their rights on the trust property's proceeds and may subrogate in the beneficiary's rights.

**Art. 16:** The trustee's property is not liable for any obligation arising from the execution of the trust, which shall only be met only with the trust property. The insufficiency of the trust assets to meet these obligations does not lead to the bankruptcy thereof. In such case, and in case of lack of other resources provided by the settlor or the beneficiary under the terms of the agreement, the trust will be liquidated by the trustee. In such case, the trustee shall dispose of the trust assets and will deliver its proceeds to the creditors according to the order of privileges established for bankruptcy cases. The provisions of Article 24 shall apply to financial trusts.

**Art. 17:** The trustee may dispose of or encumber the trust assets when required for the purposes of the trust, without the consent of the settlor or the beneficiary, unless otherwise agreed.

**Art. 18:** The trustee is entitled to exercise all actions necessary to defend the trust assets, both against third parties and against the beneficiary.

A court may authorize the settlor or the beneficiary to exercise actions substituting the trustee, when the latter fails to do so without sufficient cause.

### Chapter IV

### Financial Trusts

**Art. 19:** A financial trust is any trust subject to the prior provisions, in which the trustee is a financial institution or a company specially authorized by the Securities Commission to act as financial trustee, and whose beneficiaries are the holders of certificates of participation or of debt securities guaranteed by the property so transferred.

Such certificates of participation and debt securities will constitute securities and may be subject to public offering.

The Securities Commission will be the regulatory authority regarding financial trusts and may issue implementing regulations.

**Art. 20:** The trust agreement must include the provisions set forth in Article 4 and the

terms and conditions of the certificates of participation or debt securities.

## Chapter V

### Certificates of Participation and Debt Securities

**Art. 21:** The certificates of participation are issued by the trustee. Debt securities guaranteed by the trust property may be issued by the trustee or by a third party, as applicable. Certificates of participation and debt securities may be issued to in bearer form, endorsable or not, or may be book-entry securities according to Article 8 and Law 23,576 (as amended by Law 23,962.) Certificates shall be issued based on a prospectus specifying the terms and conditions and including any statement that be necessary for the identification of the trust they belong to, together with a brief description of the rights granted therein.

Global certificates may be issued for their registration with collective depositories. For that purpose, they shall be regarded as final, negotiable and divisible.

**Art. 22:** Various types of certificates of participation granting different rights may be issued. Each type shall grant the same rights. The issuance may be divided into series.

## Chapter VI

### Insufficiency of the Trust Property in the Financial Trust.

**Art. 23:** In the financial trust of Chapter IV, in the event of insufficiency of the trust property, and if there is no contractual provision, the trustee shall call a meeting of debt securities holders by the publication of notices in the Official Gazette and in a major newspaper within the jurisdiction of the trustee. Such meeting shall be held within a term of sixty days as from the last publication, and it shall decide on the management and liquidation rules for the trust.

**Art. 24:** The rules referred to in the previous Article may provide for:

a)  The transfer of the trust ownership as a unit to another company having a similar business;
b)  The amendments of the issuing contract, which may include debt exemptions, or changes in the initial terms, methods or conditions;
c)  The continuity of the management of the trust ownership until the termination of the trust;
d)  The form of disposal of the assets of the trust property;
e)  The appointment of the person who shall be in charge of selling the assets as a unit or the assets that comprise it;
f)  Any other matter as the meeting may establish regarding the management or liquidation of the separate estate.

The meeting will be regarded as validly constituted when holders representing at least two-thirds of the issued and outstanding capital are present; holders may be represented by a power of attorney duly certified by notary public, legal authority or bank; no legalization is required.

Agreements shall be adopted by the favorable vote of holders of securities representing, at least, the absolute majority of the issued and outstanding capital; except for the issues referred to in subsection b), where the majority will be two-thirds (2/3) of the issued and outstanding securities.

If there is no quorum on the first call, a new meeting must be held within the thirty (30) days following the date established for the adjourned meeting. The second meeting shall be deemed valid with the holders of securities present. Agreements shall be adopted by the favorable vote of securities representing, at least, the absolute majority of the issued and outstanding capital.

## Chapter VII

## Termination of Trusts

**Art. 25:** The trust shall be terminated by:

a)  The fulfillment of the period or condition to which it was subject or the expiration of the maximum legal term;
b)  The revocation by the settlor, if that power has been expressly reserved; the revocation shall not have retroactive effect;
c)  Any other grounds contemplated in the agreement.

**Art. 26:** Upon termination of the trust, the trustee shall be compelled to deliver the trust property to the residual beneficiary or the successors thereof, granting the instruments and contributing to the corresponding registry entries.



**PUBLIC DEBT**

**Law 27,249**

**Laws 26,017, 26,547, 26,886 and 26,984. Repealed. Law 27,198. Modified.**

**Passed: March 31, 2016**

**Enacted: March 31, 2016**

The Senate and Chamber of Deputies of the Argentine Nation gathered in Congress, etc. pass into

Law:

**ARTICLE 1st** - Laws 26,017, 26,547, 26,886, 26,984 and their supplementary rules and regulations, as well as any other laws, decrees or rules that are contrary to or incompatible with the provisions hereof, are hereby repealed.

**ARTICLE 2nd** - The ratification of the agreements referred to in Article 5th, the authorization granted to the Enforcement Authority in Article 6th, as well as the provisions in Articles 7th, 8th, 9th, 10th, 11th, 12th, 13th and 15th, all of this law, shall take effect upon confirmation by the United States Court of Appeals for the Second Circuit of the lifting of all injunctions issued against the Argentine Republic.

**ARTICLE 3rd** - Article 42nd of Law 27,198 is hereby modified and shall henceforth read as follows:

Article 42nd : The Executive Branch is authorized, through the Ministry of Treasury and Public Finance, to pursue the normalization of the public debt services referred to in Article 41st of this law, under the terms of Article 65th of Law 24,156 -Financial Administration and National Public Sector Control Systems- and modifications to it or to the Public Debt Normalization and Credit Recovery Law, thus empowering the Executive Branch to continue negotiations and to perform all such acts as may be necessary to bring said process to conclusion.

The Ministry of Treasury and Public Finance shall provide the Honorable National Congress quarterly status reports on the progress of discussions and accords arrived at during the negotiation process.

Said reports shall include an up-to-date database identifying the agreements that have been reached, the court or arbitral suits that have been terminated, the amounts of principal and the amounts paid or to be paid in each settlement and how much of the debt issuing capacity authorized in Article 7th of the Public Debt Normalization and Credit Recovery Law has been used.

In addition, certified copies of the agreements that have been reached, as well as their translation into Spanish as necessary, shall also be included.

With same periodicity, the Ministry of Treasury and Public Finance shall report on the progress of actions aimed at normalizing debt service on the government bonds issued within the framework of the public debt restructuring provided for in Decrees 1735/2004 and 563/2010.

Final judgements issued against the provisions of law 25,561, Decree 471 dated March 8, 2002 and their supplementary regulations affecting those bonds, are included in the deferral indicated in Article 41st hereof.

**ARTICLE 4th** - In the event that the provisions proposed in Article 2nd of this law do not enter into effect for reasons set forth in said Article, the Enforcement Authority may undertake further negotiations with those bondholders (and/or their representatives) that were eligible for the exchange provided for in decree 1734 dated December 9, 2004 and its supplementary regulations, but were not presented for that exchange or the one under Decree 563 dated April 26, 2010 (Eligible Public Bonds), provided that any agreements the Enforcement Authority may sign with those creditors and any repayment and/or restructuring proposals the Enforcement Authority may extend shall be subject to approval by the National Congress.

**ARTICLE 5th** - The repayment agreements entered into and between the Argentine Republic and the holders of Eligible Public Bonds (and/or their representatives), which as Appendix I, an English copy and its translation into Spanish are included, are an integral part of this law, are hereby ratified.

The Ministry of Treasury and Public Finance is hereby authorized, as the Enforcement Authority under this law, to extend the maturity deadlines set forth in said repayment agreements.

**ARTICLE 6th** - The Enforcement Authority is authorized to:

i) Enact amendments and/or addenda to the repayment agreements referred to in the preceding Article as long as same do not modify their purpose, their financial conditions and their terms and conditions; and,

ii) Carry out any actions that may be needed to repay the debt with the holders of Eligible Public Bonds (and/or their representatives) that were not covered by the repayment agreements referred to in the preceding Article, including subscribing agreements and other instruments.

1/4

In order to give effect to subscribing the agreements referred to in the preceding paragraph, the Enforcement Authority may offer:

a) To all holders of Eligible Public Bonds, a payment equivalent to the amount of principal owed on their bonds plus fifty percent (50%) of said amount of principal (Base Offer). In no case may the amount to be paid be higher than the amount recognized in any judgment issued in regard to said bonds, plus the updated legal amount for statutory interest as of January 31, 2016.

The Base Offer shall be formalized and implemented by:

i) The signing of debt payment agreements; and

ii) A national and international offer of payment in cash against delivery of the Eligible Public Bonds ("cash tender offer", according to its denomination in English language).

For holders of Eligible Public Bonds who initiated claims in the United States District Court for the Southern District of New York, as members of a class-action suit, there is authorization to agree to an additional amount to settle the administrative expenses needed to notify the members of that class, under the terms of the Agreement provided for in paragraph 4 of Appendix I.

The National Executive Branch will not assume any additional expense or charge with respect to the remaining holders of Eligible Public Bonds encompassed in the Base Offer;

b) To those holders of Eligible Public Bonds whose claims were covered by the court orders issued by the United States District Court for the Southern District of New York on February 23, 2012, and modified on November 21, 2012 (the "Original "Pari Passu" Order") and on October 30, 2015 (the "Me Too "Pari Passu" Order" and, together with the Original "Pari Passu" Order, the "Pari Passu Orders"), the Base Offer stipulated in section a) above, or, at their election, the following proposal (the ""Pari Passu" Offer"):

i) To those holders of Eligible Public Bonds included under the "Pari Passu" Orders, which had a monetary judgment declared before February 1, 2016, recognizing the debt arising from the Eligible Public Bonds they hold, a payment equivalent to seventy percent (70%) of the legal claim (which includes the amount recognized in said judgment plus legal interests accruing from the date of the judgment through January 31, 2016), and

ii) To those holders of Eligible Public Bonds included under the "Pari Passu" Orders that did not have a monetary judgment declared before February 1, 2016, recognizing the debt arising from the Eligible Public Bonds they hold, a payment equivalent to seventy percent (70%) of the legal claim (including the principal owed plus accrued amounts at the contractual interest rate and the statutory interest rate on the contractual interest rate through January 31, 2016, pursuant to the laws of the State of New York, United States of America).

**ARTICLE 7**th – Provisions are to be made, through the Enforcement Authority and as subject to this law, to issue National Treasury bonds and/or enter into contracts for other government borrowings for up to an original face value of US dollars and/or its equivalent in other currencies, that may be needed to meet the required payments under this law as long as such payments do not exceed the sum of twelve billion five hundred million US dollars (USD 12,500,000,000) and/or its equivalent in other currencies, thereby expanding, consequently, the General National Budget for Fiscal Year 2016 approved by Law 27,198.

The Enforcement Authority shall allocate the proceeds of the issuances referred to in the preceding paragraph to the debt repayments provided for in this law. In the event that the issuance amount exceeds the payment amount required under this law, the overage will be charged against the existing authorization for public debt provided for in the General Budget of the National Administration for Fiscal Year 2016, approved by law 27,198.

**ARTICLE 8**th - Holders of Eligible Public Bonds who wish to participate in a repayment transaction that may be held within the framework of this law, including the creditors who signed the agreements in Appendix I and those who accept the proposals set forth in Article 6th, must waive all other rights they may have under the bonds in question, including any rights that may have been recognized in any legal or administrative ruling, arbitration award or decision by any other authority, regardless of jurisdiction, and waive and release the Argentine Republic from any legal, administrative, arbitration or other type of proceeding that has been initiated or may be initiated in the future in relation to the bonds in question or to the obligations of the Argentine Republic that arise from them, including any actions intended to collect principal or interest service on said bonds or any other added appurtenant accrual or expense.

**ARTICLE 9**th - The Enforcement Authority is authorized to include clauses establishing the extension of jurisdiction to foreign courts, and that providing for a waiver of the right to raise the defense of sovereign immunity, exclusively, with respect to the jurisdiction being extended and in relation to the agreements that may be signed and issuances of public debt that may be undertaken, as set forth in this law and subject to the inclusion of the so-called "collective action clauses" and "pari passu" clause, in accordance with current practices on international capital markets.

The waiver of the right to raise the defense of sovereign immunity shall not imply that there has been a waiver of immunity by the Argentine Republic with regard to an attachment of the property listed below:

a) Any Central Bank of Argentina reserves;

b) Any property belonging to the public domain located in the territory of the Argentine Republic, including those covered by Articles 234 and 235 of the Federal Civil and Commercial Code;

c) Any property located within or outside the Argentine territory that might provide an essential public service;

2/4

d) Any property (whether in the form of cash, bank deposits, securities, third-party obligations or any other method of payment) owned by the Argentine Republic, its government agencies and other government entities related to the implementation of the budget, within the scope of Articles 165 to 170 of the Permanent Supplemental Budgetary Law N° 11,672 (t.o.2014);

e) Any property attained by the privileges and immunities of the 1961 Vienna Convention on Diplomatic Relations and the 1963 Vienna Convention on Consular Relations, including, but not limited to, property, establishments and accounts of Argentine missions;

f) Any property used by a diplomatic, governmental or consular mission of the Argentine Republic;

g) Taxes and/or royalties owed to the Argentine Republic and the rights of the Argentine Republic to collect taxes and/or royalties;

h) Any property of a military nature or under the control of a military authority or defense agency of the Argentine Republic;

i) Any property that makes up part of the cultural heritage of the Argentine Republic; and

j) Property protected by any law of sovereign immunity that might apply.

**ARTICLE 10th** - The Enforcement Authority is authorized to undertake all necessary acts necessary to fulfill the provisions of this law, including, but not limited to, to:

a) Setting the time periods and deadlines for participating in the debt repayment offers;

b) Setting the time periods, deadlines, methods and procedures for issuing the new public bonds;

c) Appointing the financial institutions that will be participating in the placement of the new public bonds and entering into contracts for other public credit borrowings;

d) Signing agreements with financial entities placing the new public bonds to be issued, and providing, for such purposes, for the payment of commissions at market conditions, but which in no event may exceed zero point twenty percent (0.20%) of the amount of issuance;

e) Preparing and registering a program of public bonds with the organizations that control the leading international capital markets;

f) Signing agreements with fiduciary agents, payment agents, information agents, custody agents, registration agents and risk rating agencies as may be needed for both the debt repayment transactions and the issuance and placement of the new public bonds, and providing for the payment of corresponding fees and expenses in market conditions; and

g) Paying additionally registration, printing, leaflet distribution, translation and other necessary related expenses, all of which must be at market conditions, in order to fulfill the provisions of this law.

**ARTICLE 11th** - The transactions covered by this law are exempt from the payment of all federal taxes, fees and assessments that may exist now or be instituted in the future, and from currency exchange restrictions that might apply to the transactions contemplated in this law.

**ARTICLE 12th** - The transactions covered by this law are exempt from the provisions of Articles 7th and 10th of Law N° 23,928 and amendments thereto, and from the provisions of Article 765 of the Federal Civil and Commercial Code.

**ARTICLE 13th** - The Enforcement Authority shall, within sixty (60) days of performance of the condition in Article 2nd hereof, adopt all necessary measures intending to normalize the servicing of public bonds issued within the framework of the public debt restructuring determined by Decrees 1735, dated December 9, 2004, and 563, dated April 26, 2010 (hereinafter the "Restructured Public Bonds"), including:

i) The normalization of the situation of The Bank of New York Mellon as fiduciary agent under the Trust Agreement dated June 2, 2005, amended on April 30, 2010 (the "Trust Agreement");

ii) If necessary, to hire another institution that fulfills the fiduciary agent's duties as established by the Trust Agreement; and

iii) The issuance of instructions that may be needed to process the transfer of funds deposited in the "Law N° 26,984 Sovereign Payment of Restructured Debt Fund" ["Fondo Ley N° 26.984 Pago Soberano de Deuda Reestructurada" in Spanish] of Nación Fideicomisos Sociedad Anónima at the Central Bank of Argentina, to the corresponding accounts at The Bank of New York Mellon, or to the entity that replaces it as a fiduciary agent under the Trust Agreement, in the Central Bank of Argentina, in order to apply them to the payment of said bonds. Until such time that the contractual situation with The Bank of New York Mellon as fiduciary agent under the trust agreement is normalized, the Enforcement Authority may transfer the corresponding funds for future maturity dates of the Restructured Public Bonds to Nación Fideicomisos Sociedad Anónima, the entity hereby appointed as the temporary payment agent (for which purpose, the Enforcement Authority shall reach an agreement with said entity as to the terms of such appointment), for subsequent transfer to the fiduciary agent under the Trust Agreement, not implying the provisions of this Article any amendment whatsoever to said Trust Agreement.

**ARTICLE 14th** - In the event that the provisions contemplated in Article 2nd of this law do not enter into force for reasons provided for in said Article, the Enforcement Authority may transfer the funds allocated to future maturities of the Restructured Public Bonds to Nación Fideicomisos Sociedad Anónima as the temporary payment agent for subsequent transfer to the fiduciary agent under the Trust Agreement, not implying the provisions of this article any amendment whatsoever to said Trust Agreement.

# SPA-73

5/19/2019

**ARTICLE 15th** - The Ministry of Treasury and Public Finance is hereby appointed as the Enforcement Authority of this law, allowing it to issue any clarifications or supplementary rules that may be necessary to cause the fulfillment of this law.

**ARTICLE 16th** - The Chief of the Cabinet of Ministers has the power to make any budgetary adjustments that are relevant to fulfill the provisions of this law.

**ARTICLE 17th** - The payments anticipated in this law shall be charged to the budget item "Public Debt Expenses and Commissions" of Jurisdiction 90.

**ARTICLE 18th** – Under the scope of the Honorable National Congress, a Standing Bicameral Committee to Monitor and Oversee the Contract Arrangements and Payment of the Nation's Foreign Debt is hereby created, and it shall be comprised of ten (10) Senators and ten (10) Deputies, appointed by the Speakers of the respective Chambers from nominees proposed by the parliamentary blocks in proportion to their political representations, and which shall be governed by the internal rules of operation as may be established for it and whose primary purpose shall be to monitor the progress, management and payments of the Nation's foreign debt.

The Committee may request information, documentation or data from national, provincial or municipal agencies, whether centralized, de-centralized or independent, and from both national and international financial entities, whether public or private; and any other organization as may be necessary to fulfill its duties.

**ARTICLE 19th** – This law is public policy and shall take effect on the date of its publication in the Official Gazette.

**ARTICLE 20th** – The EXECUTIVE BRANCH is so notified.

PASSED IN THE SESSION ROOM OF THE ARGENTINE CONGRESS, IN BUENOS AIRES, ON THE THIRTY-FIRST DAY OF MARCH, TWO THOUSAND SIXTEEN.

-ENTERED UNDER N° 27249-

FEDERICO PINEDO. – EMILIO MONZÓ. – Eugenio Inchausti. – Juan P. Tunessi.

NOTE: The Appendix or Appendices that are an integral part of this Law are published on the online edition of the BORA – www.boletinoficial.gov.ar- and may also be viewed at the Main Office of this National Department (Suipacha 767 – Autonomous City of Buenos Aires).

SPA-74

**Civil and Commercial Code Law**

**Art. 958**: Freedom of the parties to enter into contracts. The parties are free to enter into any agreement and to determine its content, within the limits established by the law, the public policy, the moral and the good manners.

**Civil and Commercial Code Law**

**Art. 959**: Binding effect. Every valid contract entered into is binding for the parties. Its content may only be modified or extinguished by the parties' agreement or in the cases provided by law.

**Civil and Commercial Code:**

Excerpts from the Third Book- Individual Rights, Title IV- Contracts in Particular

(...)

**Chapter 30**

**Trust**

*Section 1st*

*General Provisions*

**Art. 1666**: Definition. A trust agreement takes place when one party, known as the settlor, transfers or commits to transfer assets to another individual designated as trustee, who commits to manage it in the interest of a designated beneficiary named in the agreement, and to transfer it to the residual beneficiary upon a specified term or condition having been met.

**Art. 1667**: Contents. The agreement must contain the following:

a) A description of the assets that are the subject of the agreement. If such description cannot possibly be provided upon the date of the trust's execution, a listing of the requirements and characteristics that the assets must satisfy will be required;
b) A determination of the manner in which other assets may be incorporated into the trust, if applicable;
c) The terms or conditions to which the fiduciary ownership is subject;
d) A listed beneficiary or evidence thereof, in accordance with Article 1671;
e) The recipient of the assets upon termination of the trust, indicating the residual beneficiary to whom it shall be transferred or instructions to determine it, in accordance with Article 1672; and
f) The trustee's rights and responsibilities and the way to appoint its replacement, should it change.

**Art. 1668:** Term. Condition. The trust cannot last more than thirty years as from its execution, except if the beneficiary has incapacity to enter into a contract or has limited abilities declared by law, in which case the trust can last until the incapacity or the limitation to their abilities conclude, or their death. If the parties agree to a longer term, it will be reduced to the maximum term provided. Once the condition is fulfilled or thirty years have passed since the execution of the contract without it being fulfilled, the trust terminates, and the assets must be transferred by the trustee to whoever was appointed in the contract. If there is no stipulation, the assets must be transferred to the settlor or their successors.

**Art. 1669:** Formality. The trust agreement, which must be registered in the corresponding Public Registry, may be done in a public or private instrument, except when the trust assets being transferred require a public instrument. In such case, when the formality is not complied with, the agreement counts as a promise to enter into the trust. If these kinds of assets are incorporated to the trust following the execution of the agreement, the complying with the formalities required for their transfer is sufficient. Such act must be registered in the trust agreement.

**Art. 1670:** Object. The object of the trust agreement may be any assets found in the market,

including general assets, but future inheritances cannot be the object of the agreement.

*Section 2nd*
*Parties*

**Art. 1671:** Beneficiary. Any individual or legal entity which may or may not exist at the time that the agreement is issued may be a beneficiary; in the event of the latter, information must be provided to allow their future identification. Settlors, trustees, and/or residual beneficiaries may be beneficiaries.

Multiple beneficiaries may be designated in equal parts, unless otherwise stipulated; in the event that one or more designated beneficiaries refuse or resign their status as such, or any of them do not exist, a right to accretion from the others may be established, or substitute beneficiaries may be designated if required.

In the event that no party accepts their designation as beneficiary, all beneficiaries resign, or none exist, the residual beneficiary shall be the designated beneficiary. If the residual beneficiary also resigns, refuses, or does not exist, the settlor will be designated as beneficiary.

Even if refused, beneficiary rights may be conferred by *inter vivos* or *mortis causa* transactions, unless otherwise stipulated by the settlor. In the event that death extinguishes a designated beneficiary's status, the regulations contained in the preceding para graphs will apply.

**Art. 1672:** Residual beneficiary. The residual beneficiary is the person to whom any remaining assets of the trust are transferred to upon its termination. It can be the settlor, the beneficiary, or a different person. The residual beneficiary cannot be the trustee.

The provisions in the first, second and third paragraph of article 1671 apply to the residual beneficiary.

If none of the residual beneficiaries accept, all resign or do not exist, the residual beneficiary will be the settlor.

**Art. 1673:** Trustee. The trustee can be any individual or legal entity.

Only regulated financial institutions authorized to operate as such as well as any legal entity registered as financial trustee with the Securities Commission, may act as trustee of financial trusts that are authorized to publicly offer its securities.

The trustee may be beneficiary. In such case, it must avoid any conflict of interest and must act giving priority to the remaining parties of the contract.

**Art. 1674:** Standard of Duties. Joint and Several Liability. The trustee must comply with the obligations established in the law and the trust agreement, acting with the discretion and diligence of a good businessman honoring the confidence that has been placed in him.

In the case where more than one trustee is designated to act simultaneously, jointly or otherwise, they will have joint and several liability for complying with the trust agreement.

**Art. 1675:** Reporting. Reporting may be requested by the beneficiary, by the settlor or by the residual beneficiary, in accordance to the law and the provisions regulated in the agreement; the accounts must be settled with a frequency not longer than a year.

**Art. 1676:** Prohibited Exemptions. The agreement cannot exempt the trustee from its reporting obligation, nor from its negligence or willful misconduct in which it or its dependents may incur, nor from the prohibition to acquire the trust assets for itself.

**Art. 1677**: Expense Reimbursements. Remuneration. Unless otherwise stipulated, the trustee has the right to the reimbursement of expenses and to a remuneration, both in charge of whoever is stipulated in the agreement. If the remuneration is not fixed in the agreement, the court must fix it taking into account the nature of the trustee's duties, the significance of the duties, the effectiveness of the trustee's administration and other circumstances in which the trustee acts.

**Art. 1678:** Finalization of the Trustee. The trustee ceases to act as such due to:

a)  Judicial removal for breach of obligations, or for being physically or legally unable to perform its duties, at the request of the settlor; or at the request of the beneficiary or the residual beneficiary, with a summons of the settlor;
b)  Legally stated incapacity, disqualification, or limited abilities, and death, if it were an individual.
c)  Dissolution, if it were a legal entity; this provision shall not be applied in case of merges or take-overs, notwithstanding the application of the subsection a), if applicable;
d)  Bankruptcy or liquidation;
e)  Resignation, if the agreement had expressly authorized it, or in case of justified cause or physical or legal inability to comply with their duties; the resignation shall be effective after the trust property has been transferred to the substitute trustee.

**Art. 1679:** Substitution of the Trustee. Upon finalization of the trustee, it shall be replaced by the substitute appointed in the agreement or the person designated in accordance with the procedure provided by the trust. If there is no substitute, or the substitute does not accept the appointment, the court must appoint one of the authorized entities to act as trustee in pursuant to article 1690.

Upon death of the trustee, those interested may dispense with the judicial intervention, granting those necessary acts in order to transfer the assets.

For the remaining cases provided in subsections b), c) and d) of article 1678, those interested can request the court to verify the existence of legal grounds and inform who the substitute is or the procedure for its designation, in accordance with the agreement and the law, by the shortest proceeding established under local procedure regulations. In every case provided in article 1678, the court may, upon request of the settlor, the beneficiary, the residual beneficiary or creditor of the separate estate, appoint a temporary judicial trustee or issue injunctions in order to protect the estate, if there was danger in any delay.

If the appointment of the new trustee is made with judicial intervention, the settlor must be heard.

The trust assets must be transferred to the new trustee. If the assets need registration, it is sufficient with the court, public notary or private authenticated instrument in which

the appointment of the new trustee is recorded. Such recording may also be requested by the new trustee.

**Art. 1680:** Guarantee Trust. If the trust is constituted with guarantee purposes, the trustee may apply any estate proceeds, including those derived from judicial or extrajudicial collection of the credits or trust rights, to pay the guaranteed loans. Regarding other assets, in order to be applied for repayment, the trustee may apply them as provided in the agreement and, if there is no agreement regarding those assets, in a private or judicial manner, ensuring a procedure that procures to obtain the highest possible value for the assets.

**Art. 1681:** Acceptance of the Beneficiary and the Residual Beneficiary. Fraud. To receive the benefits of the trust, the beneficiary and the residual beneficiary must accept their roles as such.

Such acceptance is presumed when they are part to the trust agreement, when their acts unequivocally imply it or they are holders of certificates of participation or debt securities in financial trusts.

If there is no acceptance in such terms, the trustee may request such acceptance in an authenticated act setting a reasonable deadline for that purpose. If the acceptance is not given, they must submit a petition to the court to request it without further delay, fixing the most adequate way to give notice to those interested.

The beneficiary and the residual beneficiary may, depending on their interests, claim the due fulfillment of the agreement and the revocation of the trustee's acts committed with fraud, notwithstanding the rights of third parties that act in good faith.

*Section 3rd*
*Effects*

**Art. 1682:** Fiduciary Ownership. The assets transferred in trust will be subject to fiduciary ownership pursuant to the provisions of this Chapter and all provisions relative to the nature of the assets.

**Art. 1683:** Effectiveness Against Third Parties. The trust nature of the property will be effective against third parties upon the fulfillment of any required formalities, depending on the nature of the respective assets.

**Art. 1684:** Registration. Incorporated assets. If assets are registrable, the corresponding records must reflect the fiduciary status of the ownership under the trustee's name.

Unless otherwise stipulated in the agreement, the trustee shall acquire fiduciary ownership of the profits and proceeds of the assets in trust and the assets acquired with such profits and proceeds, or by the subrogation on such assets, which must be recorded on the title deed and on all pertinent records.

**Art. 1685:** Separate Estate and Insurance. The assets in trust are kept separated from the estates of the trustees, settlors, beneficiaries and the residual beneficiaries.

Notwithstanding their responsibilities, trustees are required to contract liability insurance

to cover damages caused by the assets that are in the trust. Insurance must be contracted for the risks and amounts set forth by the regulations in effect, or whatever is deemed reasonable, in the absence of such regulations. Under the terms of article 1757 and related articles, trustees will be held liable in the event that no insurance has been contracted or the coverages for risks or amounts are deemed inadequate.

**Art. 1686:** Creditors' Entitlement to Sue. The trust assets are exempt from any individual or joint action by the trustee's creditors. The settlor's creditors may not attack the trust property, except in the event of fraud or during the suspicious period. The beneficiary's creditors and those of the residual beneficiary may subrogate in the rights of its debtors.

**Art. 1687:** Debts. Liquidation. The trustee's property will not be liable for any obligation arising from the execution of the trust, which will only be met with the trust assets.

Neither the settlor, the beneficiary nor the residual beneficiary will respond for such obligations except in cases where they gave their express commitment.

The provision of this article does not prejudice the responsibility of the trustee for the application of the general principles, if it were applicable.

The insufficiency of the trust assets to meet those obligations, shall not lead to the declaration of its bankruptcy. In such case and in absence of other resources provided by the settlor or the beneficiary pursuant to the terms of the agreement, the trust assets shall be liquidated by the competent court, which must determine the proceeding based on the bankruptcy regulations, in whatever is relevant.

**Art. 1688:** Exercise Rights and Encumbrances. The trustee may dispose of or encumber assets in trust whenever the purpose of a trust so requires, in which case the consent of settlors or beneficiaries is not required.

The agreement may set forth limitations to such rights, including a prohibition on transfers, which must be in the records of all registrable assets. Such limitations shall not be binding on third parties acting in good faith, notwithstanding the corresponding rights of trustees.

In the event that multiple trustees are designated, a joint ownership shall be established in accordance with the provisions of Article 1674, whereby their rights must be exercised jointly by all of them unless contracted otherwise, and no trustee may undertake any partitioning during the term of the trust.

The foregoing does not apply to any disposal made by the trustee in accordance with this provision.

**Art. 1689:** Actions. The trustee is entitled to exercise all necessary actions to defend the trust assets, against third parties, the settlor, the beneficiary, or the residual beneficiary.

The judge may authorize the settlor, the beneficiary or the residual beneficiary to exercise actions instead of the trustee, when the latter fails to do so without sufficient cause.

*Section 4th*
*Financial trust*

**Art. 1690:** Definition. A Financial trust is any trust subject to the prior provisions, in which the trustee is a financial institution or a company specially authorized by the capital market's regulatory authority to act as financial trustee, and whose beneficiaries are the holders of securities guaranteed by the property so transferred.

**Art. 1691:** Securities. Public Offering. The securities referred to in article 1690 may be publicly offered in the terms of the securities public offer regulations. In that case, the capital market's controlling authority will be the regulatory authority regarding financial trusts, who may issue regulations that include the specification of the formalities to comply with to act as trustee.

**Art. 1692:** Financial Trust Content. Formality. Term. In addition to the general trust formalities included in article 1667, the financial trust must include the terms and conditions for the issuance of the securities, the rules for the decision making by the beneficiaries that include provisions in case of insufficiency or insolvency of the trust property, and the name or particular identification of the financial trust.

The obligation to register trusts provided in article 1669 will be fulfilled with the authorization for public offering in those financial trusts constituted pursuant to article 1691, in accordance with the procedure that the capital market's controlling authority may establish.

The maximum term for trusts provided in article 1668 will not apply to financial trusts that publicly offer their securities and have as purpose the securitization of mortgage loans and/or equivalent instruments, in accordance with the regulations the capital market's controlling authority may issue.

*Section 5th*
*Certificates of Participation and Debt Securities*

**Art. 1693:** Issuance and Characteristics. Global certificates. Notwithstanding the ability to issue atypical securities, in accordance with the terms of article 1820, the certificates of participation are issued by the trustee. Debt securities guaranteed by the trust assets may be issued by the trustee, the settlor, or by third parties. The certificates of participation and the debt certificates may be issued in bearer form, endorsable or not, or may be book-entry certificates, according to the relevant regulations.

The certificates must be issued based on a prospectus which shall contain the conditions of the issuance, the necessary statements in order to identify the trust to which they belong, and a description of the rights they provide.

Global certificates regarding the certificates of participation and debt certificates may be issued, for their registration with collective depositories. For that purpose, they shall be regarded as final, negotiable and divisible.

**Art. 1694:** Types. Series. Different types of certificates of participation or debt securities may be issued, granting different rights. Each type of certificate must grant the same right. The issuance can be divided into series. The debt securities give their holders the right to an executive claim.

*Section 6th*

*Debt Securities and Certificates of Participation Holders' Meeting*

**Art. 1695:** Holder's Meeting. In the absence of agreement to the contrary, or capital market's regulatory authority regulations, the collective decisions of the beneficiaries of financial trusts which publicly offer their securities must be adopted by a holder's meeting, to which the regulations for convening, quorum, operation and majorities of a company will apply, except in case when the meeting deals with the insufficiency of the trust estate or the restructuring of payments to the beneficiaries. In the latter, the regulations regarding the extraordinary meetings for companies will apply, but no decision will be considered valid without the consent of three-quarter of the securities issued and outstanding.

**Art. 1696:** Calculations. In case of existence of debt securities and certificates of participation in the same financial trust, the quorum and majorities will be calculated over the joint nominal value of the securities outstanding. However, unless otherwise stipulated in the agreement, no decision regarding the insufficiency of the trust estate or the restricting of the payments to the beneficiaries will be valid without the consent of three-quarter parts of the of the debt securities issued and outstanding, without taking into account subordinated debt securities.

*Section 7th*
*Termination of the Trust*

**Art. 1697:** Grounds. The trust will be terminated by:

a)  The fulfillment of the period or condition to which it was subject to or the expiration of the maximum legal term;
b)  The revocation by the settlor, if that power had been expressly reserved; the revocation will not have retroactive effects; the revocation will be ineffective in the financial trusts after the certificates of participation and the debt securities have been publicly offered.
c)  any other ground provided in the agreement.

**Art. 1698:** Effects. Upon termination of the trust, the trustee shall be compelled to deliver the trust assets to the residual beneficiary or their successors, granting the instruments and contribution to the corresponding registry entries.

*Section 8th*
*Trust by Will*

**Art. 1699:** Applicable Regulation. The trust may also be constituted by will, which shall include, at least, the formalities provided in article 1667.

Articles 2448 and 2493 and the provisions of this chapter apply; those provisions referring to the trust must be considered referred to the will.

In the event that the trustee appointed by will does not accept its designation, the provisions in article 1679 apply.

The maximum term established in article 1668 will start counting as from the death of the settlor.

**Art. 1700:** Annulment. A trust constituted with the purpose that the trustee be obliged to keep or manage the trust estate in order to be transferred only after his death to another

trustee that may or may not exist at the time will be null and void.

### Chapter 31

### Trust Ownership

**Art. 1701:** Trust Ownership. Definition. The trust ownership is acquired due to the constitution of a trust by agreement or by will, and is subject to last only until the termination of the trust, with the purpose to transfer the assets to whoever is appointed in the agreement, in the will or by law.

**Art. 1702:** Applicable Law. The provisions for *in rem* rights in general are applicable to the trust property and, particularly, to the trust ownership, contemplated in Titles I and III of the Fourth Book of this Code.

**Art. 1703:** Exceptions to the General Rules. The trust ownership constitutes an exception to the general ownership rules and, particularly, the conditional ownership as long as it is possible to include in the trust the limitations to the power of the owner contemplated in Chapter 30 and in this Chapter.

**Art. 1704:** Powers. The holder of the trust ownership has the same powers over it as the owner, as long as the acts of the trustee suit the purpose of the trust and the agreement provisions.

**Art. 1705:** Non-retroactivity. The termination of the trust property does not have retroactive effect regarding the trustee's acts, except those acts are not suitable with the trust purposes and with the agreement provisions, and that the third party acquirer lacks good faith and valuable consideration.

**Art. 1706**: Reacquisition of the Conditional Ownership. Once the trust in terminated, the trustee automatically becomes the holder of the assets under the name of the owner. If the asset is registrable and the registration is necessary in order to constitute the trust, the reacquisition must be registered; if the registration is not required in order to constitute the trust, it will be required for its enforceability vis-à-vis third parties.

**Art. 1707:** Effects: When the termination does not have retroactive effects, all the acts carried by the trustee may be enforceable against the owner.

If the termination has retroactive effects the owner reacquires the ownership free of any acts performed by the trustee.